```
 1            IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION

 3      UNITED STATES OF AMERICA,    )
                                     )
 4                 Plaintiff,        )
                                     ) Case No. 3:17-cr-00025
 5           v.                      )
                                     ) WAVERLY D. CRENSHAW, JR.
 6      ROBERT ELLIS WADDEY,         ) CHIEF DISTRICT JUDGE
                                     )
 7                 Defendant.        )
                                     )
 8                                   )
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9               EXCERPT OF PROCEEDINGS

10                SENTENCING HEARING

11 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
   BEFORE:                WAVERLY D. CRENSHAW, JR.
13                         CHIEF DISTRICT JUDGE

14 DATE:                   February 5, 2018

15 TIME:                   9:34 a.m.
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16
   APPEARANCES:
17
   FOR THE GOVERNMENT:     Mr. Brent Adams Hannafan
18                         Nashville, Tennessee 37203

19
   FOR THE DEFENDANT:      Mr. Edward M. Yarbrough
20                         Nashville, Tennessee 37219

21

22
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
23 LISE S. MATTHEWS, RMR, CRR, CCP
   Official Court Reporter
24 837-A U.S. Courthouse
   Nashville, TN 37203
25 lise_matthews@tnmd.uscourts.gov
```

1          I N D E X

2          Monday, February 5, 2018

3

4          INDEX OF WITNESSES

5
WITNESSES:                                              PAGE

6

7    DANIEL RUSSELL PULLEY
         DIRECT EXAMINATION BY MR. YARBROUGH              7
8        CROSS-EXAMINATION BY MR. HANNAFAN               14
         REDIRECT EXAMINATION BY MR. YARBROUGH           20
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came on to be heard on

2  February 5, 2018, before the Honorable Waverly D. Crenshaw,

3  Jr., Chief District Judge, when the following proceedings

4  were had, to-wit:

5          THE COURT:  All right.  Be seated.

6          All right.  We're here on Case 17-25, United

7  States of America versus Robert Ellis Waddey, and

8  Mr. Waddey's here in the courtroom.  If counsel can introduce

9  themselves.

10         MR. HANNAFAN:  Good morning, Your Honor.  Brent

11  Hannafan on behalf of the United States.

12         MR. YARBROUGH:  May it please the Court, Ed

13  Yarbrough on behalf of Mr. Waddey.  And I would like to

14  introduce to the Court Zachary Lawson.  He's a recent

15  graduate of Vanderbilt Law School.  He's been admitted to the

16  bar of the United States and to the practice in the federal

17  court.

18         THE COURT:  All right.  Well, welcome Mr. Lawson.

19         MR. LAWSON:  Thank you.

20         THE COURT:  All right.  Mr. Waddey, we're here

21  today for sentencing.  In preparation I've reviewed the

22  indictment, the plea agreement, the government's sentencing

23  position, Document 24, the sentencing position submitted on

24  your behalf, Document 25.  I've read the letters attached to

25  that document, especially the letters from your parents,

1  attached to the sentencing position, Document 21 -- 25-1, and

2  then the presentence report.  Have you seen and read all of

3  those documents?

4          THE DEFENDANT:  No, sir, Your Honor.

5          MR. YARBROUGH:  Yes, you have.

6          THE DEFENDANT:  Oh, yes, sir.  Yes, sir, I have.

7          THE COURT:  Okay.  Do you want more time to review

8  those documents?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  Have you had time to talk to your

11  counsel about what those documents may mean to you?

12          THE DEFENDANT:  Yes, sir, Your Honor.

13          THE COURT:  Okay.  And you have good communication

14  with your counsel?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Any complaints about their services?

17          THE DEFENDANT:  No, sir.

18          THE COURT:  All right.  So are we ready to proceed

19  with the sentencing, from the Government's standpoint?

20          MR. HANNAFAN:  Yes, Your Honor.

21          THE COURT:  On July the 7th Mr. Waddey and his

22  attorney appeared and entered a plea of guilty to Count One

23  of the indictment, dated February 16, 2017, charging him with

24  making an interstate threat to injure another person,

25  specifically law enforcement persons.  The parties also

entered into a plea agreement governed by Federal of Criminal
Procedure 11(c)(1)(B) recommending to the Court an offense
level of ten and further upon sentencing the defendant as to
Count One the Government would dismiss Count Two.  Count Two
charges him with being an unlawful user of controlled
substance, also in possession of firearms.

We're here today for sentencing, to identify the
guideline range from the sentencing guidelines,
identification of any departures and variances, but most
importantly application of the factors in 3553(a).

Now, Mr. Waddey, let me go back to the presentence
report.  Did you get a copy of the presentence report dated
November the 20th, 2017?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  And have you read every page in that
report?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  And talked to your attorney about it?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  Okay.  I understand there are no
objections to the report, from the Government?

MR. HANNAFAN:  That's correct, Your Honor.

THE COURT:  Or from the Defendants?

MR. YARBROUGH:  That's correct, Your Honor.

THE COURT:  So I'm going to accept the facts

contained in the presentence report as true and rely upon them here today for sentencing.

Now, Mr. Waddey, I need to advise you that the maximum penalty under statute is no more than five years of imprisonment, supervised release up to three years. Probation is authorized for a period of one to five years. You're also subject to a fine up to $250,000 and a mandatory $100 special assessment.

Do you understand that I can sentence you up to the statutory maximums here?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: Let's talk about the guideline range. It's only one of the several factors under 3553(a). There's no dispute here about that calculation. It appears that we have a final offense level of ten, having given him credit for a two-level reduction. He's not entitled to the third point. There are no criminal history points. So he has a total offense level of ten, criminal history category of one, results in a sentencing range of six to 12 months imprisonment. Probation is authorized under the guideline. The guideline range for supervised release is one to three years. And the guideline range for a fine is $2,000 to $20,000 and there's a special $100 mandatory assessment. Does the government have any objection to the guideline range just announced?

```
 1              MR. HANNAFAN:  No, Your Honor.
 2              THE COURT:  Or the Defendant?
 3              MR. YARBROUGH:  No, Your Honor.
 4              THE COURT:  All right.  Well, Mr. Waddey, this is
 5    the time that the Court welcomes hearing from you or any
 6    other witnesses you and your attorneys want to bring forward.
 7    I'll let you all start, let the Government respond, and then
 8    you get the last word.
 9              MR. YARBROUGH:  May it please the Court, we have
10    one witness, and then Mr. Waddey and I would each like to
11    make a brief statement.
12              THE COURT:  Okay.
13              MR. YARBROUGH:  We call Mr. Russell Pulley.
14
15                       DANIEL RUSSELL PULLEY,
16    called as a witness by Defendant, was duly sworn and
17    testified as follows:
18
19                       DIRECT EXAMINATION
20    BY MR. YARBROUGH:
21    Q.   State your full name to the Court please and spell your
22    last the name.
23    A.   Daniel Russell Pulley, P-u-l-l-e-y.
24    Q.   Mr. Pulley, where do you reside?
25    A.   I reside in Nashville.
```

1  Q.   And currently do you hold any official positions in the
2  Nashville Metropolitan Government?
3  A.   Yes, sir.  I'm a councilman with the Nashville Metro
4  Council.
5  Q.   Prior to becoming a councilman for Metro Nashville, did
6  you have employment in the public sector?
7  A.   Yes, sir.
8  Q.   Tell the Court what that was, please, sir.
9  A.   Well, it spans about 35 or more years.  I started as a
10 firefighter in the city of Chesapeake, Virginia.  I did that
11 for three years.  And subsequent to that I was a police
12 officer in the City of Virginia Beach.  Subsequent to that I
13 was a trooper in Virginia.  And subsequent to that I joined
14 the FBI, was an agent with the FBI here for about 18 years,
15 and then I moved to the US Department of Labor where I worked
16 there until I retired in 2015.
17 Q.   All right, sir.
18      THE COURT:  Hold up.  Let's get the phone taken
19 care of.
20      THE WITNESS:  Oh.  I'm sorry.  I didn't realize --
21 you can just take that coat and put it outside in the
22 hallway, Richard, if you want to.
23 BY MR. YARBROUGH:
24 Q.   Mr. Pulley, upon your retirement from the FBI --
25 A.   I apologize.

1  Q.   -- in 2015, did you go into any other line of
2  employment?
3  A.   Yes, sir.  I was elected to Council, and that's all I do
4  right now.
5  Q.   All right, sir.  Now, during your time here in
6  Nashville, have you come to know the Defendant in this case,
7  Robert Waddey?
8  A.   Yes, sir.
9  Q.   In what context or what arena did you know him?
10  A.   Many.  I first met Robert when Robert and my son
11  attended the same preschool at West End United Methodist
12  Church.  I believe they were four or five years old at the
13  time.  Subsequent to that Robert was a Cub Scout in my Cub
14  Scout pack.  He played for me on various baseball teams, and
15  then he joined the Boy Scout troop of which I was a Scout
16  Master.  So I've really known him since he was about four
17  years old.
18  Q.   How would you describe Robert Waddey's behavior and
19  personality during those years that you knew him?
20  A.   Robert was very active.  I would say Robert was the kind
21  of guy that -- you know, Robert would get -- he could be
22  mischievous.  So I guess I would describe the latter years
23  when he was in Boy Scouts with us.  Robert was always very
24  respectful to me.  He always wanted to have a military
25  career.  You know, that was one thing that he always

1  highlighted.  Every time he referred to me -- I've never
2  talked to Robert that he didn't attach the word "sir" to it.
3  Any time I ever asked him do, he did it -- or anything I ever
4  asked him to do, he did it.
5            Now, on the other side of that coin, Robert was
6  one that you had to manage from time to time.  I would
7  consider the times when his behavior I had to manage, he was
8  getting into mischievous things that drew attention to
9  himself.  He wanted to be funny when he probably shouldn't
10 have been funny, or he would do things that would draw
11 attention to himself from the other boys, that he shouldn't
12 do.  Whenever I called him out on it or I called him down on
13 it, he always responded.
14 Q.   Now, Mr. Pulley, the Boy Scout organization is somewhat
15 rigorous for a young man.  How did Robert respond to the
16 rigor of being a Boy Scout?
17 A.   Well, the rigorous part of it was very easy for Robert.
18 In fact, I remember times where we took -- and, of course,
19 any of these high adventure trips, we wouldn't take people on
20 it if we really considered them to be a behavioral risk.  So
21 we took Robert.  And the most recent trip that Robert went on
22 with us was a two-week backpacking trip out in the mountains
23 of New Mexico.  And that was tough for a lot of the kids
24 physically.  For Robert, it wasn't.  The one thing I had to
25 really manage with Robert on that trip were the -- there were

1  switchbacks that went up the mountain.  And Robert wanted to
2  go straight up the mountain without using the switchbacks.
3  And, of course, that wasn't something we wanted him to do, so
4  always had to stop him from making that move.
5  Q.    All right.  With respect to his growing-up years, after
6  he left the Scouts, did you maintain contact with him?
7  A.    Yes.  And not just Robert.  I maintain contact with all
8  the Scouts.  In fact, my son had a birthday party on the 19th
9  of January, and a number of them were over there, and they
10 spent most of their time with me over on my side.  He lives
11 in one side of the duplex and I live in the other.  So we go
12 to lunch from time to time with all of them.  And I do
13 maintain contact with Robert.  Robert -- periodically.  I
14 think the last time Robert and I did anything together we
15 went to the gun range and we shot.
16 Q.    Mr. Pulley, are you aware of the offense to which Robert
17 Waddey has pled guilty in this Court?
18 A.    Yes, sir, I am.
19 Q.    And you realize that that -- excuse me -- that that
20 involves an internet threat to law enforcement?
21 A.    Yes, sir.  I do.
22 Q.    And as a former law enforcement officer, are you able to
23 tell this Court how you feel about that?
24 A.    Well, it's -- I take those threats very seriously.  Are
25 you asking me how I feel about this specific one?

1  Q.   Yes, sir.

2  A.   I've seen the pictures.  And I think in the world of

3  criminal law, it's very important that we get to intent in

4  these kinds of things.  And, you know, when we're

5  investigating cases, when I'm looking at evidence and I don't

6  know a person, you know, we're left with, you know, these

7  things and what we know and what we see to -- to figure out

8  what that intent is.  I have the luxury of quite a number of

9  years with Robert.  I saw those pictures and I thought they

10 were not good.  You know, quite frankly.  And I dug into the

11 head of the Robert Waddey that I know.  And I don't believe

12 for a moment that he intended to threaten law enforcement

13 with those pictures.  I harken back to what I know about

14 Robert, is at the time it appeared as though that was a very

15 popular thing to do, albeit very bad and negative.  And

16 Robert exercised exceptionally poor judgment in putting those

17 pictures on the internet, but I don't believe for a moment

18 that Robert Waddey intended to harm law enforcement.

19 Q.   Mr. Pulley, have you ever been to a gun range with

20 Robert Waddey?

21 A.   Yes, sir.

22 Q.   How does he behave on the gun range?

23 A.   He's very -- very safe on a gun range.  He does -- you

24 know, I, obviously, from my career in law enforcement, so I

25 know what safety procedures you need to put in place to be

1  safe on a gun range.  And Robert always adheres to those.
2  Q.   Now, you realize, of course, that by pleading guilty to
3  a felony he'll no longer be able to possess a weapon legally
4  and he will no longer probably be eligible to serve in the
5  military.  Does that -- are you aware of how that has
6  impacted him or his attitude towards his future?
7  A.   I am not aware right now, but I can only imagine that --
8  that's pretty devastating news to Robert.
9  Q.   Mr. Pulley, final question is this.  The Court is faced
10 with the choice of either further incarceration of Mr. Waddey
11 or possibly putting him on probation or supervised release.
12 How do you intend, if you do, to help Robert survive his
13 period of probation or -- or supervised release if he should
14 get it?
15 A.   Well, I would certainly think this is a low point in
16 Robert's life.  And as with many people who are in this
17 situation, I think accountability is -- is important.  And
18 accountability to people who will hold you accountable to the
19 right kinds of things is very important.  So it would
20 certainly be my intention to make myself available to Robert
21 in a much more frequent basis than before to hopefully guide
22 him through a real low time in his life and climb out of
23 whatever it is that's causing this.
24          MR. YARBROUGH:  Thank you very much.
25          THE WITNESS:  Yes, sir.

1        MR. YARBROUGH:  Your witness.

2        THE COURT:  All right.  Cross-examination.

3        MR. HANNAFAN:  Yes.

4

5                    CROSS-EXAMINATION

6    BY MR. HANNAFAN:

7    Q.    Good morning, Mr. Pulley.

8    A.    How are you?

9    Q.    I'm good.  Thank you.  How are you doing?

10   A.    I'm very well.  Thank you.

11   Q.    So as I understand it, you're formerly a member of law

12   enforcement for many years, correct?

13   A.    Yes, sir.

14   Q.    And you would agree with me that people making threats

15   against law enforcement is very serious, correct?

16   A.    I do believe that, yes.

17   Q.    And you said that you've -- you're aware of the charge

18   in this case, correct?

19   A.    Yes, sir.

20   Q.    Okay.  And you've seen the photograph that was posted on

21   Instagram that is the subject of this case?

22   A.    Yes, sir.  I have.

23   Q.    Okay.  And what do you recall it being?

24   A.    I recall the photograph that I saw was Robert -- it -- I

25   think I remember Robert with a gun and maybe it was a State

1   Trooper or something in the background.  And I remember
2   something about the word "pig".  Am I remembering that
3   correctly?
4   Q.   Not quite.
5   A.   Okay.  Well, that's what I recall.
6   Q.   Okay.  So --
7              MR. HANNAFAN:  Your Honor, if I may just approach
8   briefly.
9              THE COURT:  Sure.
10             MR. HANNAFAN:  I wanted to show him the
11  photograph.
12             THE COURT:  Sure.
13             MR. HANNAFAN:  And if I can have it back.
14             THE WITNESS:  If you don't mind, let me take my
15  glasses out so I can see this better.
16             MR. HANNAFAN:  Sure.  Certainly.
17             THE WITNESS:  I must say that's the first time
18  I've seen that language.
19  BY MR. HANNAFAN:
20  Q.   Well, but this -- this was the actual post.  All right?
21  This was the post that the Defendant Mr. Waddey put up on
22  Instagram, and it depicts him pointing a handgun at the
23  driver's side of a Tennessee Trooper's vehicle, correct?
24  A.   There's nothing good about that picture.  I agree with
25  that.

1  Q.   Okay.  Well, I'm not asking you if there's anything good
2  it.  We can all agree there's nothing good about it.  But my
3  question is it depicts him pointing a handgun at the driver's
4  side of a Trooper's patrol car, correct?
5  A.   Yes, sir.
6  Q.   And the quote was quote, "fuck them nonattentive ho's,"
7  correct?
8  A.   Yes, sir.
9  Q.   Now you said earlier -- you said you didn't believe he
10 intended to threaten law enforcement, right?
11 A.   Yes, sir.
12 Q.   Now that you've seen this, to refresh your recollection
13 with respect to what it is, do you still believe he didn't
14 intend to threaten law enforcement when he posted that?
15 A.   Yes, sir, I do believe that.
16 Q.   Okay.  Well, you understand it's the crimes to which
17 he's pleaded guilty, correct?
18 A.   Yes, sir.
19 Q.   All right.  Now you also said something earlier today
20 about how at the time it was a very -- very popular thing to
21 do.  Are you saying at the time that he posted it it was very
22 popular to post threats against law enforcement?
23 A.   No, sir, that is not what I meant by that statement.
24 What I meant by that was there was a lot of popularity, anti
25 law enforcement rhetoric that was out there that was popular

1   at that time and still to a degree is.

2   Q.   Okay.  But this isn't just rhetoric, right?  This is the

3   Defendant holding a firearm maybe ten feet from the Trooper's

4   car while pointing it at the driver's side of the vehicle,

5   right?

6   A.   Yes, sir.

7   Q.   Are you aware of some other photographs that were found

8   on the defendant's phone?

9   A.   I have heard about them, but I have not seen them.

10  Q.   Okay.  Are you aware that there was a photograph of an

11  officer who was bleeding and sitting on the ground and it

12  says "only a dead cop is a good cop"?  Are you aware of that?

13  A.   No, sir.

14  Q.   Are you aware that -- that the Defendant had sent some

15  text messages talking about calling his AK -- you know what

16  an AK is, right?

17  A.   Yes, sir, I do.

18  Q.   Assault rifle, calling it my "pig slayer, LOL"?  Were

19  you aware of that?

20  A.   I don't know that I was aware of the details that you

21  just described.  I do remember hearing something about the

22  word "pig."  That's why I put it in my statement to you.

23  Q.   And I assume you understand that to mean -- pig, that's

24  a slang for -- derogatory slang for a police officer,

25  correct?

1  A.    Absolutely.

2  Q.    So a pig slayer -- an AK being a pig slayer, would you

3  agree with me that the message is that he would be using an

4  assault rifle to shoot an officer?

5  A.    If you'll repeat what it is that it says, I'll answer

6  that again.

7  Q.    Sure.  It said, "I call my AK my pig slayer, LOL".

8  A.    Okay.  And what's the question again?

9  Q.    Would you agree with me that the meaning behind that,

10  that he was referring to his assault rifle as something that

11  could be used to kill cops?

12  A.    Yes.

13  Q.    Okay.  And "LOL," what do you understand that to mean?

14  A.    Laugh out loud.

15  Q.    Right.  So apparently the Defendant thought that was

16  funny to make that statement; is that right?

17  A.    Yes.

18  Q.    Okay.  Were you aware that there was another photograph

19  on his phone where there was an officer who appeared to have

20  been shot numerous times and was lying bleeding on the

21  ground?

22  A.    I'm not aware of that.

23  Q.    Okay.

24         MR. HANNAFAN:  Can I show this to him?  May I

25  approach?

```
 1              THE COURT:  Go ahead.
 2   BY MR. HANNAFAN:
 3   Q.    It's at the top of the page.
 4   A.    Which one?  The top?
 5              COURT OFFICER:  Yes, sir.
 6              THE WITNESS:  No caption or anything with it.
 7   BY MR. HANNAFAN:
 8   Q.    There's no caption for that one.
 9   A.    Okay.
10   Q.    You see the photograph, correct?
11   A.    Yes, sir.
12   Q.    And it's an officer lying facedown on the pavement with
13   what appears to be blood coming from his head, correct?
14   A.    Yes, sir.
15   Q.    Now, I'm not going to go through them all, but were you
16   aware that there were other photographs or text messages
17   talking about the defendant's disdain for law enforcement
18   found on his phone?  Were you aware of anything else?
19   A.    I was aware of what I stated earlier and that's it.
20   Q.    Okay.  Now, you had said that you had found Mr. Waddey
21   when he was younger to be mischievous, correct?
22   A.    Yes, sir.
23   Q.    Okay.  Would you agree with me that this goes far beyond
24   mischievous?
25   A.    Yes, sir.
```

1  Q.    Okay.  In fact, would you agree with me that these
2  posts, having these photos on a phone, as a former law
3  enforcement officer would find those disturbing?
4  A.    They are disturbing, yes, sir.
5  Q.    Okay.  And would you agree with me that if someone posts
6  a threat against law enforcement on the internet that there
7  should be consequences for that?
8  A.    Sure.
9  Q.    Serious consequences?
10  A.    Yes.
11        MR. HANNAFAN:  Nothing else, Your Honor.
12        THE COURT:  Redirect?
13        MR. YARBROUGH:  Briefly, Your Honor.
14
15                REDIRECT EXAMINATION
16  BY MR. YARBROUGH:
17  Q.    Mr. Pulley, now that you've seen those additional
18  photographs and heard the other words -- and obviously no one
19  in this room thinks that's good behavior -- does that have
20  any effect on your opinion regarding the potential for
21  rehabilitation of Robert Waddey?
22  A.    No, sir.  Because again I think that my opinion of all
23  this is wrapped in a cloak of seeing the photographs,
24  reacting to them, and basically 20 years of knowledge of who
25  he's all about.  And when I put all of that together, I think

```
 1   one thing that's very important is what did -- what was
 2   Robert's intent.  And with all of that knowledge, it is my
 3   opinion that Robert never intended to hurt a law enforcement
 4   officer.  Robert intended in a very poor way to draw
 5   attention to himself, and he did so.  I think quite clearly
 6   he did.
 7   Q.   And these -- all of these acts that the prosecutor has
 8   just outlined to you occurred before he had a child?  Right?
 9   A.   I don't know that.  But -- yeah, I would certainly --
10   Q.   Well, if I tell you they occurred more than a year ago,
11   it would be before he had a child?
12   A.   Well, sure.
13   Q.   And it was before he spent more than 30 days in federal
14   confinement, right?
15   A.   Yes, sir.  Quite clearly.
16   Q.   And it was before he obviously pled guilty to that
17   offense in this Court and became convicted of a felony?
18   A.   That's right.
19   Q.   And would you say that Robert has already suffered some
20   consequence?
21   A.   Yes.  Absolutely.
22              MR. YARBROUGH:  Thank you.
23              THE COURT:  All right.  You can step down.
24              MR. HANNAFAN:  No questions, Your Honor.
25              THE WITNESS:  Thank you.
```

1              (Witness excused.)

2              THE COURT:  All right.  Mr. Yarbrough, do you have

3    another?

4              MR. YARBROUGH:  May it please the Court,

5    Mr. Waddey and I would like to make statements.

6              THE COURT:  All right.  Why don't you come to the

7    podium.  We'll do that.

8              THE DEFENDANT:  Well, my brief statement is first

9    off, I would like to thank you for incarcerating me for that

10   30 days.  It was enough time, you know, to open my eyes.  It

11   was a big wake up call for me.  You know, I have a daughter

12   and a fiance here with me, you know, and I need to change my

13   act.  You know, I need help with my drinking issue if any --

14   if anything in the Court -- if anybody in the Court could

15   give me some programs that are anything, I would be very

16   grateful for and -- and I'm determined, you know, to, you

17   know, get back out in the community and, you know, go on with

18   a productive and -- sort of -- you know, productive life, you

19   know, support my family and all that, Your Honor.

20             THE COURT:  Well, I appreciate that.  And I don't

21   want to cut you off.  So anything else?

22             THE DEFENDANT:  No, sir.

23             THE COURT:  Well, help me understand, you know,

24   what was -- what was going through your mind, I think when we

25   were here a month ago, when you came to court intoxicated?

1  What are you thinking when you did that?

2          THE DEFENDANT:  Oh, Your Honor, it wasn't -- I

3  hadn't had anything to drink that day.  It was just I was

4  nervous the night before and probably had a little bit too

5  much the night before.

6          THE COURT:  Okay.  And why did you think that's a

7  good thing to do, or an appropriate thing, I should say, to

8  do?

9          THE DEFENDANT:  I don't think it was an

10  appropriate thing to do.  I -- I've been struggling with my

11  drinking for the last year or two, ever since I've been

12  dealing with this.  And, you know, it just got the best of me

13  on that night, sir.

14          THE COURT:  Okay.  Do you know -- or have you --

15  do you appreciate now what that says about you to come to

16  court intoxicated?  Do you have any appreciation of what that

17  said about you or how that reflected on you?

18          THE DEFENDANT:  It reflected very poorly, Your

19  Honor.

20          THE COURT:  And why is that?

21          THE DEFENDANT:  Because I didn't have the

22  self-control not to drink, I guess, the night before, sir,

23  Your Honor.

24          THE COURT:  Okay.  Now, you've pled guilty to a

25  felony, which is going to be with you for the rest of your

```
 1  life.  Do you understand the ramifications of that felony
 2  conviction and pleading guilty?  You could have had a trial
 3  and we went through all that.  But you decided to plead
 4  guilty.  I would think that once someone has pled guilty to a
 5  felony, at least at a minimum you've come to terms with the
 6  criminal accusations and allegations, and said those are
 7  true, and you're ready to take responsibility or -- or as
 8  Mr. Pulley put it, accountability, for what you did.  So
 9  that's my thinking.  What was your thinking when you pled
10  guilty?
11          THE DEFENDANT:  That same -- same thing, Your
12  Honor.
13          THE COURT:  Well, tell me in your own words what
14  you were thinking.
15          THE DEFENDANT:  You know, that I realized that I
16  had messed up.  I had done something that, you know, I
17  shouldn't have, that now I'm very sorry that I did.  Looking
18  back it was very foolish of me to do so.  And, you know,
19  like -- like Russ said, you know, taking responsibility and
20  accountability for my actions, Your Honor.
21          THE COURT:  Okay.  Before you were taken into
22  custody, you were unemployed.  And as I look through the
23  presentence report, quite frankly, your employment history is
24  pretty sparse and totally unremarkable.  So you're going to
25  have -- I mean, you -- you -- you've got a lot of life ahead
```

1  of you, but I can't tell -- what are your plans of being
2  productive now that you have a child and other
3  responsibilities?  Because the employment history here is
4  quite poor.  What's your plan there?
5              THE DEFENDANT:  Sir, Your Honor, I'm planning on
6  going back to the job that I had before I got -- before --
7  I -- I had taken a --
8              THE COURT:  Well, hold on.  Let's get on -- what
9  job are you referring to because I think all I saw was some
10 unskilled labor positions.  What job are you referring to?
11             THE DEFENDANT:  Oh, this particular one, I was
12 talking about Suds Up a -- working and managing a car wash.
13             THE COURT:  So those are plans you have, that's
14 not something you've done in the past?
15             THE DEFENDANT:  No, sir.  That was my latest job,
16 sir.
17             THE COURT:  Well, the latest job you were
18 unemployed for the past five months, since August of 2017, is
19 what I have.  Then you worked -- you're talking about Suds
20 Up, the car wash attendant?
21             THE DEFENDANT:  Yes, sir.
22             THE COURT:  And you worked for them for about six
23 months.  And then you got laid off.  Why did you get laid
24 off?
25             THE DEFENDANT:  Because I needed -- I was going to

```
 1   rehab and stuff trying to get help for my drinking.  And it
 2   was --
 3           THE COURT:  And on the rehab, let me just tell
 4   you, your parents could not have done more over your entire
 5   life.  The -- it's four pages, four and-a-half pages, in this
 6   document about the extraordinary efforts your parents have
 7   gone through to help you with drug/alcohol abuse.  I cannot
 8   imagine anybody could have done more to help you.  But it
 9   still persists as a problem.  So let's go back to the
10   employment.
11           So you're talking about this car wash attendant?
12   That's your future employment?
13           THE DEFENDANT:  That would be for the -- like
14   right when I would be getting out.
15           THE COURT:  Yeah.
16           THE DEFENDANT:  But I plan on going to vocational
17   school and learning a trade and --
18           THE COURT:  What trade?
19           THE DEFENDANT:  Welding or -- or -- or electrician
20   or --
21           THE COURT:  Why do you want that?
22           THE DEFENDANT:  Just because I like working with
23   my hands.  And like my previous job before, Suds Up, I was
24   installing fireplaces.  And so I was getting -- with Dale,
25   Incorporated.  And I was getting a lot of, you know, I guess
```

```
 1  hands-on experience with framing, installing windows and
 2  doors, installing fireplaces, doing rough electrical work and
 3  that sort of thing.
 4           THE COURT:  So why haven't you already pursued
 5  that desire?
 6           THE DEFENDANT:  Sir?
 7           THE COURT:  If welding is -- working with your
 8  hands and having that vocation is what you want to do with
 9  your life, why have you not already started on that path?
10           THE DEFENDANT:  Well, Your Honor, we've been kind
11  of waiting on those kind of things until we had all this
12  wrapped up, Your Honor.  Just -- just because, you know, we
13  didn't know where all this was going to end up and all that.
14           THE COURT:  Okay.  Who was witness number one?
15  The friend -- is that a friend or relative?  Who is that?
16  Who is the person you were showing the Instagram photos to?
17           THE DEFENDANT:  Oh, Keigan Reece (phonetic).
18           THE COURT:  Is that a friend, relative?
19           THE DEFENDANT:  A friend, sir.
20           THE COURT:  Okay.  Well, I don't -- I mean, you're
21  welcome to say anything else.  I appreciate you answering my
22  questions.
23           THE DEFENDANT:  What it was like at Grayson County
24  or, you know, when I was locked up -- like I said before, I
25  do think it was -- it was a major eye opener for me.  It gave
```

```
 1  me that time -- at least I have, you know, 30 days sober,
 2  ready to go forward with -- with the medications and doctor.
 3  Like we were getting set up with a doctor, whatever, I was
 4  going to take the Vivitrol shot to help me with my drinking.
 5  And it also gave me time to reflect and think about, you
 6  know, what I did and the foolishness of my ways and also the
 7  importance of being out and, you know, providing for my
 8  family because --
 9              THE COURT:  Do you have a child support obligation
10  for your child?
11              THE DEFENDANT:  Child -- no, sir, I'm not paying
12  child support, but we -- I -- but I support the child, you
13  know, like with everything I can.
14              THE COURT:  Were you paying anything before you
15  were incarcerated?
16              THE DEFENDANT:  No, sir, Your Honor.
17              THE COURT:  Have you paid anything for the child
18  since they've been born?
19              THE DEFENDANT:  Yes, sir.
20              THE COURT:  How much?
21              THE DEFENDANT:  Dollar amount is -- I don't know,
22  but me and my family -- like, before, for the first four --
23  four and-a-half months she was living with me, and I was
24  monetarily providing the majority of everything, if not
25  everything, and since I've been here or since I've been
```

```
 1   incarcerated my parents have been helping out with money
 2   either from getting it out of my bank account or helping --
 3   helping her with -- with the money that they have.
 4             THE COURT:  And help me one more time.  What's
 5   your plan with your life as a 23-year-old with a child?
 6   What's your plan to take care of yourself and the child
 7   and/or your wife?
 8             THE DEFENDANT:  Well, the first -- the first
 9   thing, Your Honor, is I do need to tackle this drug and
10   alcohol problem, I believe, is the first thing.  And then,
11   like I said, go to school, learn a trade, and keep working,
12   keep busy, stay active, and anything I can do to support my
13   family, you know, just keep doing that.  My parents, with the
14   resources that we have, down the future, are planning on
15   opening or buying some businesses and that sort of thing and
16   running them.  Yes, sir.
17             THE COURT:  Okay.  Thank you.
18             MR. YARBROUGH:  May it please the Court, just
19   briefly.  I know I probably can't say anything the Court
20   hasn't already thought of, but Mr. Waddey is a -- is an
21   unusual case in some ways and in other ways he's all too
22   common what we see in the Court system.  But I think the
23   unusual part is that he's now before Your Honor with the
24   benefit of having seen the inside of a federal detention
25   center.  When we went up there to see him a week or so ago,
```

1  the day -- the difference between the Robert Waddey I saw in
2  that hallway and that I see today versus the one I saw the
3  last time we were in the Court is daylight and dark, and the
4  only difference is he dried out, as he said.  And we all
5  recognize that alcohol is a substance that some people simply
6  cannot participate in.  He is clearly one of those people.
7  The question is how can we assure that he doesn't have a
8  relapse?  And, of course, if we lock him up for the statutory
9  maximum, he still comes out, and he still has to come back
10  into the community in some form or fashion, and he still has
11  to stop drinking.  And so the question is, are we -- are we
12  better suited to do it now that he's had the 30-day
13  experience and heard the door slam, or would he be a better
14  candidate for that in six months, a year or even more?
15          What I am asking the Court to consider is that
16  this is the time to give him that final chance.  If he were
17  to come out and have an alcohol monitoring device so that he
18  knows one drink puts him back in the lockup, and then has
19  some kind of oversight from an outpatient program and a 12
20  step program, which I'm convinced is the only answer to this
21  type of problem, then -- then he might make it.
22          And I can remember vividly being in this very room
23  with Judge Morton over 30 years ago when I had a young man
24  who was manufacturing drugs, a case that under the guidelines
25  would have been probably a mandatory ten year sentence, but

back -- this is before guidelines.  And Judge Morton gave a
young man for that offense probation.  He never came back.
He committed a terrible crime.  I'm sure Mr. Hannafan is
going to go on and on about how terrible this crime is.  And
it is.  I don't defend the crime.  The point is, there always
comes a time when the young man has to go out into the
society, and the hope is that something that we have done or
the Court has done or the system has done will help him, will
empower him to go back into that community and succeed.  I'm
just suggesting that this is that moment for Robert Waddey.
And I'm asking the Court to consider that in crafting a
sentence that will not only benefit him, but benefit society
as a whole.

          THE COURT:  All right.  And while you're there --
so, Mr. Hannafan -- or maybe you all agree.  Are we going to
have an agreed order on the guns, the -- he's relinquished
title.  Is that taken care of?  Is he going to do a
forfeiture, or how do you all want --

          MR. HANNAFAN:  I think -- I think he agreed that
he was abandoning all interest in them as opposed to a
forfeiture.

          THE COURT:  Okay.

          MR. HANNAFAN:  But those are in the custody of the
FBI.  And so there's --

          THE COURT:  Do you want me to put that in the

 1  judgment?

 2          MR. HANNAFAN:  That they are abandoned?

 3          THE COURT:  Or he's relinquished title.

 4          MR. YARBROUGH:  He is relinquishing any and all

 5  claims to the guns.  Now, I should advise the Court, and I

 6  know Mr. Hannafan is aware of this, that some of those

 7  weapons belong to his parents.  What they are contemplating

 8  doing, I don't know.  I obviously will not represent them in

 9  that matter, if there is a matter.  I don't know that there

10  will be.  But we are relinquishing any and all claim.

11          THE COURT:  How do you all want me to reflect

12  that?  Tell me -- or do I need to do anything?

13          MR. HANNAFAN:  I'm not --

14          THE COURT:  I may not need to do anything.

15          MR. HANNAFAN:  I'm not sure you need to do

16  anything, Your Honor.

17          THE COURT:  Okay.

18          MR. HANNAFAN:  I will note -- I think

19  that Mr. Coker had been handling this before and spoken to

20  Mr. Little about concern that if -- well, I just --

21          THE COURT:  No.  I just wanted to tidy it up.

22  It's no big deal.

23          MR. HANNAFAN:  No.  I understand.

24          Your Honor, you know, Mr. Yarbrough said I'm going

25  to come up here and go on and on about what a serious crime

it is.  I'm not.  It is a serious crime.  It's a threat
against law enforcement, and I -- you know, I'm sure
Mr. Yarbrough as a former US Attorney and the head federal
law enforcement officer in this district would agree with me
that threats over the internet against law enforcement should
be taken seriously.  And it's not merely that one post, Your
Honor, I think that should concern the Court.  It's looking
at the photographs, the text messages, the exchanges the
Defendant had that were found on his phone, some of which I
touched on today, but are more, you know, detailed in the
PSR.  They paint a pretty disturbing picture.

        Now, Mr. Pulley agreed with me those are
disturbing.  Only -- "only a dead cop is a good cop."  I
think, you know, the person probably meant to say the only
good cop is a dead cop, but laughing about shooting police
officers -- you know, and this wasn't a one-time thing.  It's
not like there was one photo out of a thousand, you know, or
one text out of a thousand.  There were numerous of those
types of photos and comments and texts.  And I think the
Court should consider that in considering who Mr. Waddey is.

        And with respect to who he is today and the effect
that the 30 days has had on him, you know, the Court has
asked him, you know, what were you thinking when we were here
last time.  I was waiting for the response that I would have
given, which is I wasn't thinking, and instead what he said

was, well, he had a little bit too much to drink the night
before.  He didn't have a little bit too much to drink the
night before.  He had a lot to drink the night before.  I
think the probation office said his blood alcohol content was
.17 or .178, if I remember.

THE COURT:  .18.

MR. HANNAFAN:  I'm sorry.  .18.  So easily more
than double the legal limit to drive.  And the fact -- I
think the hearing was 11:00 in the morning.  So there was an
awful lot that he had to drink the night before.  And so to
stand here and say, well, geez, I just had a little too much
to drink, he's not really again taking responsibility for his
actions.  He wants to stand here and try to say the right
things.  I don't honestly believe that he -- that he truly
has accepted responsibility for what he's done, and in terms
of -- of being accountable for his own actions.  I feel for
him.  I feel for his family.  I feel for his fiance and their
young child.  But as with most defendants who come before
you, you know, they've got parents.  They've got, you know,
children.  They've got fiances or wives or husbands,
et cetera.  This doesn't make him unique.

What I would ask the Court to focus on the most is
-- is Title 18, Section 3553(a)(2)(B), states the Court shall
consider the sentence imposed to reflect adequate deterrence
and is not merely deterrence to the Defendant but deterrence

to the community in general.  And I believe that a sentence of additional time of incarceration for Mr. Waddey is appropriate.  You know, I think the Court should send a message to the community that if you threaten law enforcement, you threaten an officer or agent over the internet, you're going to jail.  And it doesn't matter whether you've got a bad criminal history or no criminal history or that you've got a child or no child, whether your family is wealthy, your family is not wealthy.  If you threaten law enforcement in this district you're going to do some time, and not merely a month because he didn't have the good sense to show up sober at the initial hearing.  That's why he went to jail, because he violated the conditions of pretrial release.  I think if the Court does not impose some additional jail time the message that will be sent is that, you know, he got off -- you know, he's a rich kid who got off, you know, the judge gave him a break.  Right?

He hasn't done anything to warrant getting a break.  So I would ask the Court impose thee sentence that I had requested, which is six months of actual imprisonment, followed by a two-year period of supervised release, but with the following six months of supervised release to be in a halfway house.  I think from everything that's before the Court, from what I've seen, is that Mr. -- Mr. Waddey would benefit from that type of environment.  You know,

Mr. Yarbrough says, well, if he has one drink he's going to jail. I don't know if that could be tested or not, you know, one drink or not, but I feel certain if he's in a halfway house it's going to be much harder for him to have a drink and get away with it. And I think he could be there in that environment and be working and be providing for his family. So I ask the Court to impose a sentence of six months, which would give him credit for the past 30 days, followed by two years of supervised release, with the first condition that the first six months of that be in a halfway home.

The final point I'll make, Your Honor, is with respect to a fine. Frankly it's not often we see defendants before the Court who have the type of resources that Mr. Waddey has. I do understand he has a young -- a young child. And again, I am personally sympathetic for -- excuse me -- sympathetic to that. But professionally, can he afford a fine? Absolutely he can afford a fine. So if the Court is considering being lenient on him with respect to any jail term, but I think there should be a substantial fine that he should be ordered to be paid.

THE COURT: All right. Mr. Yarbrough you and Mr. Waddey get the last word here.

MR. YARBROUGH: If Your Honor please, I may have misheard Mr. Hannafan, but it sounds like he agrees with us that there will be this transition, that we have to -- to

1   understand that Mr. Waddey needs to make that transition.

2   And somehow he thinks it would be better for him to do that

3   after five more months of incarceration and be in a halfway

4   house around people that would not necessarily be the

5   greatest influence on his future plans. I guess we just

6   simply disagree on that. And we'll have to leave it up to

7   Your Honor's wisdom to decide whether now is the time or

8   whether he's proposed a better plan.

9           THE COURT: Okay. All right. Mr. Waddey as I've

10  already indicated, I've read all the submissions and studied

11  over the presentence report. The briefs were very helpful

12  and your attorneys -- and all attorneys were helpful. But my

13  responsibility is to impose a sentence that's sufficient but

14  not greater than necessary to accomplish the purposes in the

15  sentencing laws as it applies to you, as it applies to your

16  behavior, as it applies to your admitted criminal behavior,

17  and it applies -- and as it applies to your particular

18  circumstances and history.

19          And that's -- that's what I'm going to do. I've

20  already alluded to this, but before I get into the details,

21  I -- the Court would just compliment your parents. Because

22  as I read through the presentence report, as I've already

23  said, I cannot imagine that they could have done anything

24  more to have avoided where we are here now. It -- it's very

25  impressive and certainly demonstrates their commitment to

you.  But what brings us here today is -- and where you are
here today, Mr. Waddey, is you're 23 years old with a high
school diploma, with no substantial, significant or otherwise
noteworthy employment experience, or skills for that matter.
While I heard what you had to say about your plans, I still
don't get the link of why you haven't moved on those prior to
now as we stand here today or as we all gather here today for
sentencing.

I also recognize that since age 13 you suffered
from some very persistent emotional and mental issues that
were aggravated by a substance abuse and alcohol.  The fact
that you've had treatment opportunities both inpatient and
outpatient for so many years leads me to the conclusion that
now it's really up to you.  Third parties, medical experts
have all done what they could do.  And you've been successful
at some of those.  But now the burden's on you.  And at age
23 I fear that if we don't get you to help yourself, I don't
know what's going to happen at age 46, if you make it that
far.  We're here today because you've pled guilty to Count
One which is threats to injure law enforcement through
interstate commerce.

As the Court already reflected, that means that
you accept responsibility for your criminal behavior, and you
also accept the restrictions and consequences that comes from
your voluntary action to plead guilty.  I have to look at --

and it's helpful for the Court to look at the factors under
3553(a).  So I look at the fact you've pled guilty to a
felony.  And this is your first felony.  You -- this
particular criminal behavior didn't result in any harm to any
person.  There was no actual violence, but that was the
threat of violence.  And the Government's correct, this is a
threat of violence that has occurred repeatedly since 2015.
Indeed, before the Court are nine -- eight or nine total
incidents, separate incidents, of threatening behavior that's
directed to law enforcement.  These threats are very dark and
very disturbing and very dangerous.  It appears you have some
fascination with law enforcement.  And it is, as one of your
letters -- ironic -- I think your father's letter -- your
parents' letter.  It's ironic that you had a desire to pursue
a military career.

         So the nature and circumstances of what brings us
here today are very serious.  And I have to put it in the
context of where we are today.  Now, if we rewind the clock
20 or 30 years, your threatening behavior doesn't -- is still
threatening, dark, and severe, and -- and serious, but today
we live in such a different world that these kind of threats
are sometimes materialized into actions and we have to -- we
have -- I have to impose a sentence that addresses it to you
and to others.  These factors under 3553(a) also allow me to
look at particular characteristics that are unique to you and

your history.  I've already alluded to the long-standing

emotional and behavior control issues that are very, very

well detailed in the presentence report.  I agree that they

reflect some anger on your part, some impulsive behavior, a

lot of lack of judgment, and perhaps these numerous emotional

and mental conditions are explained -- explain that conduct

but they don't provide an excuse.  The alcohol issue has

persisted with you since grade 7.  And the presentence report

reflects a use of vodka, one to two pints a day.  There's

years of substance abuse and alcohol treatment that you've

been afforded through the generosity of your parents.  And

they have provided some temporary improvement but only to

relapse later.  The financial support you have from your

parents reflects an otherwise strong family support system.

As an only child, as your parents reflected, you could not

have had a more normal upbringing.  And I do give weight to

the relative youthfulness.  You're 23 years old.  And I do

think you exercised some very poor judgment, probably to

impress friends, but again that doesn't really justify.  I am

concerned that this behavior -- that I do what I can to send

a message that the behavior to -- has to cease in the future

for both the public's good and your own good.

Another factor that I give strong weight to is to

reflect -- have a sentence that reflects the seriousness of

the offense, promote respect for the law and provide just

punishment. While you did plead guilty and that should reflect some decision on your part to accept the consequences, I'm not sure that that has resonated with you.

As we came here today, what I really wanted to hear from you, or words similar to this is -- I think the first thing you should have said is I apologize to the law enforcement officials to whom these threats were made. And I can't remember the name -- Mr. Hannafan, what's your client's name? What is your co-counsel -- what is -- your name?

THE WITNESS: Aaron Strait, Your Honor.

MR. HANNAFAN: He's with the FBI, Your Honor.

THE COURT: Okay. Mr. Strait? I mean, Mr. Strait is here as a representative of those law enforcement people. He sort of embodies and symbolizes the Tennessee Highway Patrol or others you may have been fixated on. I really wish you had turned to him and apologized for that. The second apology I really needed to hear to show me you understand the seriousness of this is you needed to apologize to the Court because that showed a tremendous disrespect to the Court. That's where my questions were leading. You weren't thinking at all. And as a result of that, what you did is show this Court I really don't care. And that's a problem. And I think the third apology that was appropriate here today from you as a 23-year-old was one to your parents who have done so much over the years. That would have told me that you

1  understand the seriousness of the offense.  That would have
2  told me that you've now come around to show respect for the
3  Court and to law enforcement for your behavior in the past.
4  And that would have shown me that you're ready to accept
5  accountability and responsibility for your actions.

6          The next factor I have to look at -- and I give
7  great weight to -- I gave great weight to even before I read
8  the briefs here from the Government.  Is in today's world
9  these kind of threats take on new meaning.  So I do need to
10  send a message that -- to others that if you make threats
11  towards law enforcement and other kinds of violent behavior,
12  even if you don't act on them, people don't know these days,
13  and we just live in a different world.  So it has to have
14  some general deterrence, and specific deterrence on you that
15  I hope that at age 23 this is once and for all resolved with
16  you, if -- if that's what you want.

17          While protection of the public is another factor I
18  look to and need to apply, I do note that there's no threat
19  to yourself and there was no violence to others, but there is
20  the potential there.  And I don't want these dark thoughts
21  that you have and fascination about law enforcement to turn
22  into actions that would create a potential danger to the
23  public.

24          I do think that the guideline range between six
25  and 12 months is due some consideration and the issue of --

1  and the issue of the guns has been resolved because you've
2  abandoned title to it.
3          So with all that said and applying all those
4  factors and giving them the weight that I think is
5  appropriate for you, I'm going to commit you to the custody
6  of the Attorney General for five months, with the
7  understanding you'll get one-month credit for the time you've
8  already spent.
9          Upon release, I'm going to impose a supervised
10  release term of two years, and I do want the first six months
11  of that to be served in a halfway house.  I think the halfway
12  house would be very helpful to you.  First, it will get you a
13  job.  And you'll be required to have a job full time, maybe
14  it's a temporary job until you decide what skill or vocation
15  you really want to pursue, but I want you to have a full-time
16  job and the halfway house will allow you to do that.  I'm
17  going to suspend the obligation that you have to pay.  The
18  halfway house is not free, but I'm going to suspend that
19  obligation only because you do have a child and you need to
20  start paying something on a regular basis pursuant to
21  somebody's court order for the child's care.  So I'll suspend
22  the subsistence payment so that you can support the child
23  while you're in the six-month of the halfway house.  Again,
24  the halfway house provides structure.  It's going to require
25  you to start learning how to make decisions for yourself,

aside from the parents, who have done all they can, so that
you can come to grips with what you want to do with your life
going forward.

I'm going to -- in addition to the supervised
release terms, I'm going to impose the following special
conditions: That you refrain from any use of any kind of
alcohol, that you participate in drug testing and substance
abuse as determined by probation, and that can include
inpatient or outpatient treatment. The -- I'm going to also
impose a mental health program treatment to be determined by
the probation office. And you'll furnish all financial
records, including -- without limitations to the probation
office.

Now, during the halfway house term, not only will
you have more structure and accountability and responsibility
for those six months, bear in mind that's -- that is only to
help you determine your own life once you're no longer in the
halfway house but still under supervised release. You'll be
reporting to probation, drug testing, verifying your
employment. And the way this works is if you don't do those
things, Mr. Waddey, then you and I will be back here to see
what else I can do to persuade you, to convince you, to get
you to simply fulfill the responsibilities that everybody
else in this courtroom has. While you're on supervised
release -- after you're released you'll report to probation.

1  Within 72 hours after initially reporting, they'll give you

2  terms on the frequency of your reporting to them thereafter.

3  You cannot leave the federal judicial district without first

4  getting the permission of the Court.  You must cooperate with

5  probation and you must tell them the truth.  So while you're

6  on supervised release, if you mislead them or tell them a

7  falsehood, then they're going to let me know.  And then we're

8  going to be back here again.  You have to live and work in a

9  place approved by probation.  You have to allow probation to

10  visit you at any time in your home or elsewhere or permit

11  you -- and permit them to take any items that are prohibited

12  by your conditions of supervised release that are in plain

13  view.

14        Again, I've already talked about the importance

15  that you will be required to have a full-time job.  And I'll

16  just let you know, I give a tremendous amount of weight to

17  people who have a full-time job.  I think -- I don't know if

18  it's a silver bullet.  Some say it is.  But I think that will

19  be a good way to avoid the drinking, a good way to avoid the

20  drugs, a good way to keep your life on focus at age 23 for

21  the rest of your life.  So I give a lot of weight -- if I get

22  a report back that we found you a job -- and you're blessed

23  to be in the Middle District because we have so many

24  employers, really good employers, who will hire convicted

25  felons.  So you'll tell the truth about your past.  And some

of those jobs are paying $15 an hour, and I've even heard of
some at $18 an hour.  So I give a lot of weight to the fact
that you need to have -- and you must have -- and you will
have a full-time job.

You must not communicate or interact with someone
you know is engaged in criminal activity.  If you know
someone has been convicted of a felony, you must not
knowingly interact with that person without first getting the
permission of the probation officer.  If you're arrested or
questioned by law enforcement, you need to notify probation
within 72 hours.  You must not own, possess or have access to
a firearm, ammunition, destructive device, or dangerous
weapon.  You must not act or make any agreement with law
enforcement to act as a confidential source without first
getting the permission of the Court.  And if the probation
officer determines you pose a risk to another person, then
they may require you to disclose that risk to the person and
confirm that you've done so.  You must not commit another
state, federal or local crime.  You must not unlawfully
possess any controlled substance.  And you must cooperate in
the collection of DNA as directed by probation.

I am going to impose a fine.  I want to impose a
fine that in some way allows the government to recuperate the
cost of supervised release.  That's going to be done by
full-time employees of the Court.  And that's a cost to the

1   Court.  Typically defendants don't have that resource to do
2   so, but I'm going to impose a fine of $6,600 specifically to
3   cover some of the expense the government will incur while
4   you're on supervised release.  That doesn't fulfill the
5   government's obligation in full, but at least gives the
6   government back something, and I hope, again, let's you know
7   there are consequences to what you've done.
8           The mandatory special assessment of $100 per count
9   is also imposed.  And the issue of the guns has already been
10  addressed.  Do the parties have any objection to the sentence
11  just pronounced that have not previously been raised?  From
12  the Government?
13          MR. HANNAFAN:  No, Your Honor.
14          THE COURT:  From the Defendant?
15          MR. YARBROUGH:  No, Your Honor.  I do have a
16  question if the Court --
17          THE COURT:  Sure.
18          MR. YARBROUGH:  Would that -- because of the term
19  that the Court has imposed, would he complete that at Grayson
20  or would he have to be assigned to a federal facility?
21          THE COURT:  Do you want Grayson?  I can recommend
22  Grayson.
23          MR. YARBROUGH:  I believe we would prefer that, if
24  Your Honor please, since he's already acclimated there and by
25  all accounts doing well.

1          THE COURT:  Yeah, I don't -- I don't get to tell

2    the Bureau of Prisons what to do.  As I understand it, the

3    U.S. Attorney doesn't get to tell.  I'm not sure who they

4    report to.  But I can make a recommendation --

5          MR. YARBROUGH:  That would be our request.

6          THE COURT:  -- to Grayson, but they may or may not

7    follow that depending on all what's here.  I'll further

8    recommend that he shall -- if not Grayson, that he be placed

9    in a facility as close to Nashville as possible to facilitate

10   his family visits.

11          The sentence is hereby ordered imposed as stated.

12   And does the Government have a motion on Count Two?

13          MR. HANNAFAN:  Yes, Your Honor.  The United States

14   moves to dismiss Count Two.

15          THE COURT:  All right.  So Count Two will be

16   dismissed.

17          Now, Mr. Waddey, not withstanding your guilty

18   plea, and as limited by your plea agreement, as well as the

19   sentence imposed, you have a right to appeal.  And your right

20   to appeal generally follows 14 days after the judgment

21   enters.  And the judgment will be entered today.  So 14 days

22   after today you can file a Notice of Appeal with the Court of

23   Appeals.  If you can't afford to pay the costs, you can apply

24   to appeal as a pauper.  If you tell your attorney to file a

25   Notice of Appeal, he'll do so.  If you tell the Clerk of

1 Court here to file a Notice of Appeal on your behalf, the

2 Clerk will do so.  And I'm going to give you a form Notice of

3 Appeal that you can use however you want, but I strongly urge

4 you to do it with the advice of a lawyer.

5         Okay.  Mr. Waddey, do you have any questions about

6 your appeal rights?

7         THE DEFENDANT:  No, sir, Your Honor.

8         THE COURT:  All right.  I think that -- anything

9 else I need to cover?  From the government?

10         MR. HANNAFAN:  No, Your Honor.

11         THE COURT:  From the defense?

12         MR. YARBROUGH:  No, Your Honor.  Thank you.

13         THE COURT:  Okay.  All right.  Thank you.

14         (Court adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on February 5, 2018, in the

8    matter of UNITED STATES OF AMERICA v. ROBERT ELLIS WADDEY,

9    Case No. 3:17-cr-00025; that said proceedings in connection

10   with the hearing were reduced to typewritten form by me; and

11   that the foregoing transcript (pages 1 through 49) is a true

12   and accurate record of said proceedings.

13           This the 14th day of February, 2019.

14

15                           /s/ Lise S. Matthews
                             LISE S. MATTHEWS, RMR, CRR, CRC
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25