UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


UNITED STATES OF AMERICA )
)
VS ) No. 3:17-cr-025
)
ROBERT ELLIS WADDEY )
_____


BEFORE THE HONORABLE BARBARA D. HOLMES,

MAGISTRATE JUDGE

**TRANSCRIPT OF ELECTRONIC RECORDING**

(via video conference)

May 19, 2020

_____

<u>APPEARANCES:</u>

For the Government:    J. CHRISTOPHER SUEDEKUM
U.S. Attorney's Office
110 Ninth Ave S., Suite A961
Nashville, TN 37203


For the Defendant:    JONATHAN FARMER
Bone, McAllester & Norton
511 Union Street, Ste 1600
Nashville, TN 37219


_____

PREPARED FROM **ELECTRONIC RECORDING** BY:

**Roxann Harkins, RPR, CRR**
Official Court Reporter
801 Broadway, Suite A837
Nashville, TN 37203
615.403.8314.
roxann_harkins@tnmd.uscourts.gov

1

2                          **I N D E X**

3   Government witnesses

4   **JAMES FOSTER**

5   Direct Examination By Mr. Suedekum ..................8
    Cross-Examination By Mr. Farmer ....................34
6   Redirect Examination By Mr. Suedekum ...............57
    Recross-Examination By Mr. Farmer ..................61

7

8   **MICHAEL ETHERIDGE**

    Direct Examination By Mr. Suedekum .................65
9   Cross-Examination By Mr. Farmer ....................73
    Redirect Examination By Mr. Suedekum ...............79

10

11  Defense witness

12  **GARY WADDEY**

13  Direct Examination By Mr. Farmer ...................82
    Cross-Examination By Mr. Suedekum ..................92

14

15

16                       **E X H I B I T S**

17   Government No. 1....warrant affidavit .............61

18

     Defense No. 1....Incident Report No. 2020-0187135 .65
19            dated 3-1-2020
     Defense No. 2....Email from Fred Thomas dated .....85
20            5-19-2020
     Defense No. 3....Photo of table holding multiple ..89
21            items, papers, lighters, game controller,
              etc.

22

23

24

25

The above-styled cause came to be heard on May 19, 2020, before the Hon. Barbara D. Holmes, Magistrate Judge, when the following proceedings were had to-wit:

**TRANSCRIPT OF ELECTRONIC RECORDING**

**\*\*\***

THE COURT: I see the marshal, now I see -- I think we have everyone on. Can you all hear me? If you would just nod your heads if you can hear me. All right. Everyone's nodding their head. I'm going to ask everyone to mute their line because we are getting some feedback.

All right. And then I'm going to go ahead and call the case and we'll start the rest of this afternoon's proceedings. We are here in the matter of the *United States versus Robert Ellis Waddey*, No. 3:17-00025. All right. We have -- now we've lost Mr. Suedekum. Let's see if Mr. Suedekum rejoins.

And, again, if everybody would mute their line. There we go. That's better. We've lost Mr. Suedekum again. All right. I'm going to have everybody reload. If you will go up to the refresh or

1    reload symbol in the top left-hand corner that looks

2    like a half circle with an arrow and click that, and

3    if everybody would reload, then we'll see if we can

4    resolve some of these feedback issues.

5             All right.  That seems to have worked.

6    Can everybody see and hear?  We lost Mr. -- all right.

7    We have a witness back.  All right.  All right.

8    Again, if everybody would keep our system muted.

9             We are here in the matter of the

10   United States versus Robert Ellis Waddey,

11   No. 3:17-00025.  On behalf of the government we have

12   Assistant United States Attorney Chris Suedekum, and

13   on behalf Mr. Waddey, we have Jonathan Farmer.

14            All right.  Let's take care of a couple

15   of housekeeping things and then we'll get into the

16   substance of the hearing.  Mr. Farmer, have you had an

17   opportunity to talk with Mr. Waddey about proceeding

18   today by video conference?  Mr. Farmer?  I need you

19   to -- go ahead and unmute, if you would.

20            MR. FARMER:  I can hear you now.

21            THE COURT:  Yes, and I'll have you mute

22   it again in a moment because there's a lot of

23   feedback, but have you had an opportunity to talk with

24   Mr. Waddey about proceeding by video today?

25            I think he's trying to do it on a phone.

1          Mr. Farmer, have you had an opportunity
2     to talk with Mr. Waddey about proceeding by video
3     today?
4          MR. FARMER:  Yes, I have.  We've
5     discussed proceeding via the preliminary hearing and
6     the detention hearing by video.  And we consent to do
7     the same.
8          THE COURT:  Is there anyone that's using
9     two devices that might be interfering with each other,
10    like a phone and a laptop?  Okay.  Well, that seems to
11    have solved whatever the problem was for the moment.
12         All right.  But I am hearing a lot of
13    feedback, so if you would just keep your devices
14    muted.  And we've lost Mr. Farmer again.
15         Mr. Waddey, let me ask you a question,
16    Robert Waddey, would you have any opposition to
17    Mr. Farmer participating by telephone rather than by
18    video?
19         THE DEFENDANT:  If he thinks that would
20    be a good idea, no, ma'am, I do not.
21         THE COURT:  And do you --
22         THE DEFENDANT:  I don't have any
23    objection.
24         THE COURT:  And do you consent proceeding
25    today by video or telephonically?

1            THE DEFENDANT:  Yes, ma'am, Your Honor.

2            THE COURT:  All right.  Hold on just a

3    moment.  I'm going to mute my line and I'm going to

4    have my courtroom deputy call Mr. Farmer or email him

5    and have him participate by phone.

6            THE DEFENDANT:  Okay, yes, ma'am,

7    Your Honor.

8            (Pause in proceedings.)

9            THE COURT:  All right.  We're just --

10   we're seeing about Mr. Farmer dialing in.  Mr. Farmer,

11   are you on the line?

12           MR. FARMER:  Hello.

13           THE COURT:  Mr. Farmer, is that you?

14           MR. FARMER:  It is me, yes.

15           THE COURT:  All right.  Mr. Waddey is

16   agreeable to you participating by telephone, but I am

17   going to ask you to mute your line until I talk to you

18   because we're getting a lot of interference again.  So

19   I know it's not anything you're doing, Mr. Farmer, but

20   I think it's at your end where we're having some of

21   these issues, so if you can mute your line and then --

22   I already -- this is, again, the matter of the

23   *United States versus Robert Ellis Waddey*,

24   No. 3:17-00025.  We are proceeding by video today for

25   the preliminary hearing and detention hearing in

connection with the petition for warrant for offender on supervision.

And because Mr. Waddey is a supervised releasee, Mr. Farmer, it is your -- it is his burden to demonstrate by clear and convincing evidence, of course, that there's a basis for release. It is the government's burden with respect to the preliminary hearing.

So I think because it is the government's burden on the preliminary hearing, Mr. Suedekum, I'm going to have you go first. And then we'll hear from Mr. Farmer as to any proof that he has with respect to detention.

So, Mr. Suedekum, are you ready to proceed?

MR. SUEDEKUM: Yes, Your Honor.

THE COURT: All right. If you'd go ahead, then, sir.

MR. SUEDEKUM: Your Honor, I do have two witnesses. The first witness is probation officer James Foster.

THE COURT: All right. Mr. Foster, if you would raise your right hand for me, please.

1                        **JAMES FOSTER**

2    called as a witness, after having been first duly

3    sworn, testified as follows:

4              THE COURT:  I'm going to need you to

5    unmute for just a moment, Mr. Foster.

6              THE WITNESS:  Yes.

7              THE COURT:  So you do swear to tell the

8    truth, the whole truth and nothing but the truth.

9    Swear or affirm, all right.  And then Mr. Foster, you

10   can lower your hand.  And if you'd state your name for

11   us, please.

12             THE WITNESS:  James Foster.

13             THE COURT:  All right.  Go ahead,

14   Mr. Suedekum.

15             MR. SUEDEKUM:  Thank you, Your Honor.

16                   **DIRECT EXAMINATION**

17   BY MR. SUEDEKUM:

18        Q.    Mr. Foster, are you currently supervising

19   Mr. Waddey?

20        A.    That's correct.

21        Q.    And how long have you been the

22   supervising probation officer for him?

23        A.    I've been supervising Mr. Waddey since

24   approximately September of 2019.

25        Q.    And did you say 2018 or 2019?

1          A.     2019.  Mr. Waddey was previously

2     supervised by other probation officers in the office.

3          Q.     Okay.  I want to begin by talking about

4     the petition that you submitted to the Court.  In or

5     around March 20 of 2020, did you submit a petition to

6     the Court for action regarding Mr. Waddey?

7          A.     Yes.

8          Q.     And what was the basis of your petition?

9          A.     The basis of the petition consists of

10    three violations.  First violation being that at that

11    time Mr. Waddey had been charged with a misdemeanor,

12    domestic assault out of Davidson County.  The second

13    violation alleged instances of admitted and drug tests

14    (indiscernible) marijuana use.  And third violation of

15    admissions of alcohol use.

16         Q.     And with respect to the petition, was the

17    information that you put in the petition, do you

18    believe that to be true and accurate to the best of

19    your knowledge?

20         A.     Yes.

21         Q.     With respect to the first alleged

22    violation, could you just describe the basic facts as

23    you understood them that led to the arrest affidavit

24    for domestic assault?

25         A.     Yes.  Briefly, the Metropolitan Nashville

1  Police Department received a phone call on the evening

2  of March 15 from Mr. Waddey's girlfriend, Andrea

3  Stone, alleging a domestic incident.  Police came to

4  the scene and interviewed both Mr. Waddey and

5  Ms. Stone.  Ms. Stone alleged, in essence, that she

6  and Mr. Waddey had been physically scuffling during

7  which his foot broke her jaw.  Mr. Waddey gave a more

8  brief but silently different explanation during which

9  he admitted they were scuffling, but he terminated his

10  account of events apparently earlier than Ms. Stone

11  did.

12         Police left the scene after counseling

13  both individuals on domestic violence issues.

14  Mr. Waddey -- no charges were pressed that evening.

15  Mr. Waddey reportedly left the incident -- or left the

16  residence and then stayed with his parents that night.

17         It appears that on the 16th, in relation

18  to the same alleged course of conduct, Ms. Stones

19  requested a temporary order of protection, which was

20  issued, prohibiting Mr. Waddey from having any

21  threatening or other contact with her or their

22  children.  And on the 17th, Ms. Stones -- or Ms. Stone

23  requested a domestic assault charge, which was sworn

24  out against Mr. Waddey, that being the aforementioned

25  misdemeanor domestic assault charge.  And that warrant

1  existed and was in place until his recent arrest

2  earlier this month.

3       Q.   And did a state court judge find probable

4  cause and issue an arrest warrant for the domestic

5  assault incident?

6       A.   Yes.

7       Q.   And to summarize Ms. Stone's allegation,

8  she said that at some point that they were wrestling

9  or doing MMA-style moves together; is that right?

10      A.   Yes.  As stated in the petition, we

11  allege that earlier on the same evening, that would be

12  March 15, Mr. Waddey had been consuming alcohol and

13  watching movies.  She stated that he occasionally

14  liked to act out such films and also that they had, of

15  late, been learning Brazilian jujitsu together and

16  they sometimes practiced together, but he allegedly

17  sometimes took it, quote, too far.

18           On the evening in question, she alleged

19  that they'd been practicing martial arts

20  (indiscernible) on their bed and that she had wished

21  to conclude that practice but Mr. Waddey would not.

22  She stated that she broke out of several of the holds

23  that he was using upon her (indiscernible) pinned her

24  down several more times.  And that in the course of

25  her breaking one of his holds, his foot allegedly

1    struck her jaw.

2          Q.    And she went to the police two days

3    later.  Did she report that her jaw was still hurt?

4          A.    If I may, I would need to refer to that

5    document.

6          Q.    Do you have a copy of the domestic

7    assault affidavit that she signed?

8          A.    I do.  I'm reading it now.

9                MR. SUEDEKUM:  Your Honor, this is the

10   affidavit that I'd provided to the Court and

11   Mr. Waddey's counsel prior to the hearing.

12               THE COURT:  All right.

13               THE WITNESS:  According to the affidavit,

14   the alleged victim, Ms. Stone, stated that Mr. Waddey

15   would become violent when he consumed alcohol.  She

16   stated that on the evening of the 15th of March,

17   Mr. Waddey was intoxicated.  They entered into a

18   scuffle, after which he put her into an ankle lock.

19   She stated that she had been able to free herself by

20   kicking him off.

21               She stated that she kicked him off, but

22   he continued to pursue her and pin her down on the bed

23   with his knees and that she was able to again kick him

24   off, but in that moment he broke her jaw with his

25   foot.  She stated that the actions were unwanted and

1    that she had, instead of doing these things, wanted to

2    go to sleep.  She claims that she had repeatedly told

3    Mr. Waddey to stop, but he did not stop.  And she

4    stated that while there was no visible injury, her jaw

5    continued to hurt.

6          Q.    All right.  And at some point did you

7    obtain a copy of the police report from March 15 when

8    police officers responded to their home?

9          A.    Yes.  In the days immediately following

10   the alleged incident, I obtained first a copy of the

11   incident report.  The document that I was just quoting

12   a moment ago, the affidavit, I obtained that three

13   days ago because those documents had remained sealed

14   (indiscernible) Mr. Waddey's state warrant

15   (indiscernible).

16         Q.    Did Mr. Waddey, from your review of the

17   police report, speak to police on the night of

18   March 15?

19         A.    According to the incident report, he did

20   speak to them on that evening.

21         Q.    And according to the incident report, did

22   Mr. Waddey give a different version of events from

23   what Ms. Stones had said had happened?

24         A.    Mr. Waddey stated that he and Ms. Stones

25   had been practicing Brazilian jujitsu on their bed

1    where Ms. Stone attempted to place him into an ankle

2    lock.  He stated that he reversed that attempt and

3    then put her into an ankle lock, at which time she

4    claimed that he had hurt her ankle.

5              But according to the incident report,

6    Mr. Waddey's statements did not go beyond that, as he

7    declined to answer any further question regarding the

8    event.

9         Q.   When you spoke to Mr. Waddey a day or two

10   later -- and I believe this is set forth in the

11   petition -- did Mr. Waddey provide you a different

12   version of events from what he had told police,

13   according to the police report?

14        A.   Yes.

15        Q.   When you spoke to Mr. Waddey a day or two

16   later, what was the new version of events that he

17   shared with you, that he claimed had happened?

18        A.   I spoke to Mr. Waddey on the 16th.  He

19   stated that he and Ms. Stones had been arguing

20   frequently in the week prior to the alleged domestic

21   assault and also alleged that (indiscernible) COVID-19

22   pandemic had not been able to obtain some of her

23   psychiatric medication.  He stated that on the evening

24   of the 15th after they put their two children to bed,

25   he and Ms. Stones engaged in, quote, rough sex, during

1    which, at Ms. Stones' request, he, quote, choked her

2    some.

3              He stated that she began to object to

4    that activity and accused him of, quote, being too

5    rough, which led to a verbal argument between the two,

6    after which she called police.  Mr. Waddey stated that

7    after the police had departed the residence, he left

8    and stayed at his parents' residence where he consumed

9    an unspecified quantity of alcohol that evening.

10         Q.    Turning your attention to the third

11   alleged violation, is it your testimony that

12   Mr. Waddey admitted to you that he had consumed

13   alcohol on the night of March 15th?

14         A.    Yes.  His admission of using alcohol was

15   after he went to his parents' residence.  I don't

16   believe he made an admission about alcohol abuse prior

17   to the alleged event with Ms. Stone.

18         Q.    Fair enough.  At some point, though, he

19   admitted to you that at some point that evening he had

20   consumed alcohol?

21         A.    Yes.

22         Q.    And one of the conditions of his

23   supervised release is that he's not allowed to consume

24   any alcohol; is that correct?

25         A.    That's correct.

1          Q.     To your knowledge was this the only

2    occasion on which Mr. Waddey consumed alcohol while

3    he's been on supervised release?

4          A.     No.

5          Q.     Did Ms. Stones, in her report to police

6    and in her domestic violence affidavit, did she

7    indicate that Mr. Waddey occasionally drank alcohol in

8    her presence?

9          A.     Yes.

10         Q.     Above and beyond what Ms. Stones

11   reported, are you aware of any other occasion while on

12   supervised release that Mr. Waddey has either consumed

13   alcohol or an occasion for which you suspected him of

14   consuming alcohol?

15         A.     Yes.

16         Q.     If you would, could you please elaborate

17   as to any occasions that you're aware of?

18         A.     Yes.  In March of 2019, prior to when I

19   initiated supervision of Mr. Waddey, he had what he

20   admitted as a significant alcohol relapse, which was

21   followed by inpatient treatment for alcohol use.

22   Later during the evaluation that was conducted in

23   August 19th -- or August 2019, he admitted having

24   consumed alcohol after he left inpatient treatment.

25   Mr. Waddey also admitted on August the 14th that he

1    had consumed alcohol, specifically vodka, on the

2    evening of August 12 and August 13.

3        Q.   As a result of these or other incidents,

4    has Mr. Waddey been referred to alcohol or other

5    substance abuse counseling or treatment?

6        A.   Yes.

7        Q.   Based on your conversations with him and

8    with any therapist, what do you know about whether or

9    not those sessions have been helpful to Mr. Waddey in

10    coping with his use of alcohol?

11        A.   My understanding is that at times, based

12    on Mr. Waddey's self-report, he had stated that the

13    treatment has been helpful. Based on his continued

14    use of alcohol, I don't think it's been helpful in

15    helping him to abstain completely.

16        To answer your earlier question regarding

17    his treatment, Mr. Waddey has been in some form of

18    outpatient treatment virtually the entire time that

19    he's been on supervised release, primarily outpatient

20    counseling through Dr. Gary Wilson, which continued

21    until, I believe, as late as earlier this year.

22        He's also received psychiatric medication

23    through Dr. Kent Kyger. Specifically for alcohol,

24    Mr. Waddey did, in April of 2019, attend a multi-day

25    inpatient detox hospital at Rolling Hills Hospital.

1    And then I believe between June and July of the same

2    year, he attended inpatient substance abuse treatment

3    for approximately 30 days at Mirror Lake Recovery

4    (indiscernible).

5            Mr. Waddey was also referred in August of

6    2019 to assessments for further treatment at the

7    Evelyn Frye Center.  Those recommendations from the

8    Frye Center indicated that he was not a good candidate

9    for the type of treatment modality which they were

10   hoping to work with him, which involved examination of

11   prior -- prior stressors, prior traumas.

12           My conversations with Mr. Waddey's

13   aforementioned outpatient counselor, Dr. Gary Wilson,

14   he believed that his work with Mr. Waddey was

15   beneficial, believes that Mr. Waddey was somewhat

16   opening up to him, but was also extremely paranoid and

17   a severely emotional man, as he put it.

18           And Dr. Wilson stated that it was his

19   opinion that any referrals to any other treatment

20   would eventually be useless because he doubted that

21   Mr. Waddey would ever open up to any other treatment

22   providers or attend any form (indiscernible).

23       Q.    Before we move on and talk about the

24   issue regarding Mr. Waddey's release or detention, I

25   want to also talk about the second alleged violation

1    regarding positive tests for the presence of THC.  Are

2    you aware of whether or not during the time Mr. Waddey

3    has been on supervised release he has tested positive

4    for THC?

5           A.    Yes, he has.

6           Q.    And is THC the chemical or compound

7    that's present in marijuana?

8           A.    Yes.  It's the psychoactive chemical

9    present in cannabinoidal products, such as marijuana.

10          Q.    According to the petition, you indicate

11   that Mr. Waddey tested positive, it appears, on

12   several occasions; is that correct?

13          A.    Yes, that's correct.

14          Q.    The most recent occasion listed is

15   November 22 of 2019.  Has Mr. Waddey continued to be

16   drug tested since that time or is that the last time

17   he was drug tested, to your knowledge?

18          A.    Mr. Waddey tested negative consistently

19   between the end of November and between late February,

20   which was the last drug test that the probation office

21   conducted with Mr. Waddey prior to this hearing.

22          Q.    At some point between August 23, 2019,

23   and November 22, 2019, did you have any conversations

24   with Mr. Waddey about the fact that he was having

25   these positive drug tests for marijuana?

1          A.    Yes.   Mr. Waddey and I discussed
2    (indiscernible) virtually every one (indiscernible).
3          Q.    Did Mr. Waddey ever admit to consuming
4    marijuana during these conversations?
5          A.    No, not specifically.   Mr. Waddey
6    emphatically denied having used marijuana, per se.
7    However, Mr. Waddey claims that the only substance
8    that he used he believed would account for his drug
9    tests was CBD oil or hemp, which he claims to have
10   legally purchased from various suppliers in Nashville.
11         Q.    What, if anything, did you advise him or
12   respond to him regarding whether or not these -- these
13   items would cause him to have THC present in his
14   system?
15         A.    So I requested input from a national
16   testing laboratory, the same laboratory that tests all
17   the drug samples sent in by the probation office.
18   That testing laboratory explained that to be legally
19   available, hemp and CBD products must contain below a
20   certain minimal threshold of THC.
21               Essentially, no product can be sold which
22   has enough THC that it would be psychoactive.   Or
23   (indiscernible) upon this lab's test.   The lab
24   essentially was stating to me that they could not
25   confirm or deny that Mr. Waddey might have been

1     purchasing hemp.

2              What the lab did tell me was that if

3     Mr. Waddey was using only substances that he'd

4     obtained legally, then whatever he was obtaining and

5     using contained more than the legally permissible

6     level of THC.

7              Mr. Waddey seemed very against making any

8     admission of using marijuana.  Therefore, I thought it

9     was a dead end to try to lead him to any form of

10    confession, so to speak.  Instead, I explained to

11    Mr. Waddey that it appeared, based on testing, that

12    whatever he was using did not meet the definition of

13    something that should be legally sold.  Instead,

14    (indiscernible) appeared to have illegal amounts of

15    THC.  Therefore, I encouraged him to stop using

16    whatever it was that he was using.

17    Q.     Do you recall when it was you had this

18    conversation with Mr. Waddey and warned him about

19    this --

20    A.     These conversations took place on

21    multiple occasions with exactly the same talking

22    points between August and late November.

23    Q.     So at least one of these conversations

24    occurred between you and Mr. Waddey, and then he

25    thereafter tested positive for THC again; is that fair

1  to say?

2        A.    Yes.

3              MR. SUEDEKUM:  Your Honor, I would ask

4  the Court, is it all right now if I transition to

5  discussing factors relevant to detention?  Or do you

6  have anything further that you'd like to hear

7  regarding the alleged petition violations from

8  Mr. Foster?

9              THE COURT:  Well, are your questions

10 about detention of Mr. Foster as well?

11             MR. SUEDEKUM:  Yes, I do have some

12 questions related to that.

13             THE COURT:  Then go ahead and finish your

14 examination of Mr. Foster and then I'll let Mr. Farmer

15 cross-examine Mr. Foster for any purpose.

16             MR. SUEDEKUM:  Thank you, Your Honor.

17 BY MR. SUEDEKUM:

18       Q.    Mr. Foster, on the whole, how would you

19 describe Mr. Waddey's behavior and compliance with the

20 conditions of his supervised release from October 2018

21 to the present?

22       A.    I believe that Mr. Waddey has struggled

23 with some conditions of supervised release.  In some

24 areas, in terms of being willing to report to

25 probation and submit requested documentation, he's

1    been very good.  Mr. Waddey's primary (indiscernible)

2    has been in his use of substances.  And I think that

3    Mr. Waddey's willingness to engage in other forms of

4    treatment or his ability to engage in other forms of

5    treatment has been lacking.

6          Q.    How has the current COVID-19 pandemic

7    impacted -- first I want to ask you about Mr. Waddey's

8    behavior while he's on been supervised release during

9    the pandemic, and then I want to specifically ask you

10   about how the pandemic has affected your ability to

11   continue to supervise him.

12               So first, can you talk a little bit about

13   Mr. Waddey's behavior during the past few months

14   specifically?

15         A.    Okay.  I would preface this by stating

16   that since I've met Mr. Waddey, according to records

17   for virtually the entire time Mr. Waddey has been

18   under supervision, even before Mr. Waddey

19   (indiscernible) several individuals, including

20   treatment providers and myself an abiding interest and

21   concern about what has been described by some writers

22   as real political concerns, future war, fear of the

23   future, concerns about government and conspiracies,

24   bordering on paranoia.

25               How this -- how the COVID-19 pandemic

appears to have affected Mr. Waddey is, from what I
have heard, very poor.  Mr. Waddey, from about the
time of the 15th of March until late April, maintained
regular, if not daily, near daily conversation with me
for several weeks.  I preface this, again, by stating
that normally once a warrant has been issued for an
individual's arrest, the probation office pulls back
on certain supervision elements in order to make room
for the marshals to be able to execute the warrant.

In this case Mr. Waddey, unbeknownst to
him, after the 17th and then again on the 19th
simultaneously (indiscernible) warrants which he
wasn't aware of.  Even within the days between the
15th and the 19th, Mr. Waddey's conversations with me
indicated that he seemed deeply troubled by the
COVID-19 pandemic.  He seemed to be emotionally
struggling and paranoid; therefore, I maintained
regular contact with him.

And over the course of those days and
weeks, it appeared to me that Mr. Waddey became more
and more concerned, became more and more paranoid.  It
seemed that his social interactions with others were
falling away and were limited.  He expressed feelings
of fear and anxiety and stress regarding his family
and their health; loneliness regarding his girlfriend

having left. Uncertainty about his job, uncertainty
about his health status.

In fact, on two different occasions
Mr. Waddey believed he himself had contracted
COVID-19, and during the latter one of those, based on
his own description, he may well have, but I don't
believe at any point he tested positive or submitted
himself for testing.

Overall I think that it affected him in a
pronounced way in that it played upon many of his
preexisting concerns and ideas and I would say
interests bordering on obsession, those being
surviving such a possible outcome, surviving what he
believed would be the collapse of society.

Q.    Did Mr. Waddey make any request to you
about wanting to leave his residence perhaps related
to the pandemic?

A.    Yes.  On more than one occasion, I
believe on approximately the 18th, only a few days
after the incident with his girlfriend, Mr. Waddey
asked if I would allow him to relocate to an
undisclosed wooded location (indiscernible) Middle
Tennessee.  On its face I realize that that request
was a bad idea, but I denied that request.

I talked with Mr. Waddey about it as

1    logically as I could, asking him, where would you
2    stay, how could I supervise you if you were somewhere
3    else.  Where would you even want to go.  Mr. Waddey
4    humored my question, but he told me that he wouldn't
5    tell me where he wanted to go.  It seemed that that
6    defeated the purpose of wanting to go to an
7    undisclosed location.  Again, I told him that wasn't
8    possible and encouraged him to stay put.  In fact, I
9    had to claim to Mr. Waddey that if he were to leave
10   his address permanently or semi-permanently, I was no
11   longer able to locate him, I would be obligated to
12   inform the Court and a warrant for his arrest must
13   surely be issued.
14           Even after that discussion, Mr. Waddey
15   asked me for that permission on, I believe, two more
16   occasions during the month of March and as late as, I
17   believe, April (indiscernible) asked for permission
18   to, quote, get the fuck out of Dodge and hang out at
19   an undisclosed location during the COVID-19 pandemic.
20       Q.    Mr. Foster, to -- I will state, to
21   Mr. Waddey's credit, when you told him he wasn't
22   allowed to do that, did he say that he would agree
23   to -- he wouldn't do it then?
24       A.    Mr. Waddey stated during most of those
25   conversations that he would try to follow the advice

1   that I was giving him, yes.

2          Q.     And to your knowledge did he ever attempt

3   to leave and go out to an undisclosed location or was

4   he still living at his residence to the best of your

5   knowledge?

6          A.     To my knowledge Mr. Waddey never

7   relocated to any other locations that I was aware of.

8   During the month of March and April, I conducted two

9   (indiscernible) home contacts with Mr. Waddey at his

10  residence, wherein I drove to his residence, parked

11  across the street and made phone contact with him.  He

12  came to the window, waved to me, and I verified his

13  location there and we talked for a while.

14         Q.     I want to talk more about that.  How has

15  precautions related to the COVID-19 pandemic impacted

16  your ability to continue close supervision of an

17  individual like Mr. Waddey?

18         A.     I think it's significantly impacted the

19  ability to safely and closely conduct supervision

20  activities.  While a lot of supervision nowadays,

21  thanks to technology, does consist of phone calls and

22  emails and other forms of reporting, the probation

23  office still conducts home contact.

24                During the course of a normal home

25  contact, the probation officer will walk into an

1    individual's residence, walk around the residence with
2    that individual and do what's called a plain view
3    search or plain view observation, meaning that the
4    probation office looks to see if (indiscernible) in
5    the home.  If there are any objects that appear to
6    constitute contraband or violations of supervised
7    release conditions, the officer is obligated to seize
8    these items.  These home contacts also allow the
9    probation officer to generally assess how someone
10   appears to be doing, how well they're doing at home,
11   how well they appear to be holding up with basic
12   living necessity, things of that nature.
13              The COVID-19 pandemic has significantly
14   impacted probation operations in that it is not safe
15   for probation officers at this time to go into the
16   residences of people under supervision.  The reason
17   for that is that the average probation officer at any
18   given day conducting field activities may go into the
19   homes of anywhere between half a dozen to a dozen
20   different individuals.
21              And in my case, having the caseload that
22   I do, those individuals would reside likely not only
23   all over Nashville, Metropolitan Nashville, but
24   potentially in various counties across Middle
25   Tennessee.  So I could be exposing myself to the

1  residences of between half a dozen or a dozen

2  different individuals a day.

3          And when I go into other individuals'

4  home, if I have exposed myself to anything during my

5  prior stops, by entering the next individual's home,

6  I'm potentially exposing them to everything I've been

7  exposed to.

8          So for those reasons, since only about a

9  week after the federal warrant for Mr. Waddey's arrest

10 was issued, I've not been able to go into his home or

11 the home of anyone that I supervise.  Therefore, that

12 prevents me from being able to see with my own eyes

13 what's going on in the residence.  It also prevents me

14 from being able to do that (indiscernible) in an

15 effective manner which (indiscernible).  We don't

16 always announce we're coming.

17         We may just knock on someone's door or we

18 may call a mere matter of minutes before we arrive or

19 if someone doesn't answer the door, we may call from

20 at the door.  In case of the COVID-19 pandemic, and

21 particularly in Mr. Waddey's case, when I arrived at

22 his residence, I would always call so as not to

23 exacerbate what appeared to be his previously stated

24 concerns about individuals coming to his house or

25 potentially trying to make entry.

1          Q.    And from these conversations and the

2     modifications you made to your supervision, to your

3     knowledge, was Mr. Waddey aware of the more limited

4     way in which you were conducting supervision of him?

5          A.    Mr. Waddey was aware.  As the probation

6     office has made certain changes to supervision, we've

7     not necessarily sent out a list or any kind of formal

8     notice to every individual under supervision to any

9     modifications we're making.  Most individuals under

10    supervised release are learning about these

11    modifications as they go along.

12              For example, when I make a visit to

13    someone and say it's the first time I've visited them

14    since I've no longer been able to go by their house,

15    I'll call from outside and explain what's going on.

16              In Mr. Waddey's case, the discussion

17    about modification of supervision activity became one

18    of the focal points of our conversations on the phone

19    after or around March 15.  Mr. Waddey repeatedly asked

20    me questions along the lines of whether or not the

21    probation office was essentially ceasing activities

22    because the government was falling apart.

23              Many times Mr. Waddey called me, asked me

24    if I knew anything.  He stated on multiple occasions

25    that he believed that I, as a representative of the

1   federal government, would have some deeper insight
2   into what was going on with regard to the general
3   pandemic and what was coming.  In those conversations
4   Mr. Waddey indicated that what he believed was coming
5   was essentially riots in the streets or a federally
6   ordered quarantine.  So, again, he repeatedly asked me
7   questions about that.
8                   The most humane and I felt helpful
9   response that I could give Mr. Waddey was to calmly
10  explain to him that I do not represent the entire
11  federal government, that I represent part of the
12  judiciary; and, therefore, I explained to him that we
13  were changing the way that we did some things in order
14  to be try to stay safe and healthy during this
15  pandemic.  We weren't ceasing our operation.
16                  And I emphasized to him during every one
17  of those conversations (indiscernible) modification,
18  the way the probation (indiscernible) his job, he
19  remained subject to every single one of his supervised
20  release conditions and had to follow all of them
21  equally.
22          Q.   Based on these conversations, was
23  Mr. Waddey aware that you had, you know, for at least
24  some period that you were discontinuing conducting
25  home visits in which you would actually go inside his

1    home?

2         A.    Yes.  Mr. Waddey would have been aware of

3    that since at least mid March.

4         Q.    Are you familiar with the United States

5    Marshals Service report regarding items that were

6    located in Mr. Waddey's residence when they attempted

7    to serve the arrest warrant on him?

8         A.    Yes, I am.

9         Q.    Have you reviewed that report?

10        A.    Yes, I have.

11        Q.    Are any of the items that were identified

12   or seen while in Mr. Waddey's home items that you

13   would have considered either contraband or subject to

14   confiscation if you had been able to conduct

15   (indiscernible) inspection?

16        A.    Yes.

17        Q.    Are there any of the specific items that

18   you would identify as items that you would have

19   confiscated?

20        A.    Yes.  According to the report, on

21   Mr. Waddey's coffee table was located a water bong

22   pipe.  I'm familiar generally with what those look

23   like and I would have viewed that as drug

24   paraphernalia.  Also on the report in the bedroom

25   there were cans of police chemical spray, gas

1    grenades, which I believe was described as the brand

2    SABRE RED.  Also Mr. Waddey was in possession of

3    airsoft pistols.  And while airsoft pistols are not

4    necessarily something that might deliver a lethal

5    blow, I have in the past seized those from

6    individuals' homes because they do appear to be

7    identical to handguns.

8              He also had allegedly on his possession

9    two knives, including what was described as a necklace

10   blade.  And I believe that had I become aware of

11   anything like a necklace blade or a blade that

12   appeared to be anything other than something someone

13   would use at a regular workplace, those likely would

14   have been seized as evidence of contraband as well.

15        Q.    The basis for seizing those items, would

16   that be because they were potential dangerous weapons?

17        A.    Yes, potential dangerous weapons to

18   another person.  In the case of all of those items

19   being together in one place, given the particulars of

20   Mr. Waddey and his supervision, they would certainly

21   cause alarm had I found them in the course of a

22   regular home contact.

23             MR. SUEDEKUM:  Your Honor, I don't think

24   I have any further questions for Mr. Foster at this

25   time.

1          THE COURT:  Mr. Farmer, any

2    cross-examination?

3          MR. FARMER:  Yes, Your Honor.  Thank you.

4                    **CROSS-EXAMINATION**

5    BY MR. FARMER:

6          Q.    Mr. Foster, can you hear me?

7          A.    I can.

8          Q.    Okay.  Do you have your -- your petition

9    in front of you?

10         A.    Yes.

11         Q.    Do you have the incident report that you

12   referenced from the police department that I had filed

13   as an exhibit also in front of you?

14         A.    I have the incident report.  I did not

15   see which one you filed as the exhibit, but the one I

16   have says Incident Report at the top, yes.

17               THE COURT:  Is it the Incident --

18               MR. FARMER:  Is it a five-page --

19               THE COURT:  Incident report from March 15

20   of 2020?

21               THE WITNESS:  Yes.

22               THE COURT:  All right.  I think -- I

23   believe it's --

24               MR. FARMER:  I'm going to ask --

25               THE COURT:  Go ahead, Mr. Farmer.

1    BY MR. FARMER:

2         Q.    I'm going to ask you about those.  First,

3    I just wanted to clarify, have you spoken personally

4    with Mrs. Andrea Stones?

5         A.    No, I have not.

6         Q.    When was the last time you spoke with

7    Mr. Waddey?

8         A.    I believe that my last conversation with

9    Mr. Waddey was in late April, I believe approximately

10   on the 24th.  I believe he left voicemail messages for

11   me early on the morning on which he was arrested, but

12   I don't believe we had telephonic contact that date.

13        Q.    Okay, all right.  Okay.  So I want to

14   talk about the violations that you allege in your

15   petition.  And I just want to take them in order,

16   okay.  So I want to focus first on violation No. 1.

17   Are you with me?

18        A.    Yes.

19        Q.    Okay.  So the narrative that you give

20   here, I'm looking specifically at page 2 of the

21   violation report, this narrative -- and you say in

22   here it was obtained largely from an incident report

23   prepared by MNPD.  Do you see that?

24        A.    Yes.

25        Q.    Do you see where you represent that?

1          A.     Yes.

2          Q.     Okay, all right.  And is that the same

3     incident report that you have in your possession?

4          A.     Yes.

5          Q.     Okay.  And so is it your understanding,

6     based from the incident report, that the police were

7     called out there that night and didn't make an arrest;

8     is that correct?

9          A.     That they did not make an arrest, is that

10    what you said?

11         Q.     Yes.

12         A.     Yes, that's my understanding.

13         Q.     And that they spoke with both Mrs. Stones

14    and Mr. Waddey at the scene; is that correct?

15         A.     Yes.

16         Q.     And that this was at Mr. Waddey's home;

17    correct?

18         A.     Yes.

19         Q.     And it was a little unclear to me from

20    your testimony whether you were saying that you

21    believed that Mr. Waddey had been drinking at that

22    time.  And so -- so if you could clarify that for me.

23    Are you saying that you believe Mr. Waddey had been

24    drinking when the police showed up?

25         A.     No, I don't have evidence of him having

1  been consuming alcohol when the police arrived, no.

2  And that was not my reading of the report.

3          Q.    Okay.  And that -- and that's not my

4  reading either, but it was a little -- a little fuzzy

5  to me.  Okay.

6          A.    I believe -- if I can clarify, I believe

7  that I was referencing to the statement made by

8  Ms. Stone to police.

9          Q.    Okay.  Are you crediting that statement?

10         A.    I'm stating that she said it.  I don't

11 have any other independent evidence to say whether or

12 not it was true.

13         Q.    Did you ask Mr. Waddey if he had been

14 drinking while -- while he was doing Brazilian jujitsu

15 with Ms. Stone?

16         A.    No, we did not discuss whether he had

17 been using alcohol prior to arriving at his parents'

18 residence later during the same evening.

19         Q.    Okay.  But it's your understanding that

20 he left while the police were -- were still there?

21         A.    I'm not entirely clear on that point.

22         Q.    Okay.  So it's possible he left while the

23 police were still there?

24         A.    Well, I wrote in my report, which is

25 based on a note that I made, that after -- that before

1    police departed he left to spend the rest of the

2    evening at his parents' house.  So I believe he maybe

3    left while they were still there.

4         Q.    Okay.  Certainly if he was drunk or had

5    used alcohol, you wouldn't expect the police to allow

6    him to drive away, would you?

7         A.    I couldn't speculate as to that, but I

8    would concede the point you're making.

9         Q.    Okay.  Look at the incident report for

10   me, if you can.  And specifically page 4.  Tell me

11   when you're there.

12        A.    I'm there.

13        Q.    And I want to -- I want to focus on the

14   paragraph -- and this paragraph didn't make the

15   petition.  It looks like the rest of it did, but this

16   specific paragraph did not.  The very last paragraph

17   said due to conflicting statements.  Do you see that?

18        A.    Yes, I do.

19        Q.    Okay.  And I'm going to read it and you

20   tell me if I've read it correctly.  Due to conflicting

21   statements, lack of physical injuries, and lack of any

22   witnesses, officers were unable to prosecute on the

23   victim's behalf.

24              Did I read that right?

25        A.    Yes, that's correct.

1          Q.    Okay.  Are you familiar with Tennessee
2     law regarding domestic violence incidents?
3          A.    Not intimately, no.
4          Q.    Are you familiar generally in your role
5     as a probation officer?
6          A.    I would not dare to speak to my knowledge
7     of the law (indiscernible).
8          Q.    Okay.  So the fact that Mr. Waddey was
9     not arrested after the police investigation, does that
10    tell you anything as a probation officer?
11         A.    It would appear to be consistent with the
12    statement made here, that they did not see visible
13    injuries and there were no other witnesses.
14         Q.    Right.  They didn't take her down -- she
15    didn't request to go down to get a warrant that
16    evening, did she?
17         A.    No, I don't believe so.
18         Q.    Okay.  Are you familiar with Tennessee
19    Code Annotated 36-3-619?
20         A.    No, I am not.
21         Q.    Are you familiar with the mandatory
22    arrest privilege -- or, I'm sorry.  Strike that, let
23    me start over.
24               Are you familiar with the mandatory
25    arrest provision in Tennessee law regarding domestic

1   violence incidents?

2          A.    No, I'm not.

3          Q.    Okay.  But in any event, you agree with

4   me that on the -- on the night at issue, March 15, the

5   police were called out there, they did an

6   investigation, and they didn't make any arrest;

7   correct?

8          A.    Yes.

9          Q.    Okay.  The next day did Mr. Waddey

10  discuss this event with you, is that correct, on

11  March 16?

12         A.    That's correct.

13         Q.    Okay.  And then also that day or possibly

14  the next day Mr. Waddey discussed that he'd been

15  served with a temporary order of protection; is that

16  correct?

17         A.    I believe on the 17th Mr. Waddey stated

18  that he had been informed by representatives of

19  Davidson County Sheriff's Office that there did exist

20  a temporary order of protection, but I don't believe

21  he stated that he was served.

22         Q.    Okay.  Have you seen that temporary order

23  of protection?

24         A.    No, I have not.

25         Q.    Okay.  Do you know what a temporary order

1   of protection is?

2         A.    Yes, I do.

3         Q.    Okay.  So I started to ask you to explain

4   it to me, but maybe let me do it this way.  You

5   understand that a temporary order of protection is

6   issued ex parte; is that correct?

7         A.    Yes.

8         Q.    It's issued without the benefit of a

9   hearing; is that right?

10        A.    It's my understanding that they are

11  issued and then an individual is served and then at a

12  subsequent date a hearing will be set regarding

13  (indiscernible).

14        Q.    That's right.  That's exactly right.  But

15  in the meantime the temporary order of protection

16  requires the person, once served, to not have any

17  contact with the alleged victim; is that your

18  understanding?

19        A.    That's my understanding.

20        Q.    Okay.  And then looking back at your --

21  at the petition, you report in here that you also told

22  Mr. Waddey that he's not to have any contact with

23  Ms. Stones as of March 17; is that right?

24        A.    Yes.

25        Q.    Okay.  To your knowledge has he had any

1  contact with Ms. Stones?

2          A.    No.

3          Q.    Okay.  To your knowledge is the order

4  still in effect?  Has there been a hearing as to the

5  merits of the order or not?

6          A.    Not that I'm aware of.

7          Q.    Okay.  To your knowledge has anyone filed

8  any allegations or made any claims that Mr. Waddey has

9  violated this petition in any way as it relates to

10 Mrs. Stone?

11         A.    Not that I'm aware of, no.

12         Q.    Okay.  Mr. Suedekum asked you about the

13 arrest warrant alleging domestic assault.  Do you see

14 that?

15         A.    Yes.

16         Q.    Okay.  What date was that sworn out?  And

17 I'm not trying to trick you.  It's March 17 at 9:51 in

18 the morning --

19         A.    The 17th, yes.

20         Q.    -- do you see that at the bottom?

21         A.    Yes.

22         Q.    Do you see that?  Okay, all right.  All

23 right.  And that is a good two days after the incident

24 occurred; is that right?

25         A.    Yes.

1      Q.   A day after the police were out there
2  investigating?  Or two days after that; is that
3  correct?
4      A.   Yes.
5      Q.   Okay.  You had said -- and I believe you
6  were asked if a state court judge had found probable
7  cause.  Do you see who issued this warrant, who signed
8  it?
9      A.   I believe (indiscernible).
10     Q.   Do you know who that is?
11     A.   No, I don't know him.
12     Q.   Do you know if he's a judge or a night
13 court magistrate?
14     A.   I don't know.
15     Q.   You don't know that?
16     A.   It says Metropolitan General Sessions.
17     Q.   All right.  It says slash commissioner;
18 right?
19     A.   Slash commissioner, yes.
20     Q.   Okay.  So it could be a commissioner?
21     A.   Yes.  And I see that there is, underneath
22 his name stamped partially obscured, judicial
23 magistrate.
24     Q.   Judicial magistrate, okay.  Okay.
25          Let's move on to No. 2.  You must refrain

1    from unlawful use of a controlled substance.  And this

2    was separate and apart from the violation alleging

3    alcohol use; is that correct?

4         A.    Yes.

5         Q.    Okay.  So I want to talk about these

6    test -- positive test dates that you have on here.

7    First of all, how frequently was Mr. Waddey being

8    tested, being drug tested?

9         A.    Very frequently.  At times several times

10   a week.

11        Q.    Several times a week?  Okay.  And you've

12   listed all the positives that he had during -- during

13   this time period; is that correct?

14        A.    Yes.

15        Q.    Do any of these -- these tests on these

16   dates at issue, did any of these have to be

17   resubmitted or retested in any way?

18        A.    I don't believe so.  I know that when I

19   asked for an analysis of a number of these, I asked

20   for a comparative analysis, wherein the lab was

21   supposed to tell me whether or not he had used

22   marijuana anew, (indiscernible) certain tests, but I

23   don't believe it was a reanalysis (indiscernible).  I

24   believe it was a comparison of THC levels.

25        Q.    A comparison of THC levels?

1    A.    Yes, I believe so.

2    Q.    Did you get that back?

3    A.    Yes, I did.

4    Q.    What did it show?  While you're looking

5    at that, may I ask some questions at the same time?

6    A.    I had to get to the right page, I

7    apologize.

8    Q.    Okay.

9    A.    It states that it was the opinion of the

10   writer, Pat Pizzo, Director of Toxicology at Alere

11   Toxicology Services, that Mr. Waddey used marijuana or

12   a product containing THC prior to each of the

13   collections listed.  And those that were listed in

14   this report that I received back from Alere were

15   8-23-19, 8-26-19 and 10-7-19.

16   Q.    Okay.  And what about the other four?

17   A.    I didn't request analysis for those, not

18   beyond the analysis of whether or not they contained

19   THC.

20   Q.    Okay, all right.  So a couple questions

21   about this issue, then.  So you state in your petition

22   that you've informed Judge Crenshaw of this already;

23   is that right?

24   A.    I had previously informed Judge Crenshaw

25   of, I believe, the majority of those positive tests.

1       Q.     And he requested no action so that
2   Mr. Waddey could go to out -- could continue receiving
3   outpatient counseling; is that correct?
4       A.     That's correct.
5       Q.     Okay.  And that was your recommendation
6   as well; is that right?
7       A.     Yes.
8       Q.     Okay.  And I think you told us that he's
9   been in outpatient counseling pretty much
10  consistently; correct?
11      A.     Yes, he has.
12      Q.     Okay.  So he's in outpatient counseling;
13  is that right?
14      A.     Up until the time of these arrest, I'm
15  not certain.  I believe that when I was speaking with
16  him in March and April he'd indicated it had been some
17  time since his last outpatient counseling, but that
18  point of our conversation was unclear.  So I would say
19  that he was, at least until March, still in outpatient
20  counseling.
21      Q.     Okay.  And who -- where was he -- who was
22  he -- where was he receiving outpatient counseling?
23      A.     I believe that up until a few months
24  before that he'd been seeing Gary Wilson.  But he had
25  more recently, in February, told me that he had gone

1    to another specialist whose name I do not recall.  And

2    that he was still continuing to receive medication

3    through Dr. Kyger.

4            Q.    So Dr. Kyger -- and who is Dr. Kyger?

5            A.    I believe Dr. Kyger is a psychiatrist who

6    prescribes to him psychiatric medication.

7            Q.    Okay.  And your information is that

8    Dr. Waddey currently has a doctor/patient -- not

9    Dr. Waddey, excuse me, let me start over.

10              Your information is that Mr. Waddey

11   currently has a doctor/patient relationship with

12   Dr. Kyger; is that correct?

13           A.    I believe so.

14           Q.    Okay.  So but in any event Mr. Waddey has

15   always denied that he used marijuana; is that right?

16           A.    Yes.

17           Q.    During your supervision he's never been

18   arrested with marijuana, has he?

19           A.    No.

20           Q.    You've never found marijuana in his

21   house, have you?

22           A.    No.

23           Q.    On the raid that you discussed earlier

24   on -- on May 7 when the police came in, there was no

25   marijuana there then, was there?

1    A.    None in the report that I saw, no.

2    Q.    Okay.  Was CBD oil found?

3    A.    I don't believe that any was listed in

4  the report.

5    Q.    Okay.  Have you looked at any pictures

6  from the -- from the raid?

7    A.    No, I have not.

8    Q.    If I were to tell you or if a witness

9  were to testify that the bong that you referenced was

10  found immediately next to CBD oil, would you have any

11  reason to dispute that?

12    A.    No.

13    Q.    Okay.  All right.  Let's move on to

14  Violation No. 3, the refrain from use of alcohol.  And

15  so we've already kind of cleared out whether this

16  alleged assault, whether we think alcohol was a

17  fueling factor of that; correct?  We've already talked

18  about that.

19    A.    We have discussed that.

20    Q.    Okay.  So -- and I'm looking at your --

21  your allegations here.  And you talk about a half

22  point of vodka with a relapse, and this was reported

23  to Judge Crenshaw, and both you and Judge Crenshaw

24  requested no action so that he could continue to do

25  outpatient counseling.  And is that similar to the

1    issue we talked about above with the -- with the THC

2    positive test?

3         A.    Yes.

4         Q.    Okay.  So the new issue of alcohol is

5    this issue where he told you that -- and tell me if

6    I've got it wrong.  He told you that he'd gotten into

7    an argument with a -- some sort of scuffle, however

8    you want to describe it, with his girlfriend.  He

9    left, went to his parents' house and said he drank

10   alcohol at his parents' house; is that right?

11        A.    Yes, that's correct.

12        Q.    Okay.  This outpatient treatment he has

13   been involved in, does that include alcohol treatment

14   as well?

15        A.    The treatment that he received via his

16   outpatient counselor and psychiatrist, as it was

17   described to me, was intended to address the totality

18   of his issues, which are co-occurring.  A co-occurring

19   issue is when someone suffers from an issue with a

20   substance, as well as any other underlying mental

21   health diagnosis.

22        Q.    Okay.  How many times has he been

23   screened for alcohol?

24        A.    Mr. Waddey was screened for alcohol

25   concurrent to every one of his drug tests.

1          Q.    Okay.  Has he ever had a negative -- has
2     he ever had negative screens?
3          A.    If you'll give me a moment to review my
4     notes on that information, please.
5               According to my notes, he tested positive
6     for alcohol on April 15 of 2019 and he tested positive
7     for alcohol on August 14 of 2019.
8          Q.    Okay.  And so you -- and you discussed
9     the positive of August 14 of 2019 in your petition,
10    but I was asking about negative screens.  Am I correct
11    as far as the remaining tests were negative?
12         A.    Yes.  He was tested at a frequency of
13    very often two or three times a week, so if it's not
14    listed here, the tests were negative.
15         Q.    You don't report the negative ones, you
16    report the positive ones; is that right?
17         A.    That's correct.
18         Q.    Okay.  Okay.  During the May 7 raid of
19    his house, was any alcohol found?
20         A.    I don't believe any was listed in the
21    report that I got, no.
22         Q.    You're not aware of any alcohol being
23    found?
24         A.    I'm not aware of any.
25         Q.    Okay.  How long has Mr. Waddey been on

1    supervision, not just with you, but all in all?

2         A.    Mr. Waddey initiated his supervision term

3    on June 1 of 2018.

4         Q.    And how long is his supervision?

5         A.    His supervision was a two-year term that,

6    I believe, was originally scheduled to conclude on

7    May 31 of 2020.

8         Q.    So then 10 days or 12 days, this

9    violation notwithstanding, he was due to be finished

10   in less than two weeks; is that fair to say?

11        A.    Yes.

12        Q.    Okay.  These are Grade C violations, is

13   that right, or 5C violations?

14        A.    That's correct.

15        Q.    Okay.  I want to talk a little bit about

16   this concept that Mr. Waddey is, I guess,

17   conspiracy-minded.  Are you familiar with what I'm

18   talking about?

19        A.    Yes, I am.

20        Q.    Okay.  You're not saying that being

21   conspiracy-minded is illegal, are you?

22        A.    No.

23        Q.    You're not saying that being

24   conspiracy-minded is a violation of Mr. Waddey's

25   supervision, are you?

1          A.    No.

2          Q.    I would say, frankly, that a significant

3     portion of our country right now is fairly

4     conspiracy-minded.  Would you agree with that?

5          A.    I can see that.

6          Q.    Okay.  You also discussed that the

7     COVID-19 makes it more difficult to supervise

8     Mr. Waddey; is that right?

9          A.    Yes.

10         Q.    Is it fair to say that Mr. Waddey is very

11    concerned about contracting this virus?

12         A.    Yes.

13         Q.    Okay.  You discuss he would ask you

14    questions about government shutdown and those sorts of

15    things.  Is it fair to say that he was concerned about

16    what the effect of the virus was having on the

17    government?

18         A.    Yes.

19         Q.    He talked to you all the time, didn't he?

20         A.    Very regularly.

21         Q.    He called you almost daily, I think, at

22    some point you said; is that right?

23         A.    Yes.

24         Q.    Did he view you as a source of

25    information inside the federal government that could

1     help give him some insight as to what was really

2     happening with this COVID-19 pandemic?

3         A.    No.

4         Q.    You don't think so?

5         A.    No.  As I explained to Mr. Waddey on

6     multiple occasions, my knowledge of what the overall

7     federal government and the state government was doing

8     often came at the same rate of speed that it would for

9     him.  I, like I encouraged Mr. Waddey to do and I did

10    myself, would listen to or read about daily federal

11    government briefings and listen to or read about state

12    briefings.

13             And that was the majority of information

14    that I would receive, as I emphasized to Mr. Waddey.

15    I did not have any inside line to information, nor was

16    I receiving information at a faster rate of speed.

17         Q.    And you understand that and I understand

18    that, but Mr. Waddey kept asking you for information;

19    is that right?

20         A.    That's correct.

21         Q.    Okay.  And so -- and maybe I

22    misunderstood, but, you know, I kind of felt like that

23    the tone of some of these questions about the CO-VID

24    shutdown and the government, you know, not sending

25    probation officers out in the field anymore is that

1   Mr. Waddey knew nobody was checking up on him so he

2   could do more stuff.

3           But just to reiterate, there was no

4   alcohol or marijuana found in his home; is that right?

5           A.   Not as far as I know, no.

6           Q.   Okay.  The items in the home, you talked

7   about this water bong pipe that you've told me that

8   you don't know if it was CBD oil next to it or not;

9   correct?

10          A.   That's correct.

11          Q.   Okay.  And then the -- I think there was

12  chemical spray and airsoft pistols and some knives.

13  And I understand you to tell me that you would have

14  confiscated those because of a guy like Mr. Waddey,

15  his history, you would have had concerns about him

16  having that stuff; is that fair?

17          A.   Yes.

18          Q.   Are you saying, though -- you're not

19  saying that the airsoft pistols are illegal, per se,

20  are you?

21          A.   No.

22          Q.   Or the knives, that they're illegal per

23  se, are you?

24          A.   No.  Although, I can -- I've not seen the

25  knives.  I couldn't tell you about their legality.

1          Q.    That's fair.  And that the police
2    chemical spray, the chemical spray that it's illegal
3    per se, are you?
4          A.    No.
5          Q.    Are these things that are commercially
6    available, to your knowledge?
7          A.    While several of them sound commercially
8    available, I do remember that there was a notation
9    about the chemical spray that I believe stated police
10   grade or police type.  So I'm not sure about the
11   legality of his ownership of that.  Again --
12         Q.    You don't know one way or the other about
13   that?
14         A.    No.
15         Q.    But in any event, Mr. Waddey wasn't
16   charged with any crimes based on what was found in his
17   house, was he?
18         A.    No, not that I'm aware of.
19         Q.    Okay.  All right.  He talked to you about
20   going to live -- I think he described it as in the
21   middle of a state park.  Do you remember that?
22         A.    Yeah, that was about as far as he would
23   narrow it down, yes.
24         Q.    Okay.  All right.  And tell me if I'm
25   wrong, but it sounds like you were describing that

1    more as he wanted to go kind of be in the woods away

2    from everybody, off the grid, didn't want anybody to

3    know where he was.  Is that fair enough?

4            A.    Yes, that was my impression.

5            Q.    Okay.  But I just think it bears honing

6    in on.  He asked you if he can do this; is that right?

7            A.    Repeatedly, yes.

8            Q.    And you told him no; is that right?

9            A.    That's correct.

10           Q.    And he didn't do it, did he?

11           A.    No, not as far as I know.

12                 MR. FARMER:  Okay.  All right.  Those are

13    my questions.

14                 THE COURT:  Mr. Foster, this is

15    Judge Holmes.  Do you know where Mr. Waddey was living

16    at the time that he was arrested?

17                 THE WITNESS:  Mr. Waddey?

18                 THE COURT:  Yes.

19                 THE WITNESS:  I believe he was at his

20    address of record, which is in the Crieve Hall area of

21    Nashville.

22                 THE COURT:  Was that the residence where

23    his girlfriend and his children also live?

24                 THE WITNESS:  Yes, up until, I believe,

25    March 15, after which the girlfriend took their

1   children and resided elsewhere.

2               THE COURT:  All right.

3               All right.  Any other questions for

4   Mr. Foster as a result of my questions, either by

5   Mr. Suedekum or Mr. -- Mr. Suedekum, you first.  Any

6   other redirect?

7               MR. SUEDEKUM:  Your Honor, I do have a

8   few redirect questions.

9                   **REDIRECT EXAMINATION**

10  BY MR. SUEDEKUM:

11        Q.    Mr. Foster, you were asked about

12  Mr. Waddey and some of his conspiracy theories.  In

13  your opinion, what is the significance of those,

14  the -- I will use paranoia about certain world events.

15  What is your opinion of the significance of that as it

16  relates to Mr. Waddey's supervision?

17        A.    Mr. Waddey's conspiracy beliefs and ideas

18  seem to impact his willingness to trust or take at

19  face value the input of the probation office or even

20  the reasons for some of his supervised release

21  conditions.  It also, I believe, intercepted, quite

22  unfortunately, with what our country has experienced,

23  and that it seemed to play into and validate or appear

24  to validate several of his beliefs.

25                  On many occasions he expressed to me that

1    he did not feel that he could adequately protect

2    himself from circumstances that he firmly believed

3    were coming into being around him, such as the notion

4    that because he himself had stockpiled various

5    resources such as food and other items, that he would

6    have to protect himself and those items from other

7    individuals in the community who would, inevitably,

8    come to take them from him.  That, to me, seemed of

9    concern, of significant concern.

10          On several occasions he told me that he

11   saw what he described as cars full of young people of

12   minority dissent driving around casing homes.  And he

13   stated emphatically that he knew what it looked like

14   when someone cased a home and that he would protect

15   himself, if he had to, from anyone who tried to

16   intrude.

17          He also stated on one occasion that his

18   mother had brought him some food.  And in the

19   conversation with me he seemed upset about it, that

20   she'd done so in plain view of anyone in the

21   neighborhood who might have seen it because it was

22   further evidence that he had things that he believed

23   others would want.

24          He believed that there were food

25   shortages that would occur and were already occurring.

He described sincere belief that society was already
collapsing and that it was coming soon.  He vaguely
described other alleged sources of information and
intelligence, as he called it.  People -- at least one
person, allegedly some governmental source or
governmental employee that he knew other than me, who
was telling him that things would happen very soon and
that things were going to get really, really bad.

On several occasions that we spoke or
that I sometimes just listened, Mr. Waddey sounded
distraught to the point that I believed that based
upon the way he was talking and the manner of voice he
may have even been intoxicated already.

All of these things create significant
concern for me that Mr. Waddey's existing world view,
which is well-documented, is coalescing with the world
around us, and that potentially he would either not
heed my instructions to stay put or that he might
misinterpret things around him as being actual danger,
that he might have to (indiscernible) or that he might
seek to somehow harm himself.

Now, again, I'm not saying that he did
any of these things.  I'm expressing that these were
my concerns, in answer to your question.

Q.    You were asked about testing him for

1  using alcohol.  To your knowledge, how long does

2  alcohol stay in a person's system normally?

3          A.    Less than 72 hours.  Generally not more

4  than 30 something hours or 48 hours, in my experience.

5          Q.    So, in contrast to, say, marijuana if

6  someone were to consume alcohol, it would leave their

7  system and leave no traces much more rapidly; is that

8  fair to say?

9          A.    Yes.

10         Q.    Are you familiar with where Mr. Waddey

11  had the special condition that he was not to consume

12  any alcohol while on supervised release?

13         A.    Yes.  He had previously identified issues

14  of abusing alcohol.  There were documented occasions

15  where he told treatment providers that admittedly he

16  had some fear issues of alcohol before, and I believe

17  there was an occasion that (indiscernible) sentencing

18  date before Judge Crenshaw where he had apparently

19  consumed alcohol in excess the evening before and was,

20  I believe, deemed to have been intoxicated at the time

21  of that sentencing; therefore, it was forestalled to

22  another date.

23         Q.    You were asked some questions about

24  whether or not the marshal found any drugs or alcohol

25  anywhere in the residence.  To your knowledge, were

1    the marshals conducting a full search of the premises,

2    as if they were conducting a search warrant or were

3    they there to locate Mr. Waddey?

4         A.    I believe they were there to locate

5    Mr. Waddey.

6              MR. SUEDEKUM:  Your Honor, I don't have

7    any further questions for Mr. Foster.  But I would, at

8    this time, move to enter the warrant affidavit as

9    Government's Exhibit 1.  I don't believe I actually

10   entered that into evidence.

11             THE COURT:  All right.  Any response,

12   Mr. Farmer, to the government's request to admit the

13   warrant affidavit into evidence?

14             MR. FARMER:  No, Your Honor.

15             THE COURT:  All right.  That will be

16   admitted as Government's Exhibit 1.

17             (Government Exhibit No. 1 was admitted.)

18             THE COURT:  Any recross, Mr. Farmer?

19             MR. FARMER:  I do, Your Honor.

20                   **RECROSS−EXAMINATION**

21   BY MR. FARMER:

22        Q.    Mr. Foster, following up on −− on

23   Judge Holmes' questions about where Mr. Waddey was

24   when he was arrested, your information is that he was

25   at the house that he'd been living in all this time;

1    is that right, over in Crieve Hall?

2          A.    I think I can answer with more

3    specificity.  At the moment of Mr. Waddey's arrest he

4    had returned to the residence in Crieve Hall in his

5    vehicle.  To answer the (indiscernible) he'd been

6    living, as far as I'm aware, he has been living

7    steadily at the residence in Crieve Hall since --

8          Q.    So when the marshals showed up -- I'm

9    sorry.  I didn't mean to talk over you.  Go ahead.

10         A.    It was my understanding that since the

11   events of March 15 he had been residing steadily at

12   that residence and that earlier on the morning of his

13   arrest he had left to go to work and that he returned

14   to that residence after he received notification

15   through his telephone that his doors had been

16   breached, and I believe he saw on the house's external

17   video camera that there were police vehicles there.

18   Therefore, he returned.  The marshals had already made

19   entry to the residence, saw him and placed him under

20   arrest.

21         Q.    Okay.  I gotcha.  So to be clear, when

22   the marshals showed up to his house, he wasn't there;

23   correct?

24         A.    Not initially, yes, that's correct.

25         Q.    Not initially.  When the marshals showed

1    up, he wasn't there; correct?

2          A.    Correct.

3          Q.    Okay.  When they broke the door in, he

4    wasn't there then either; is that right?

5          A.    As far as I know, yes, that's correct.

6    That's the (indiscernible) events.

7          Q.    In fact, your information is he was at

8    work when this occurred; is that right?

9          A.    I know that he wasn't at the residence.

10   And I base him being at work on a voicemail message

11   that he left for me after he received notification

12   through his telephone that there had been what he

13   believed at that time to be a break-in.  He had stated

14   that he had been at work.

15         Q.    Okay, all right.  He came back, saw the

16   police officers; is that correct?

17         A.    I believe so.

18         Q.    Okay.  Did he flee?

19         A.    I saw no mention of that in any reports,

20   no.

21         Q.    Okay.  Did he fight with the police?

22         A.    No, I saw no record of that.

23         Q.    These things that you mentioned were

24   contraband, some of those things were on his person;

25   correct?

1          A.     That's correct.

2          Q.     Did he attempt to use any of these things

3    that you've described as contraband against the police

4    or the marshals?

5          A.     No, I saw no record of that

6    (indiscernible).

7          Q.     In fact, they said that he -- he arrived

8    at the home and was taken into custody without

9    incident; is that right?

10          A.     Yes.

11          MR. FARMER:  Okay.  All right.  Those are

12    my questions.

13                THE COURT:  All right.

14                MR. FARMER:  Oh.  And I guess,

15    Your Honor, before I stop, I would like to move the

16    incident report in as the next numbered exhibit.

17                THE COURT:  All right.  That will be the

18    defendant's exhibit.  Any response to the request to

19    admit that incident report, Mr. Suedekum?

20                MR. SUEDEKUM:  No, Your Honor.

21                THE COURT:  All right.  That will be the

22    defendant's Exhibit 1.

23                (Defense Exhibit No. 1 was admitted.)

24                THE COURT:  All right.  Any other

25    witnesses, Mr. Suedekum?

1          And, Mr. Foster, if you'd go ahead and

2   mute your line, that would be great.  Thank you.

3          Any other witnesses, Mr. Suedekum?

4          MR. SUEDEKUM:  Yes, Your Honor.  Deputy

5   Michael, Deputy Marshal Michael Etheridge.

6          THE COURT:  All right.  Marshal, if you

7   would raise your right hand for me, please.

8                    **MICHAEL ETHERIDGE**

9   called as a witness, after having been first duly

10  sworn, testified as follows:

11         THE COURT:  You can lower your hand,

12  thank you.  And if you'd go ahead and state your name,

13  please, and spell your last name for us -- first and

14  last name, please.

15         THE WITNESS:  Mike -- Michael Etheridge,

16  E-t-h-e-r-i-d-g-e.

17         THE COURT:  All right.  Go ahead,

18  Mr. Suedekum.

19                  **DIRECT EXAMINATION**

20  BY MR. SUEDEKUM:

21       Q.    Afternoon, Deputy Etheridge.  Could you

22  just briefly explain how you are connected to this

23  proceeding in Mr. Waddey's case?

24       A.    Yes.  I was assigned the supervised

25  release warrant for this case and was in charge of the

1   arrest attempt on May 4.

2       Q.    And can you describe what happened on
3   that morning?

4       A.    Yes.  We briefed prior to going to the
5   residence, and I provided information to our Task
6   Force that was provided to me, which included
7   statements that Mr. Waddey had made in the past and
8   other information, including statements that were
9   attributed to him concerning his desire to kill or
10  harm law enforcement.  And statements provided by the
11  probation officer that included his delusional beliefs
12  about the government and law enforcement, his
13  increasing paranoia, and other information from the
14  earlier complaint in this case, with statements
15  attributed to Mr. Waddey concerning that the police
16  were lucky they got the drop on him.

17          So with this information, we briefed
18  prior to the arrest attempt and then proceeded to the
19  house at 602 Dunston Drive.

20      Q.    What happened when you got to the
21  residence?

22      A.    We knocked and announced, identified
23  ourselves as marshals with an arrest warrant.  We did
24  that for several attempts and received no response, so
25  we breached the door and entered to search for

1    Mr. Waddey.

2           Q.    Did you clear the home to see if there

3    were any individuals present?

4           A.    We did.  With -- based on the arrest

5    warrant for Mr. Waddey, we searched the residence for

6    any place that he could hide.

7           Q.    Approximately what time in the morning

8    was this?

9           A.    It was after 7:00.  I don't know the

10   approximate time, but it was between, I guess,

11   7:30 and 8:00.

12          Q.    When you made your initial sweep, did you

13   find any people present in the home?

14          A.    We didn't, no.

15          Q.    As you were searching for Mr. Waddey, you

16   said you were looking anywhere that he might be.  Is

17   it fair to say that when you're serving this type of

18   arrest warrant, you do not conduct a thorough search

19   like you would if you were performing (indiscernible)?

20          A.    That's correct.  We would search places

21   like a bedroom closet, but we wouldn't search a

22   shoebox in that bedroom closet.

23          Q.    When you were searching the residence for

24   Mr. Waddey, were you there to try and find evidence of

25   alcohol or marijuana?

1      A.    We were not.  We were not there in a

2  capacity of a search for evidence.  We were there in a

3  capacity to arrest Mr. Waddey.

4      Q.    During your effort to locate Mr. Waddey

5  inside the residence, did you come across any items or

6  weapons of which you took note?

7      A.    I did.  When we -- upon entering, when we

8  entered the living room area and initially scanned the

9  room, I did note the water bong on the coffee, living

10  room table.  When we were searching under mattresses,

11  we noticed the airsoft pistols.  In cabinets were

12  knives, and there were -- there was a holster like for

13  a pistol on the -- in the living room on the couch.

14  There were things of that nature.  And in one of the

15  bedrooms there were -- I'm sorry, go ahead.

16      Q.    You mentioned that there was a holster.

17  To be clear, did you find any actual firearm in the

18  residence?

19      A.    No, we didn't.

20      Q.    Did you find any --

21      A.    In one of the rooms there -- no

22  ammunition, but in one of the rooms we did find the

23  pepper spray canisters that were a gas grenade

24  aerosol-type spray, and a gas mask on one of the

25  dressers and a battering ram, a breaching tool used

for entering residence, much like we used in that same
room.

Q.    Starting with the airsoft pistol, you
mentioned that you found those under a mattress.  How
many were there?

A.    There were two that we found.

Q.    In attempting to locate Mr. Waddey, why
would you look under the mattress?

A.    We've had instances where people hollow
out box springs and lay under the mattress in the box
springs.

Q.    Could you briefly just describe what an
airsoft pistol is.  It's not an actual firearm; is
that correct?

A.    Correct, it's -- I would say more similar
to a BB pistol or something of that nature.  I don't
own any, I'm not extremely familiar with them.

Q.    These particular airsoft pistols, did
they resemble an actual firearm?

A.    Yes, it was -- we had to look at it twice
to determine that it wasn't an actual firearm.

Q.    Although it's not an actual firearm, is
it an item that could potentially be used to inflict
injury on somebody by shooting them with pellets?

A.    Possibly.

1          Q.    To your knowledge, would that type of

2    device be allowed in a place like a federal facility

3    or courthouse?

4          A.    No, it would not.

5          Q.    Mr. Waddey -- I'm not suggesting that

6    Mr. Waddey attempted to bring it to the federal

7    facility, but my point is, would you consider it a

8    potentially dangerous weapon?

9          A.    Correct, it could absolutely be confused

10   with a real firearm.

11         Q.    Could you please explain more about the

12   tear gas canister or gas grenade that you said you

13   located.  Can you describe what it was?

14         A.    From what I -- from what I saw, it was a

15   SABRE RED brand, and it was a tear gas canister.  I

16   believe that there's a tab on the top that you pop off

17   and then it emits the contents into the air.

18         Q.    You also mentioned that you located a

19   door breaching tool.  Is that unusual to find?

20         A.    Yes, it is.  I don't believe in 17 years

21   I've come across one of those in a house before.

22         Q.    When you were looking for Mr. Waddey, did

23   you seize all of these items?

24         A.    No, we didn't.

25         Q.    Why not?

1      A.      When we were done conducting the search

2  for Mr. Waddey, we were notified that he had pulled up

3  outside.  And we left those items in place and

4  notified my supervisor and probation that the items

5  were observed in the home.

6      Q.      You mentioned that you received a report

7  that Mr. Waddey had been located.  Can you explain

8  where and how Mr. Waddey was seen?

9      A.      Yes.  He pulled up outside the residence,

10  and one of the task force officers that were outside

11  interacted with him.  And it was reported to me that

12  Mr. Waddey asked if -- if we were there because of the

13  break-in.  And before the conversation could get much

14  farther, they placed him in handcuffs.

15      Q.      Is your understanding of what happened

16  that when you entered the residence an alarm went off

17  and Mr. Waddey was notified that the alarm of his

18  residence was going off?

19      A.      That's correct.

20      Q.      To your knowledge, was Mr. Waddey taken

21  into custody without any further incident?

22      A.      Correct.  It was described to me that --

23  that when he was placed into custody he -- he complied

24  with the officers outside, had an attitude about it,

25  but did comply.

1      Q.   After he was placed under arrest, were

2  any additional items -- or in the process of arresting

3  him, were any items recovered from Mr. Waddey's

4  person?

5      A.   Yes.  There were two knives, a multi

6  tool, a fire starter and a blade on a lanyard around

7  his neck, as well as a handcuff key hidden in the back

8  of his belt with a small -- small string tied to it to

9  access it.

10     Q.   With respect to the knives that

11 Mr. Waddey was carrying, to your knowledge was it

12 illegal for him to have any of those weapons or any of

13 those knives?

14     A.   Not that I'm aware of.

15     Q.   You mentioned that a handcuff key was --

16 was under his belt.  Can you explain what -- how that

17 came to be found?

18     A.   One of the task force officers, after

19 placing Mr. Waddey in the car, based on statements

20 he's made in the past and the original charges, they

21 asked that question, if he had a handcuff key on him.

22 And it's my understanding that he said that he did and

23 it was on his belt, and they removed his belt and

24 found the key.

25              MR. SUEDEKUM:  Your Honor, I don't have

1  any further questions for Deputy Etheridge at this

2  time.

3           THE COURT:  All right.

4           Mr. Farmer, any questions?

5           MR. FARMER:  Yes.  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7  BY MR. FARMER:

8       Q.    Is it Deputy Etheridge; is that correct?

9       A.    That's correct.

10      Q.    Okay.  Deputy Etheridge, was the

11  probation officer present at the scene when you --

12  when you made entry?  Mr. Foster?

13      A.    No, he wasn't.  He was not.

14      Q.    Okay.  So I -- so as I understand, you

15  had -- you were there to serve an arrest warrant for a

16  supervised release violation; is that correct?

17      A.    Correct.

18      Q.    Did you have knowledge of the domestic

19  assault warrant when you came out there?

20      A.    We did, yes.

21      Q.    Okay.  Were you attempting to serve that

22  warrant as well?

23      A.    That was served simultaneously.

24      Q.    Okay.  Was that served by federal

25  officials or state officials?

1          A.    We had state officials on scene, and when

2     he was arrested, he was taken to Metro, booked in on

3     the domestic assault so he could --

4          Q.    Okay.

5          A.    -- take care of that charge before he was

6     turned over to the federal system on a detainer.

7          Q.    Okay, I understand.  My larger point is

8     there were Metro or state law enforcement officials on

9     the scene when this -- when this incident occurred?

10         A.    Yes, sir.

11         Q.    Okay, all right.  Did you have a search

12    warrant?

13         A.    No, we had an arrest warrant.

14         Q.    Okay.  And do you have your report of

15    investigation in front of you?

16         A.    Yes.

17         Q.    Okay.  And do you see in there where you

18    say that Task Force Officer Jacob Anderson knocked and

19    announced, US Marshals with a felony warrant.  Do you

20    see that or do you have recollection of that?

21         A.    Yes.

22         Q.    What was the felony?

23         A.    The supervised release violation.

24         Q.    Okay.  That's what you -- you considered

25    that a felony warrant?

1        A.    I believe that's what we considered it

2   that day, yes, sir.  We were under the impression that

3   the domestic assault was a misdemeanor.

4        Q.    Okay.  So while you're out there knocking

5   on the door, you don't see or hear anybody in the

6   residence; is that correct?

7        A.    No.

8        Q.    You didn't have any reason -- you hadn't

9   surveilled Mr. Waddey and watched him go in that

10  morning or anything; is that correct?

11       A.    That's correct.

12       Q.    Did you have -- other than -- other than

13  just the fact that that was his residence, did you

14  have any reason to believe he was in there?

15       A.    Yes.  Based on the information we had,

16  the last reported work for him was August of 2019, as

17  well as he reported that from probation that he was

18  self-isolating at his home.

19       Q.    Okay.  You say you breached the front

20  door.  What does breach mean?

21       A.    We used a heavy ramming object to open

22  the door.  You hit the door with an object and it

23  (indiscernible).

24       Q.    It's like a battering ram?

25       A.    Say again, sir.

1        Q.     It's like a battering ram?

2        A.     Yes.  Yes.

3        Q.     How many police officers were out there

4   that day?

5        A.     If you'll give me a second.

6        Q.     You can estimate, if you'd like.

7        A.     Approximately ten.

8        Q.     Okay.  Were you aware that Mr. Waddey had

9   been in somewhat regular contact with his probation

10  officer?

11       A.     I didn't know the regularity of it, no.

12       Q.     Okay.  Have you listened to this entire

13  hearing?

14       A.     Yes, I've been here.

15       Q.     Okay.  All right.  Was there ever a

16  thought that, you know what, why don't we just call

17  this guy up and tell him we've got a warrant and make

18  arrangements to come get him?

19       A.     No, there was not.

20       Q.     Okay.  Why not?

21       A.     Based on the history and the statements

22  he made about being paranoid, not trusting the

23  government, and the desire to kill law enforcement

24  officers, we did not take that approach.

25       Q.     But, I mean, wouldn't that have made it

1  more safe than going in there and knocking his door

2  in?

3        A.    Sometimes the element of surprise is

4  better than walking into an ambush, in my opinion.

5        Q.    All right.  Let's talk about what was

6  found.  You said you saw the water bong on the coffee

7  room table; is that right?

8        A.    Yes, sir.

9        Q.    Did you see any CBD oil or other CBD-type

10  products nearby?

11        A.    I did not.

12        Q.    Okay.  You didn't see any marijuana in

13  the residence?

14        A.    I didn't -- I didn't see any, no.

15        Q.    Okay.  All right.  All those things that

16  you described that you found in there, am I

17  understanding your testimony is that you left them all

18  in there when you left?

19        A.    Yes, we left those in place.

20        Q.    You didn't seize them?

21        A.    No, sir.

22        Q.    You didn't -- Metro -- or state

23  officials, the Metro officials, they didn't seize

24  them?

25        A.    No, they didn't.

1          Q.    Okay.  Is that because they're not

2     illegal?

3          A.    That's because we're not familiar with

4     probation and their -- their procedure for seizing

5     items.  We left them in place and reported them to

6     probation.

7          Q.    Okay.  I want to talk a little bit about

8     Mr. Waddey driving up.  Just to be clear, when he saw

9     you guys, he didn't take off and run?

10         A.    No.

11         Q.    He didn't assault anybody?

12         A.    No.

13         Q.    Nothing like that?

14         A.    No.  It's my understanding he was under

15    the impression we were there because of his alarm, and

16    he was taken by surprise when he was told he had a

17    warrant.

18         Q.    Okay.

19              MR. FARMER:  Okay.  Those are my

20    questions.

21              THE COURT:  Any redirect, Mr. Suedekum?

22              MR. SUEDEKUM:  Just very briefly,

23    Your Honor.

24

25

1                    **REDIRECT EXAMINATION**

2    BY MR. SUEDEKUM:

3         Q.    Deputy Etheridge, you were asked about

4    the decision of whether to contact Mr. Waddey and try

5    and arrange a surrender or whether to simply go and

6    execute the warrant.  When you were preparing to

7    execute the warrant, were you aware that

8    Judge Crenshaw had ordered the warrant sealed pending

9    the warrant's execution?

10        A.    Yes, I believe that was in my paperwork

11   that it was under seal.

12        Q.    Did that information, along with the

13   information provided by probation, factor into your

14   decision as to how you decided to approach trying to

15   locate Mr. Waddey and take him into custody?

16        A.    It does.

17             MR. SUEDEKUM:  No further questions,

18   Your Honor.

19             THE COURT:  Anything else, Mr. Farmer?

20             MR. FARMER:  No, ma'am.

21             THE COURT:  All right.  Thank you, Deputy

22   Etheridge.

23                 *****WITNESS EXCUSED*****

24             THE COURT:  Is there any need for Deputy

25   Etheridge to stay as part of the proceedings.  He

1    certainly may, but if no one intends to recall him or

2    offer his -- any additional testimony from him, then

3    he's also free to exit if he'd like to do so.

4                   MR. SUEDEKUM:  Your Honor, I don't have

5    any further questions for him.  And unless Mr. Farmer

6    would like him to stay, I would ask that he be allowed

7    to excuse himself if he would like.

8                   MR. FARMER:  I'm sorry, I was muted.  I

9    don't have any reason for him to stay.

10                   THE COURT:  All right.  Deputy Etheridge,

11   you're welcome to stay if you'd like, but you're also

12   free to go just like you would be if you were a

13   witness appearing in the courtroom.  So thank you,

14   sir.

15                   THE WITNESS:  Thank you.

16                   THE COURT:  Thank you.

17                   THE WITNESS:  Thank you, Your Honor.

18                   THE COURT:  All right.  Any other

19   witnesses, Mr. Suedekum?

20                   MR. SUEDEKUM:  No, Your Honor.

21                   THE COURT:  All right.  Any witnesses,

22   Mr. Farmer?  Did we lose Mr. Farmer?

23                   MR. SUEDEKUM:  He may be on mute.

24                   THE COURT:  Mr. Farmer, are you muted

25   still?

1          MR. FARMER:  I did mute, I'm sorry.

2          THE COURT:  That's all right.  No, I

3    asked you to do that, so I appreciate that.

4          MR. FARMER:  I would call Gary Waddey.  I

5    hope he's there.

6          THE COURT:  There's been -- I'm supposing

7    that was Mr. Waddey.  Are you Gary Waddey, sir?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  So let me go

10   ahead and swear him in, Mr. Farmer.

11         Mr. Waddey, if you'd raise your right

12   hand, please.

13                      **GARY WADDEY**

14   called as a witness, after having been first duly

15   sworn, testified as follows:

16         THE COURT:  All right.  You can go ahead

17   and lower your hand, sir.  And then if you would state

18   your name for us and spell your first and last name,

19   please.

20         THE WITNESS:  Yes.  Gary Waddey, G-a-r-y,

21   W-a-d-d-e-y.

22         THE COURT:  All right.  Go ahead,

23   Mr. Farmer.

24

25

**DIRECT EXAMINATION**

BY MR. FARMER:

    Q.   Mr. Waddey, you've already stated your name.  What is your relationship with -- with the defendant, Robert Waddey?

    A.   Yeah, I'm his father.

    Q.   Okay.  And how old is Robert?

    A.   He is 25.

    Q.   Okay.  And what do you do for a living, Mr. Waddey?

    A.   I'm retired.  I was a compliance officer, a compliance principal for Northwestern Mutual and Northwestern Mutual Investment Services.  And now I am an author, I've written a Civil War book that's been published by Mercer University.  And I do smaller historical writings for Williamson County and Hickman County.

    Q.   Okay.  Do you own property in the Middle District of Tennessee?

    A.   I do.

    Q.   Okay.  Does Robert own property, your son Robert, own property in the Middle District of Tennessee?

    A.   He does.

    Q.   Okay.  So you've heard talk about this

1  house he had over at Crieve Hall that was -- that was

2  raided.  Have you been on the line throughout this

3  hearing, Mr. Waddey?

4       A.    Yes, I have.

5       Q.    Okay.  So the house that was raided over

6  on Crieve Hall, are you familiar with that house?

7       A.    I am familiar with it.

8       Q.    Who owns that house?

9       A.    The house is owned by Robert, as well as

10  my wife and myself.

11       Q.    Okay.  So it's a family home that Robert

12  has ownership in?

13       A.    That is correct.

14       Q.    And how close is that to your primary

15  residence?

16       A.    Probably about a mile to two miles.  Just

17  across I65.

18       Q.    Okay.  All right.  Who currently lives at

19  the residence that -- at Robert -- I'm going to call

20  it Robert's residence, the residence over on

21  Crieve Hall.  Who currently lives there?

22       A.    Right now just Robert.

23       Q.    Okay.  So once Andrea moved out on the

24  night of the incident, she hasn't been back, to your

25  knowledge; is that right?

```
1        A.     That is correct.

2        Q.     Okay.  And Robert lives there alone?

3        A.     That is correct.

4        Q.     Okay.  Is Robert employed?

5        A.     Yes, he is.

6        Q.     Okay.  What does he do?

7        A.     He is a -- he works for E3, and I think

8   he's sort of a -- an assistant to one of the owners.

9   He sort of visits multiple job sites, does what they

10  need him to do.  And so he's not always -- sometimes

11  he has a crew, sometimes he does labor, but most of

12  the time he's sort of supervising different sites.

13       Q.     Okay.  And is his boss's name Fred

14  Thomas; is that right?

15       A.     It is.

16       Q.     Okay.  Did Mr. Thomas send you an email

17  this morning dated May 19 at 9:05 regarding your son

18  Robert?

19       A.     Yes, he did.

20       Q.     Okay.

21              MR. FARMER:  And, Your Honor, this email

22  I provided to the Court prior and the US Attorney's

23  Office.  It is from Fred Thomas regarding Mr. Waddey's

24  employment at E3 Construction Services.  I'd like to

25  make that the next exhibit, please.
```

1          THE COURT:  Any response, Mr. Suedekum?

2          MR. SUEDEKUM:  No, Your Honor.

3          THE COURT:  All right.  This will be

4    Defendant's Exhibit 2, the email from Mr. Thomas.

5          (Defense Exhibit No. 2 was admitted.)

6    BY MR. FARMER:

7          Q.    Okay.  So let me ask you this,

8    Mr. Waddey.  Since the COVID-19 onset, has your son

9    largely stayed at the house when he wasn't working?

10         A.    Yes, he has.

11         Q.    Okay.  He hasn't been out wondering

12   around.  He's very concerned about this virus; is that

13   fair to say?

14         A.    Right.  He's jogged some.  I think he's,

15   you know, been out with his dog some, but pretty much

16   he's stayed at home.

17         Q.    Okay.  All right.  Now, you are aware of

18   the assault charge that was alleged on March 15 at

19   your son's house; is that right?

20         A.    That is correct.

21         Q.    Okay.  And you're aware that your son

22   left and came to your house; is that correct?

23         A.    That's correct.

24         Q.    Now, I understand you weren't there that

25   night; right?

```
 1          A.    That's right.  My wife and I were at our
 2   farm.
 3          Q.    Okay.  So if he was drinking that night,
 4   you couldn't say one way or the other about that?
 5          A.    That's -- that's right.
 6          Q.    Okay.  All right.  He has access to your
 7   home.  He's your son; is that right?
 8          A.    That's right.
 9          Q.    Okay.  Are you aware of a temporary
10   restraining -- temporary order of protection issued by
11   Ms. Stone -- Ms. Stones against your son?
12          A.    I was.
13          Q.    Okay.  To your knowledge has Robert
14   contacted Ms. Stones in any way since the evening of
15   the alleged assault?
16          A.    Yes.  Not at all.
17          Q.    Hasn't called her?
18          A.    No.
19          Q.    Hasn't e-mailed her, hasn't sent her text
20   message, smoke signals, nothing at all?
21          A.    No.  That's correct.
22          Q.    Okay.  You've had contact with
23   Ms. Stones; is that correct?
24          A.    I have.
25          Q.    Okay.  And that was to exchange personal
```

1   items and those sorts of things?

2          A.    That's right.

3          Q.    Okay.  So from March 15 when the police

4   showed up that evening and investigated these

5   allegations to, I guess, May 7 -- and that's, I guess,

6   a seven-week period until your son was taken into

7   custody, he's basically been out working during the

8   day and staying home at night; is that right?

9          A.    That's -- that's right.

10          Q.    And then he's been in complete compliance

11   with the order of protection, to your knowledge; is

12   that right?

13          A.    Absolutely.

14          Q.    Okay.  So did you -- were you able to go

15   and look at the house after the raid occurred?

16          A.    Yes.  We were notified as well of the

17   alarm.

18          Q.    Okay.

19          A.    And so we -- after talking to Robert and

20   the alarm company told us there were several breaches,

21   I guess where other doors were opened, we came back to

22   Nashville, both my wife and I.

23          Q.    Did you take any -- did you take any

24   pictures of the inside of the house?

25          A.    Yes.  My wife did.  And I took a few as

1   well.

2          Q.    Okay.  Did you notice a picture -- did

3   you notice and take a picture of a water bong?

4          A.    I did.

5          Q.    Okay.

6          A.    I believe my wife did.  Let me correct

7   that, my wife did.

8          Q.    Okay.  But you've seen that picture; is

9   that right?

10         A.    Yes, right.  That's right.

11         Q.    And that -- and that picture represents

12  what you saw that -- that day when you looked at the

13  house; is that right?

14         A.    That is correct.  Just shortly after.

15         Q.    Okay.  And does the water bong, the

16  picture of it, does it show CBD oils and other CBD

17  substances kind of sitting on the table next to the

18  water bong?

19         A.    It does.

20         Q.    Okay.

21                MR. FARMER:  And, Your Honor, I didn't

22  provide this earlier.  I had sent while we were

23  talking, sent an email of this photo to the Court's

24  assistant and to Mr. Suedekum.  This is a picture that

25  reflects as much that Mr. Waddey's referring to that

1    I'd like to enter as the next exhibit.

2                    THE COURT:  Well, I will have to take a

3    break to look at it myself.  But any response,

4    Mr. Suedekum?

5                    MR. SUEDEKUM:  No, Your Honor, I don't

6    have any objection to it.

7                    THE COURT:  All right.  That will be

8    Defendant's Exhibit 3.

9                    (Defense Exhibit No. 3 was admitted.)

10                   THE COURT:  And at some point I'll take a

11   break --

12                   MR. FARMER:  Are you aware that -- I'm

13   sorry.

14                   THE COURT:  That's all right.  Go ahead.

15   Go ahead, Mr. Farmer.

16   BY MR. FARMER:

17        Q.    Are you aware -- Mr. Waddey, are you

18   aware that your son would use CBD oil?

19        A.    I am.  Or I have been, yes.

20        Q.    Why would he do that?

21        A.    Well, again, he felt like it was calming,

22   and certainly I -- to him as far as anxiety.  And we

23   certainly felt that way as well.

24        Q.    Okay.  All right.  To your knowledge, did

25   he always purchase these substances legally?

1          A.     Yes.  I mean, it's (indiscernible).

2          Q.     It's a legal product; correct?

3          A.     Yes.  As far as I know it is, yes.

4          Q.     Okay.  Right, me too.  Okay.

5                 So let me -- you're familiar with the

6    term third-party custodian; is that correct?

7          A.     Yes.

8          Q.     So when your son was first arrested on

9    the underlying charges before he was -- before he pled

10   guilty, did you serve as a custodian in some capacity

11   for your son?

12         A.     I did.  Both my wife and I did.

13         Q.     Okay.  All right.  And what did that

14   entail?

15         A.     It entailed a daily supervision of

16   Robert.  In the -- we laid eyes on him each day.  And

17   sometimes that would be brief, but most of the time it

18   would be for a visit or a 30-minute, an hour, just

19   however long that took.

20         Q.     Okay.  And that was satisfactory to the

21   Court at that time; is that right?

22         A.     It seemed to be.  We were asked to do it

23   a second time.

24         Q.     Okay.  You and I have discussed the

25   concept of you and your wife serving as third-party

1    custodians again for this matter; is that correct?

2          A.    Yes, that's correct.

3          Q.    And to be clear, while your previous

4    duties -- you know, as I understand, Robert stayed

5    alone in his home and you kind of checked in on him

6    daily.  You're willing to go a step further, if

7    necessary; is that correct?

8          A.    That is correct.

9          Q.    Okay.  And you're willing to have your

10   son kind of stay in your presence while he's not

11   working or out doing, I guess, essential errands-type

12   things, be it going to the store, the doctor or

13   whatnot; is that correct?

14         A.    That's -- that's correct.

15         Q.    And you and your wife, you or your wife,

16   I guess, are willing to spend the night at whatever

17   residence that he -- that he resides in; is that

18   correct?

19         A.    That's -- that's correct.

20         Q.    Okay.

21               MR. FARMER:  Okay.  Those are my

22   questions, Your Honor.

23               THE COURT:  Any questions, any

24   cross-examination, Mr. Suedekum?

25               MR. SUEDEKUM:  Yes, Your Honor, I did

1    have a few.

2                         **CROSS-EXAMINATION**

3    BY MR. SUEDEKUM:

4         Q.    Good afternoon, Mr. Waddey.  When you

5    previously served as a third-party custodian for your

6    son, that was before all the incidents that have

7    occurred in the alleged violations and petitions that

8    have been submitted while he was on supervised

9    release; is that right?

10        A.    That -- that's correct.  I believe that's

11   correct.

12        Q.    This was back during the initial criminal

13   case and before his sentencing; is that right?

14        A.    That's -- that's correct.

15        Q.    And you may have heard us discuss it

16   briefly earlier, but do you recall that at the time

17   of -- your son, also Mr. Waddey, at the time of his

18   initial sentencing, Mr. Waddey showed up intoxicated

19   to court that day.  Do you recall that?

20        A.    I do recall that.

21        Q.    And his supervised release was revoked;

22   is that right?

23        A.    That's correct.

24        Q.    Okay.  And he was taken into custody at

25   that point?

1          A.     That's correct.

2          Q.     Do you have a copy of the picture from --

3     from Mr. Waddey's residence in front of you?

4          A.     I do not.

5          Q.     Okay.  Did you say that you were present

6     when that photo was taken or that your wife went and

7     took that photo?

8          A.     My wife was there first, so she took that

9     photo, along with hundreds of others.

10         Q.     Okay.  Did you conduct -- what was the

11    purpose of taking the photos of the house?  Were you

12    just documenting the appearance of the residence or

13    what was the purpose of that?

14         A.     Sure.  I was -- I was documenting the

15    enormous amount of damage that was done to the house.

16         Q.     (indiscernible)?

17         A.     I lost your voice there.

18         Q.     Sorry.  The types of damage you're

19    referring to such as the front door was breached; is

20    that correct?

21         A.     That's correct.  A door downstairs was

22    torn off as well.  The control panel to the garage

23    door was ripped off the wall, and there were other --

24    other -- other damaged items.

25         Q.     Okay.  While your son's been on

1  supervised release, how often would you say that you

2  interact with him?

3       A.    Well, fairly often.  Again, maybe not as

4  much here during the CO-VID issue, but certainly

5  several times a week previous to that.

6       Q.    Would that include in-person and over the

7  phone or what do you -- what type of interaction would

8  you have?

9       A.    Yes, over the phone it would be much more

10 frequent.  And during the CO-VID time period.

11      Q.    I see that you've been here.  Have you

12 been able to hear the other witness testimony during

13 the course of this hearing?  I know this is an unusual

14 way to do it.

15      A.    I have, yes.

16      Q.    Did you hear testimony and are you aware

17 that there are reports that your son has continued to

18 use alcohol while on supervised release, despite the

19 fact that he's prohibited from doing that?

20      A.    I have certainly been aware of his -- of

21 his use of alcohol a time or two, yes.

22      Q.    Apart from hearing about it today in

23 court, were you already aware of the fact that your

24 son had continued to use alcohol on supervised

25 release?

1        A.    Well, again, I just said I was aware he

2   had used.  You know, I also am aware of things that

3   he's done to try to mitigate that as well.

4        Q.    I may have not asked a very good

5   question.  I guess before today were you aware that

6   your son had been using alcohol while he's been on

7   supervised release?

8        A.    I -- I certainly have been aware of that,

9   yes.

10       Q.    At any point did you talk to your son or

11  try to get him to stop consuming alcohol since it was

12  a condition of his supervised release that he not use

13  it?

14       A.    Absolutely.

15       Q.    Is it fair to say you have not been

16  completely successful in convincing him to stop?

17       A.    Well, yes and no.  I think that there --

18  I think right during this time of all times with the

19  CO-VID, he has not used alcohol.  I think the marriage

20  situation -- or not the marriage, but certainly the

21  living situation has brought on stress and some of the

22  alcohol use.

23       Q.    When you searched the house and you were

24  documenting it by taking photographs, did you find any

25  alcohol in the home?

1          A.     We did not.

2               MR. SUEDEKUM:  Your Honor, I'm attempting

3     to kind of look at the photograph as we proceed here

4     with the hearing.  I know that the Court also wants to

5     have an opportunity to look at the photograph --

6               THE COURT:  Ms. Cox --

7               MR. SUEDEKUM:  I don't think I have any

8     questions for --

9               THE COURT:  All right.  Ms. Cox has

10    brought the photograph in to me, so I do have it here.

11    But I do have a few questions for Mr. Waddey.

12               Mr. Waddey, if you -- if I should release

13    your son pending his revocation hearing, I want to

14    just be sure I understand your testimony.  You're

15    agreeable to him coming to live with you and your

16    wife?

17               THE WITNESS:  Yes, if that's necessary.

18    I think we would prefer to stay in his home for the

19    reason that, well, we have two large male dogs that do

20    not like each other.  So it would be better for

21    everyone to be separated.  And plus we would be at his

22    home, we would be in his home in the guest room.

23               MR. FARMER:  Your Honor, this is

24    Jonathan.  If I can comment.  I think to clarify what

25    he's saying is that the senior Waddeys have a dog, and

1    the younger Waddey, Robert, has a dog that don't get

2    along.  So for the younger Robert to move in full-time

3    with the senior Waddeys would create conflict there.

4              So I think what they're proposing -- I

5    guess, first and foremost, if that's the answer, then

6    that's what they'll do and they'll figure it out, but

7    what the proposal is that one or the other of the

8    senior Waddeys will be with Mr. Waddey, with the

9    younger Waddey at his home.  Do you follow?

10              THE COURT:  Yes, I do.  Thank you.

11              MR. FARMER:  Okay.

12              THE COURT:  All right.  And you

13    understand, Mr. Waddey, that if I put -- place your

14    son in your third-party custody, that if you become

15    aware that he's violating any conditions of release,

16    either his supervised release or any conditions I

17    impose, that you're required to report that to the

18    Court, to the probation officer?

19              THE WITNESS:  Yes, Your Honor.  In fact,

20    as an old compliance officer, I would like sort of a

21    listing, if you have it, of what the requirements or

22    rules are so that we could refer to that in any

23    instance.

24              THE COURT:  And you understand if you do

25    report your son, that there's a possibility, then,

1    that he could be remitted back to custody until his

2    revocation hearing if he doesn't follow the conditions

3    of release pending his revocation hearing.  Do you

4    understand that?

5              THE WITNESS:  I certainly do.

6              THE COURT:  And you're still willing to

7    report him if he fails to comply?

8              THE WITNESS:  Yes, Your Honor.  Remember,

9    I was a compliance officer.

10             THE COURT:  And you understand if you

11   don't report him, that then you could potentially, or

12   your wife, if I should decide to name her a

13   third-party custodian, that the two of you could be

14   subject to contempt of court proceedings.  Do you

15   understand that?

16             THE WITNESS:  I do, Your Honor.

17             THE COURT:  All right.

18             Any other questions for Mr. Waddey,

19   Mr. Farmer?

20             MR. FARMER:  No, Your Honor.

21             THE COURT:  Any other questions,

22   Mr. Suedekum?

23             MR. SUEDEKUM:  No, Your Honor.

24             THE COURT:  All right.

25              *****WITNESS EXCUSED*****

1          THE COURT:  Any other witnesses,

2   Mr. Farmer, or proof?

3          MR. FARMER:  No, Your Honor.

4          THE COURT:  All right.  Counsel --

5          MR. FARMER:  If I didn't make the email

6   an exhibit -- I think I did, but if I didn't, I need

7   to do that.

8          THE COURT:  You did.  That was

9   Defendant's Exhibit 2.

10          MR. FARMER:  Okay.

11          THE COURT:  So Counsel wish to be heard,

12   then?  Go ahead, Mr. Suedekum.  I'll hear from you

13   first.

14          MR. SUEDEKUM:  Yes, Your Honor.  Well,

15   with respect to the preliminary hearing, the evidence

16   has established probable cause to believe that

17   Mr. Waddey has violated each of the three alleged

18   petitions -- or conditions set forth in the petition,

19   the first being (indiscernible) in violation of

20   Tennessee law.

21          The evidence that we have in the record

22   includes not only the statements that the victim,

23   Mr. Waddey's girlfriend or ex-girlfriend, Ms. Stones,

24   she made the night of the incident, that at some point

25   they appeared to have just been wrestling, the

1  defendant had been drinking and that they were

2  practicing MMA moves on each other.

3  But at some point later on Mr. Waddey

4  continued to pursue her and come after her, even after

5  she told him stop and that she didn't want to do it

6  anymore.

7  In doing so, Mr. Waddey, according to the

8  report, not only pinned her down and put his knees on

9  top of her, but at some point when she tried to

10  protect herself and pull away, got kicked in the chin.

11  And I will concede the report is ambiguous as to

12  whether she was kicked intentionally or whether it was

13  just an accident as a result of the conduct he was

14  engaging in.

15  But even if it was not an intentional

16  kick, Your Honor, it was certainly reckless.  And

17  under Tennessee law, an assault is defined in

18  Tennessee Code 39-13-101(a)(1) as a person commits

19  assault who intentionally, knowingly or recklessly

20  causes bodily injury to another.

21  I would submit that the facts as they

22  occurred that the (indiscernible) someone is asking

23  you and telling you to stop and then being kicked in

24  the face and having an injured and sore jaw for two

25  days later is sufficient to satisfy the first prong.

1          I would also further submit, Your Honor,

2     that both of the other two prongs of how assault can

3     be committed are also satisfied by the defendant's

4     behavior here.  And I will note that two days later,

5     when Ms. Stones took out the assault affidavit, she

6     swore under oath, recounts the same facts that she had

7     asked Mr. Waddey to stop and that he continued after

8     her.  And that his conduct constituted an assault;

9     certainly, at a minimum, probable cause to believe

10    that an assault occurred, both as was found by the

11    magistrate judge, as it was found by Judge Crenshaw

12    when he approved of the revocation.

13          With respect to the second and third

14    alleged violations, I think the record is sort of

15    unrefuted that Mr. Waddey had THC in his system.  And

16    I understand Mr. Waddey to have told probation that he

17    did this by taking legally purchased and

18    over-the-counter-type substances.  But as the

19    probation officer explained, based on his

20    investigation, using hemp or CBD oil would not have

21    caused him to test positive for THC.

22          In any event, Mr. Waddey was warned that

23    whatever the substance was that he was using, whether

24    it was legally bought, whether it was CBD oil or

25    something else, that it was causing him to test

1    positive for THC.  He continued to use the substance,

2    at least for a time, as he continued to have positive

3    tests for over a span of several months.

4              And third, with respect to consuming

5    alcohol, Your Honor, that was not always a standard

6    condition.  The typical standard condition is not to

7    consume alcohol to excess.  In this particular case,

8    Mr. Waddey's conditions of supervised release are not

9    to consume alcohol at all.

10             THE COURT:  Mr. Suedekum, do you know,

11   were the -- and because I'm not able to access my

12   computer in my courtroom for some reason, but -- and I

13   didn't realize this issue of alcohol use -- I didn't

14   make the connection between the pretrial release

15   conditions -- actually, I didn't know anything about

16   Mr. Waddey's condition when he first appeared for his

17   sentencing hearing.  Was there any condition of his

18   pretrial release with respect to the use of alcohol?

19             MR. SUEDEKUM:  Your Honor, Mr. Foster can

20   correct me if I'm wrong, but I believe the pretrial

21   conditions require persons on release not to engage in

22   the excessive use of alcohol.

23             THE COURT:  Well, that's not -- that's

24   not always a condition of pretrial release.  I'll take

25   a break and I'll look at the conditions of pretrial

1   release.  Go ahead, Mr. Suedekum.

2           MR. SUEDEKUM:  Your Honor, I do have the

3   docket open on my computer, so I'm happy to look at

4   that perhaps while Mr. Farmer is talking and see if I

5   can provide the Court an answer.  But from looking at

6   the docket, I do know that Judge Crenshaw did revoke

7   Mr. Waddey's pretrial supervision as a result of him

8   being intoxicated at the initial sentencing hearing.

9   I'll have to pull up the docket to see whether

10   Judge Crenshaw explained in that order the full basis

11   of it, but I do believe that it did constitute a

12   violation of his pretrial supervised release.

13           THE COURT:  All right.  I'll take a look

14   at that.  Go ahead, Mr. Suedekum.

15           MR. SUEDEKUM:  Your Honor, and then

16   finally with respect to the third condition, consuming

17   alcohol, it may be up for dispute as to how many times

18   and how frequently Mr. Waddey consumed alcohol, but I

19   think the record is clear and everyone is -- all

20   witnesses have told the same story that at least at

21   some point on the evening of March 15 he consumed

22   alcohol, in addition to having previous other positive

23   tests for consuming alcohol.  And so I would submit,

24   Your Honor, that's sufficient to establish probable

25   cause for that violation.

1          THE COURT:  All right.  And as to

2     detention?

3          MR. SUEDEKUM:  Your Honor, so that I

4     don't repeat my argument, I'll reserve responding to

5     Mr. Farmer's argument about the detention factors if

6     the Court would permit me to do that.

7          THE COURT:  All right.

8          Go ahead, Mr. Farmer.

9          MR. FARMER:  Okay.  Thank you,

10    Your Honor.  First, as to the probable cause piece of

11    it, starting with just the violations in order, the

12    first violation is says do not violate any law.  And

13    the allegation is is that Mr. Waddey has violated

14    state law by committing an assault.

15          It's just a very weak, weak presentation

16    for an assault claim, Your Honor.  What we have,

17    what's undisputed before us is that on March 15,

18    Ms. Stones told the police that they were doing some

19    sort of Brazilian jujitsu and she felt like she wanted

20    to stop, so Mr. Waddey got rough with her.

21          The police went out there, they

22    investigated that situation, and -- and they didn't

23    find enough to arrest Mr. Waddey.  And that's very

24    significant in Tennessee domestic violence cases,

25    Your Honor.  And I asked the probation officer about

that.  That's a Tennessee Code Section 36-3-619.  It
requires police officers -- and require is strong.
It's kind of phrased mandatory arrest provision.

But what the text says is that if a
police officer finds probable cause that a domestic
injury has -- has occurred, the preferred response is
arrest.  I can tell Your Honor that that's interpreted
by Metro police officers is that if they find a
scratch, a bruise, a cut or credible evidence of an
assault, then they're arresting somebody and they'll
let the courts sort it out.  So the fact that no
arrest was made that night is -- is very, very
probative.

Additionally, Ms. Stones indicated
that -- that Mr. Waddey was intoxicated that evening
when the fight occurred.  She says that in the
incident report for the police officers.  I think we
know that's clearly not true because the police
officers let Mr. Waddey drive away.  And I don't think
it requires great powers of deduction to conclude if,
one, Mr. Waddey was drunk that, A, they would have
been more likely to arrest him; and, B, they certainly
wouldn't have let him drive away.

So, you know, you've got police officers,
the first people on the scene whose job and training

is to evaluate probable cause. And they said, you
know what, we don't think there is probable cause. So
nothing happened vis-à-vis the arrest warrant until
two days later when Ms. Stones goes down on her own
and gets a night court magistrate to agree to give her
a warrant. Short of that, there's been no finding of
probable cause from anyone, and I think this Court
should refrain from finding probable cause as to the
assault.

Moving on to the second violation, the
THC, the testimony I heard was that he has always and
repeatedly and constantly tested, and he's got six
positive tests that he regularly insists are not
related to marijuana abuse, but rather from CBD oil.
We don't have any marijuana. Mr. Waddey, the father,
testified that the son uses CBD. We've got pictures
showing CBD oil at the house.

So I just don't think he's used
marijuana. I don't think he's used controlled
substances. And this has been reviewed by
Judge Crenshaw anyway.

The alcohol, you know, I'll stipulate
that he's had positive alcohol tests per the petition,
at least that's what the record shows. I will say
that -- that Judge Crenshaw has already analyzed this,

```
1    at least as to the first ones.  I don't really have
2    any further argument as to his admission of drinking
3    alcohol.  You know, other than to say that no alcohol
4    has or ever has been found been on Mr. Waddey.
5              Would you like me to go ahead and
6    transition into detention?
7              THE COURT:  Yes, please.
8              MR. FARMER:  Okay.  All right.  So,
9    Your Honor -- as Your Honor knows for detention, I've
10   got to show by clear and convincing evidence two
11   things, based on the record, first that he's not a
12   flight; and second, that he's not a danger.
13             So starting with flight -- let me find my
14   notes.  What we know about from the record about
15   flight is that Mr. Waddey is certainly not a flight
16   risk.  He's got Class B violations.  He's satisfied
17   one year, 11 months and two weeks of his supervised
18   release.  He reported -- it sounded to me like more
19   than the probation officer wanted him to.  I almost
20   got the feeling the probation officer felt like he was
21   reporting too much, calling too much.
22             He owns property here.  He has a job
23   here.  He has no record of flight.  When the police
24   showed up at his house and broke his door in, he
25   willingly and voluntarily went along with them.
```

1    Today, and he also has a third-party

2    custodian who's said he's willing to be sure he

3    complies with -- whatever orders the Court lays down

4    and certainly those will include that he shows up

5    whenever he's supposed to.  I don't think there's any

6    valid basis in the record for flight.

7    As for danger, I think danger to

8    Ms. Stones would certainly be an issue based on the

9    allegations.  The record undisputed before us is that

10   he's been told by both the Metro Davidson County court

11   system and by his probation officer to have absolutely

12   no contact with Ms. Stones, and he's done that.  He

13   has had no contact with her whatsoever.

14   His father has participated --

15   participated in a peaceful exchange of her belongings

16   and it appears to me, Your Honor, and appears from the

17   record that they have extricated each other from one

18   another's lives, so I don't think he's a danger to

19   Ms. Stones at all.

20   Certainly, the third-party custodian

21   would be relevant in reporting any contact he would

22   have with her as well.  And I guess also this

23   undercurrent that -- you know, and it's not even

24   undercurrent.  It's out there that this idea that

25   Robert Waddey is a conspiracy-minded guy and, you

know, he's -- he's going to do bad stuff and the
CO-VID thing has stressed him out and he's just kind
of some crazy person that we've kind of got to get our
arms around.

But the record is also clear that none of
the things that he has that the probation officer is
so concerned about, none of that stuff is illegal.
He's very mindful about his firearm restriction. Not
only is it a violation of supervised release, it's a
violation of federal law at this point for Mr. Waddey
to have a firearm. So he doesn't. He knows that.

He wants to go live remotely. I think,
frankly, that's not an uncommon position at this time.
His probation officer says he can't, so he didn't. He
is concerned about his ability to defend his home.
And I will note that every one of these items were
found on his person or in his home.

And, frankly, the items that might cause
the Court the most concern were found in his home and
he's concerned about his ability to defend his home.
But he's not committing crimes and he's not -- he's
not violating any laws in this process. The fact is,
Your Honor, it's legal and it's acceptable -- and
maybe some people, you know, have a different
preference. It's legal and acceptable to be

1   conspiracy-minded and to have fears and concerns about

2   the government and to take precautions for some sort

3   of societal disruption.  There is no law or rule that

4   says he can't do that.  And I will submit that several

5   people in our country are doing just that right now.

6           But in any event, regardless of how one

7   may personally feel about that mindset, certainly it's

8   not a basis to keep someone in jail.  To the extent

9   it's relevant to some sort of mental health concerns,

10  I think the proof is that Robert Waddey has a current

11  and ongoing relationship with Dr. Kyger.  His

12  probation officer testified to that.  And that he is

13  and has been in outpatient treatment pretty much all

14  throughout his supervised release.

15          So is it working as well as they want it

16  to?  I think that depends on how you look at it.  Has

17  he completely 100 percent never touched alcohol again?

18  No, but that's not the nature of recovery, that's not

19  the nature of addiction.  I do think he's got a job,

20  he's holding down a steady job, and he's living

21  responsibly.

22          I certainly think there is a plan in

23  place for Your Honor to release Mr. Waddey and to

24  allow him to fight this petition from a -- from

25  outside the jail.

1          THE COURT:  Mr. Farmer, tell me what I

2    should do about the fact that Mr. Waddey was

3    previously in the custody -- pretrial release custody

4    of his parents, his third-party custodians, there was

5    a condition that he not use alcohol excessively and

6    then he appeared at the sentencing hearing with a

7    blood alcohol content level of .173.  Why should I

8    have confidence at this point that Mr. Waddey, Gary

9    Waddey, despite his best intentions, would be able to

10   make sure that Robert Waddey complies with the

11   conditions of release given that that was an

12   unsuccessful venture before?

13          MR. FARMER:  Well, because I think --

14   well, a couple reasons.  One, Mr. Waddey has gone

15   through much more treatment and therapy than he had at

16   that time.  Secondly, you know, regardless of how this

17   supervised release petition pans out, there will never

18   be anything in Mr. Waddey's life that is as stressful

19   and emotional as a federal sentencing hearing.  It was

20   his first experience with that.  He had no idea how or

21   what was going to happen.

22          Federal sentence is a scary proposition

23   for anybody.  It's a scary proposition for me as a

24   lawyer.  So for a 22-year-old kid who -- or 22 or 23,

25   however old he was at the time, 22 or 23-year-old kid,

1    he hadn't really been in trouble before, so standing
2    before a judge on a plea hearing not knowing what was
3    going to happen, I can imagine how he'd be freaked
4    out.
5         But Mr. Waddey has grown, he's evolved.
6    He's had the benefit of treatment.  He's not perfect,
7    but he's trying.  And I think the fact that he's
8    repeatedly and regularly in contact with his probation
9    officer, I think he does try.  He wants to do right.
10   I think Gary Waddey understands the -- both the
11   seriousness that his son faces now and the seriousness
12   that will be in his future if -- if Robert drinks.
13        And -- and I guess lastly, I think the
14   nature of the supervision prior was kind of a daily
15   check-in.  As I understood from Your Honor's
16   questioning, you're more inclined, if you are to
17   release him, to have him kind of residing with his
18   parents.  So there would be a greater level of
19   supervision there as well.
20        THE COURT:  All right.  Anything else,
21   Mr. Suedekum?  Do you want to address the detention
22   factors?
23        MR. SUEDEKUM:  Yes, Your Honor.  Just
24   quickly.  First, to quickly circle back on the
25   preliminary hearing issue, the -- I would submit the

1    difference between what happened on March 15 and why
2    an arrest warrant was issued two days later was that
3    the victim came back, expressed an interest and
4    willingness to want to go forward with pressing
5    charges and submitted a sworn affidavit in order to
6    have the warrant issued.

7              In contrast to what Ms. Stones reported
8    both to police and under oath in the affidavit,
9    Mr. Waddey has offered two different stories, first
10   the story to the police that they were wrestling, and
11   then second later telling the probation officer that
12   it wasn't an assault at all, that it was an entirely
13   different situation that led to, you know, her being
14   upset and contacting the police.

15             And so I would submit that a sworn
16   statement from the victim, especially when Mr. Waddey
17   has given inconsistent explanations for what happened
18   is enough to show probable cause that he had committed
19   an offense.  I certainly recognize that whether or not
20   the State can ultimately prove that beyond a
21   reasonable doubt is yet to be determined.

22             That's not the standard here.  The
23   standard is simply whether there's probable cause to
24   believe it.  The fact that Mr. Waddey was arrested on
25   a warrant finding probable cause to believe that, I

1  believe is strong evidence that that violation has
2  been established here.
3          The other two, Your Honor, I won't
4  belabor those points.
5          As for the detention issue, Your Honor,
6  I've spoken with probation at great length about
7  Mr. Waddey's case, and we have spent a decent amount
8  of time talking about Mr. Waddey's beliefs and his
9  fears and, in some cases, his paranoia about events.
10 And as Mr. Farmer pointed out, this is not an attempt
11 to punish or say anything about Mr. Waddey's views or
12 what he believes, other than the risk that it poses
13 potentially to others, as well as himself, Your Honor.
14         That's one of the factors that needs to
15 be taken into consideration.  When you look at the
16 items that were located in his home, the fact that he
17 had a door-breaching tool, that there is a tear gas
18 canister, the fact that he had airsoft pistols,
19 certainly in -- and Mr. Waddey elected not to testify,
20 he didn't have to.  I expect Mr. Waddey's explanation
21 would be I can't own a firearm, but I need some way to
22 protect myself.  So these are items that I can have.
23 Maybe that would be the story, maybe he has a
24 different explanation.
25         From the government's standpoint, looking

1   at the detention question, these are potential
2   weapons.  These are things that can be potentially
3   used to harm himself.  And the presence of those items
4   in the home, along with his struggles and his use and
5   consumption of alcohol creates a potentially dangerous
6   situation for him and for other people.

7           And the Court, I think, hit the nail on
8   the head that previously Mr. Waddey was on pretrial
9   release prior to pleading guilty, being sentenced.
10  And that ultimately his supervision was revoked as a
11  result of -- I think, Judge Crenshaw's order indicated
12  consuming three pints of alcohol, of vodka I think is
13  what the order said.

14          And so the government submits that given
15  the defendant's conduct while on supervised release
16  that there has been a pattern of violations.  And I
17  would submit that the domestic violence arrest, that
18  warrant is probably the most serious of them.

19          The totality of the circumstances,
20  Your Honor, is that on sort of a fairly consistent
21  basis Mr. Waddey has had trouble complying with the
22  conditions of his supervised release, resulting in
23  several petitions submitted to the Court.  This is, I
24  think, the first one that has -- the Court has elected
25  to take action on since November 2018, which was

1  reflective of attempting to give Mr. Waddey time to

2  sort things out on his own and follow the conditions

3  and get with the program.  But he's continued to have

4  issues, he's continued to have violations and for that

5  reason, Your Honor, we do believe detention is

6  appropriate here.

7          To the extent the Court is entertaining

8  allowing Mr. Waddey to be released, we do believe that

9  (indiscernible) third-party custodian so that he has

10 fairly constant supervision is appropriate here.  We

11 would also ask that Mr. Waddey, if he continues to

12 work, that he be allowed to leave to go to work, but

13 that otherwise that he would effectively be on home

14 confinement so that he would be at home to help

15 minimize the risk of any other further issues to the

16 extent the Court is considering that route.

17          THE COURT:  All right.  Anything else,

18 then, Mr. Farmer?

19          MR. FARMER:  No, Your Honor.

20          THE COURT:  Anything that you'd like to

21 add, Mr. Foster?

22          MR. FOSTER:  Your Honor, I would like to

23 add some information on the last point.

24          THE COURT:  Sure.

25          MR. FOSTER:  If the Court is inclined to

1  request any type of home confinement, again, as I
2  mentioned before, the COVID-19 pandemic has affected
3  some of the ways that the probation office is able to
4  (indiscernible) activities including various means of
5  home confinement.

6          As I mentioned right now, probation
7  officers aren't going into individuals' homes.  So we
8  would have difficulty installing or maintaining any
9  home confinement equipment.  If the Court were
10  inclined to try to utilize any other form of home
11  confinement, we would have to be sure that the
12  residence could technically accommodate some of those
13  forms, such as having a landline, if he would be on
14  voice ID.  But, again, I would answer any questions
15  the Court had if the Court was inclined to order any
16  (indiscernible).

17          THE COURT:  Mr. Foster, what is the
18  recommendation of the probation office with respect to
19  detention pending revocation?  Anything that you want
20  to add to what Mr. Suedekum has already stated as the
21  position of the government?

22          MR. FOSTER:  I concur with the points
23  raised by Mr. Suedekum.  With regard to the ongoing
24  nature, elements of noncompliance on Mr. Waddey's
25  part, I'm particularly concerned by the presence of

1    the items found in his home.  I'm concerned with what

2    has become of those items.

3            I'm concerned with not only that

4    (indiscernible) Mr. Waddey was so close to, as far as

5    he knew, pushing (indiscernible), he openly possessed

6    items which he well knows have been major issues on

7    supervised release.  His probation officer

8    (indiscernible) had any of those items been

9    encountered in the home, recommendation for action

10   would have been requested on that basis.  I think

11   that -- you know, I concur with the government's

12   recommendation for detention, and it would be my hope

13   that the matter would be resolved before

14   Judge Crenshaw to his satisfaction as soon as

15   possible.

16           THE COURT:  Mr. Suedekum or Mr. Farmer,

17   do you know, is Judge Crenshaw setting revocation

18   hearings and conducting those remotely at this time?

19           MR. SUEDEKUM:  I'm not sure, Your Honor.

20   I know that he's conducting some hearings by video

21   conference, and so this might be -- that might be the

22   type of hearing that he would schedule by video

23   conference.  I do know, it was in a different case,

24   but about two weeks ago we did -- there was an

25   in-person hearing where several defense attorneys and

1   one attorney for the government appeared to discuss

2   resetting a trial that was being moved.

3           So I don't know whether he is attempting

4   to still hold some hearings in person or whether he's

5   doing them by video conference right now.

6           THE COURT:  All right.

7           MR. SUEDEKUM:  As far as I know, he has

8   not set a hearing yet.

9           MR. FOSTER:  Your Honor, if I could

10  interject, I have participated in a hearing involving

11  revocation that was conducted by Judge Crenshaw as

12  recently as not last week, but late the week before.

13  And it is my understanding that he's using available

14  options to go ahead and hold hearings, particularly

15  for individuals who are in custody.  I believe those

16  would be conducted either telephonically or video

17  conference.  Ultimately I would not want to speak for

18  him.  I'm just letting you know what I've become aware

19  of.

20          THE COURT:  I appreciate it.  I didn't

21  take it as you speaking for him, Mr. Foster.  I

22  appreciate that you updated me.  I know that there are

23  some matters that are being conducted telephonically

24  or by video, but I also know there's some matters that

25  are being postponed, so.

1          I'm going to take a brief recess and come

2   back and give you my decision this afternoon.  Give me

3   about five or ten minutes and everyone just hold on.

4   If you want to, you can disconnect your video so that

5   you're not seeing each other and audio, but -- and

6   that's what I'm going to do, but I will come back and

7   resume in about five or ten minutes.

8                (Whereupon, a break was taken.)

9          THE COURT:  All right.  This is Judge

10  Holmes, I'm ready to reconvene.

11          All right.  I have looked at all of the

12  documents and gone back and looked at the record in

13  this case and I'm prepared to make my findings and

14  conclusions which are guided by Rule of Criminal

15  Procedure 32.1(a)(6), which requires that I consider

16  whether Mr. Waddey can be released without posing a

17  danger to any other person or the community or without

18  likelihood of flight by a clear and convincing

19  standard, which is his burden to -- which is his

20  burden to satisfy.

21          And for the reasons I'm about to state,

22  I do find that Mr. Waddey has carried his burden.  But

23  let me say this -- start out by saying, I do find that

24  there's probable cause to believe that Mr. Waddey

25  violated the conditions of release as alleged in the

1    petition.

2            The arguments that Mr. Farmer makes about

3    the sufficiency of the arrest warrant and the

4    circumstances upon which it rests are all arguments

5    that are more appropriately suited to defense in that

6    matter or to a determination by Judge Crenshaw of

7    whether the -- whether there has been a violation, an

8    adjudication of a violation.

9            For purposes of probable cause, which the

10   standard is very low, I find that there is probable

11   cause to find that Mr. Waddey violated the conditions

12   of release as alleged in the complaint.

13           All right.  With respect to -- so then

14   the question is whether Mr. Waddey ought to be

15   released or detained.  And I do find that Mr. Waddey

16   has carried his burden of showing by clear and

17   convincing evidence that there are conditions of

18   release that I can impose that would reasonably assure

19   the safety of the community and his appearance in

20   court.

21           I am going to tell you, it is a high

22   standard, and Mr. Waddey has satisfied that standard

23   by the barest minimum possible of clear and

24   convincing.  And frankly, the reason why the Court

25   makes that finding is the willingness of Gary Waddey

1   to be a more intensive third-party custodian, because
2   I am convinced after the testimony today and viewing
3   the entire record in this matter that it is only with
4   the support of Gary Waddey and -- I'm sorry,
5   Mr. Waddey, your wife's name has escaped my fingertips
6   here.
7           But it is only with the support of his
8   parents that Robert Waddey is going to finish up his
9   supervised release successfully and turn a corner and
10  put this whole matter behind him.  And -- Paula
11  Waddey.  And because Gary Waddey is willing to be a
12  third-party custodian, including willing to go stay at
13  Robert Waddey's house to provide a more intensive
14  level of custodianship, that the Court finds that
15  there has been a clear and convincing showing of a
16  basis to release Robert Waddey pending the revocation
17  hearing.
18          Let me just go through some of the
19  Court's considerations.  For the last several months
20  it appears -- at least up until the COVID-19
21  situation, it appears that Mr. Waddey had been
22  reasonably compliant; although, certainly the new
23  alleged violation is very serious.
24          I do want to say with respect to
25  Mr. Farmer's comments about Judge Crenshaw having

1    found that the previous drug screens and the previous

2    use of alcohol was not serious enough to do any more

3    than just take no action, while the Court can

4    certainly take any action on any petition brought by

5    the probation officer, generally the Court accepts the

6    recommendations of the probation office.

7         And I'm quite certain that the defense

8    bar has no desire for either the probation office or

9    the Court to start revoking supervised release or

10   revoking pretrial release based on marijuana positive

11   drug screens or use of alcohol screens.  So I don't

12   place any weight whatsoever on Judge Crenshaw having

13   taken no prior action with respect to those alleged

14   violations in this case.

15        It is always the situation that if there

16   are later more serious alleged violations, that those

17   previous violations are taken into the Court -- taken

18   into consideration by the Court at that time in

19   considering the totality of a defendant's likely

20   compliance with conditions of release.

21        Again, I do find that because of the

22   willingness of Gary Waddey to be a third-party

23   custodian, that is the tipping point for the Court.

24   But for Gary Waddey's willingness to do that -- I want

25   to tell you, Robert Waddey, that but for the

1    willingness of your father to be a third-party

2    custodian, I would be detaining you at this point.

3              I do find that that's a very significant

4    factor that pushes this case into the clear and

5    convincing realm and satisfies that burden because I

6    do believe that it is your father's support and

7    willingness to be a third-party custodian and to hold

8    you to the conditions of your supervised release that

9    clearly and convincingly establishes that you -- that

10   I can impose -- that and other conditions of release

11   that will reasonably mitigate against any danger to

12   the community and ensure your appearance in court.

13             I'm also taking into consideration the

14   fact that Mr. Waddey's supervised release would

15   otherwise have expired on May 31 of 2020.  I do find

16   merit in Mr. Foster's statements that it is concerning

17   that with two months left to go on his supervised

18   release that Robert Waddey appears to be in possession

19   of items that might be considered to be contraband.

20             And I'm not taking that lightly or

21   minimizing that, but at this point the remaining

22   period of Mr. Waddey's supervised release is very

23   short, at least up to this point.  And so the Court

24   finds that that's an additional basis that supports

25   that he be released at this time.

1          Also, the fact that there is an order of

2     protection in place, but I'm also going to restrict

3     Mr. Waddey's contact with Ms. Stones and his small

4     children, whether or not the order of protection

5     remains in place by the state court.

6          I'm also going to require that he receive

7     some mental health treatment between now and the

8     revocation hearing and that he comply and consistently

9     participate in and follow the recommendations of the

10    mental health providers.  So these are going to be the

11    conditions upon which Mr. Waddey's going to be

12    released.  And Gary Waddey, are you still there?

13    Because I want you to listen to these conditions.

14          MR. GARY WADDEY:  I am.

15          THE COURT:  All right.  I'm going to have

16    Mr. Foster send to you a copy of the supervised

17    release conditions so that you have all of those,

18    because they're going to be incorporated in this

19    order.  And they will be additional conditions, even

20    though they won't be separately recited in this order,

21    but Mr. Foster can send those to you so that you'll

22    have those.  You are going to get a copy of this

23    order.

24          And, Mr. Farmer, the way this is working

25    is I will need you to make sure that you provide to

1   Mr. Waddey a third-party custodian affirmation, and
2   I'll fill it out and then Mr. Waddey will need to sign
3   it and return it to you, Mr. Farmer, and then you will
4   need to provide that to Ms. Cox so that she can file
5   it at that point.
6           Mr. Waddey, if you would give me -- well,
7   let me go through the conditions of release because I
8   want to have you confirm one more time, Gary Waddey,
9   that you are still willing to be your son's
10  third-party custodian.  And just for ease of
11  reference, Robert, let me just say to you that I'm --
12  this probably echos what you heard from Judge Newbern
13  when she released you on pretrial release into your
14  parents' custody that you now have involved your
15  parents in your legal situation and potentially put
16  their own legal stability in jeopardy some.  That's
17  very serious.
18          And it is not the ordinary course of
19  things that parents have to step back into a role of
20  being an everyday parent for their adult children.
21  That's not the way it's supposed to work.  When our
22  children get to be adults, we should have some level
23  of confidence that we can -- they can go out into the
24  world and take care of themselves and remain
25  law-abiding, productive citizens without needing our

1  oversight and parenting --

2              UNIDENTIFIED SPEAKER:  Your Honor.

3              THE COURT:  Yes.  Who said Your Honor?

4  I'm sorry, I thought I heard someone say Your Honor.

5  All right.

6              So I just want to be sure, Robert Waddey,

7  that you appreciate how serious this is for your

8  father to be willing to step back into this role and

9  assume the role of a parent again as if you hadn't yet

10  reached the age of 18.  It's going to be a very

11  intensive parental role.  I'm going to require that he

12  spend the nights at your house and that he very

13  actively provide supervision of your compliance with

14  the conditions of release between now and the time of

15  the revocation hearing.

16              So I'm going to release you on your own

17  recognizance, Mr. Waddey, Robert Waddey.  You're going

18  to remain on the conditions of supervised release that

19  have previously been imposed by the district judge.

20  Mr. Foster will provide a copy of those to Gary Waddey

21  so that you have those.

22              And then in addition, Robert Waddey,

23  you're going to abide by the following conditions

24  pending a revocation hearing:  You may not change your

25  address or move without permission of probation office

1    or the Court.  And that means you're going to reside

2    at the 602 Dunston -- is it Dunston Drive, Dunston

3    Court, at that address, and may not move or change

4    that address without permission of the probation

5    office or the Court.

6              You must be in court each and every time

7    you're instructed to be here and surrender to serve

8    any additional sentence imposed.  You cannot

9    intimidate or harass any witness, victim, informant,

10   juror or officer of the Court and cannot obstruct any

11   criminal investigation.  And there are very serious

12   penalties if you should violate any of those

13   conditions.

14             It is punishable by up to ten years in

15   prison and a $250,000 fine or both if you should

16   obstruct a criminal investigation, tamper with a

17   witness, victim, informant, retaliate or attempt to

18   retaliate against a witness, victim, informant or

19   attempt to intimidate a witness, victim, juror,

20   informant or officer of the court.  And the penalties

21   for tampering, retaliation or intimidation are

22   significantly more serious if they involve a killing

23   or attempted killing.

24             You must not violate any local, state or

25   federal law, and if you do, you could be punished by

as much as from 90 days to ten years in prison, in
addition to a $250,000 fine, and any penalty provided
for the offense committed.

And that means everything from the most
minor traffic offenses all the way up to new
misdemeanor or felony charges of any kind.  It's not
to say that you would necessarily be returned to
custody pending the revocation hearing if you get a
traffic ticket, but it could be a violation.  So you
need to be sure that you're not violating any local,
state or federal law.

And if you violate any condition of
release, a warrant for your arrest could be issued,
your own recognizance bond forfeited and new bonds
with additional conditions or your detention until
trial, which is the revocation hearing, could be
ordered by the Court and you could be held in
contempt.

And if you fail to appear at any
proceeding in this case or fail to surrender to serve
any sentence imposed, you could be charged and
convicted of bail jumping, which applies equally to
your own recognizance, and is punishable by in some
cases by as much as ten years in prison and/or a fine
in addition to any other punishments imposed in your

1   original case.

2            And then these are the additional

3   conditions with which you're going to comply:  You

4   shall maintain or actively seek employment.  You shall

5   have no contact with Andrea Stokes (sic), either

6   directly or indirectly outside the presence of your

7   attorney, nor shall you have any unsupervised

8   visitation with your minor children.

9            For as long as the order of protection is

10  in place, you have to comply with that order of

11  protection, Mr. Waddey, but even if the order of

12  protection is lifted by the state court, I am imposing

13  the condition that you'll have no contact with Andrea

14  Stokes -- Stokes -- I think it's Stones, actually,

15  either directly or indirectly.  That means no social

16  media contact with her, no texting her, no sending

17  messages to her.

18           So Gary Waddey, if you find that your son

19  has been communicating with Ms. Stones on Instagram or

20  Snapchat, that's a violation of the conditions of

21  release and that has to be reported.

22           And I think the order of protection

23  extends to the minor children too, but I -- even if it

24  doesn't, because having any visitation with those

25  children would otherwise require contact with

1    Ms. Stones, I'm going to restrict you from having any
2    unsupervised visitation with them.
3            You will not travel outside the Middle
4    District of Tennessee without the permission of the
5    probation office.
6            And then Mr. Foster, are the other
7    standard conditions about not possessing firearms,
8    refraining from the unlawful use of narcotics and drug
9    testing, those are all standard conditions of
10   Mr. Waddey's supervised release that will remain in
11   place; correct?
12           MR. FOSTER:  That is correct.
13           THE COURT:  But I'm wondering since it
14   may be the possibility that the revocation hearing
15   does not occur until after the 31st of May, I'm going
16   to go ahead and order those things, just so that
17   there's no question about whether those conditions of
18   supervised release remain in place.  They will be
19   conditions of his release pending the revocation
20   hearing.
21           So I am going to --
22           MR. FOSTER:  It's my understanding that
23   until Judge Crenshaw reaches a resolution on the
24   pending violation matter, Mr. Waddey will remain under
25   supervision.

1           THE COURT:  I'm supposing that's a

2    correct statement of the law, but just so that there's

3    no question about that, even if these are duplicative

4    conditions, I'm going to impose them anyway.  Just so

5    that there's no question.

6           So no travel outside the Middle District

7    of Tennessee without prior approval of the probation

8    office.  So I don't know where your construction jobs

9    are, if they include counties outside the Middle

10   District of Tennessee, Mr. Waddey, but if they do, you

11   would have to get permission from Mr. Foster to go to

12   those jobs.  And if you don't get permission, then you

13   will need to not work those jobs.

14          I'm also going to say that you will

15   provide the probation officer with a weekly schedule

16   of your work, what hours and where; that you will

17   refrain from possessing any firearm, ammunition,

18   destructive device or other dangerous weapons.

19          So Gary Waddey, you have the right and,

20   in fact, the responsibility as a third-party

21   custodian, to be going through your son's room to make

22   sure that he doesn't have any of those things.  And if

23   he does, he has to be reported to the probation

24   office.

25          He's going to refrain from any use of

1    alcohol, so that means no use whatsoever.  So there

2    needs to be no alcohol in the house.  And if your son

3    comes home from work and he smells like beer, then

4    that's going to be a violation that has to be

5    reported.

6             No use of any -- no possession or use of

7    any unlawful narcotic drug.  If you've got a

8    prescription, that needs to be provided to Mr. Foster

9    because he's going to continue to drug test you.  You

10   will submit to random drug testing, and you cannot

11   obstruct or attempt to obstruct in any fashion with

12   the efficiency or accuracy of the drug testing.

13            If Mr. Foster tells you that you have to

14   participate in some kind of inpatient or outpatient

15   substance abuse therapy and counseling, you have to

16   follow that instruction.  You also are going to

17   participate in mental health evaluation treatment and

18   program as deemed appropriate by the pretrial services

19   officer -- or probation officer.

20            So that means that -- I know there's been

21   some resistance before, Robert Waddey, to you

22   participating fully in mental health treatment, but

23   that -- I know that Mr. Foster is going to be

24   coordinating that with your mental health providers

25   because that -- everyone wants that treatment to be as


1    productive and successful as possible.

2              But if you are instructed by Mr. Foster

3    to participate in mental health treatment based on the

4    recommendations of your providers, then you need to be

5    participating.  And you need to be going to

6    appointments and you need to be going to group

7    sessions.

8              Yes, go ahead, Mr. Foster.

9              MR. FOSTER:  Your Honor, along that line,

10   I think that Mr. Waddey's supervision and all of the

11   information that I've received from treatment

12   providers thus far has shown rather conclusively that

13   Mr. Waddey is not willing to engage with treatment

14   providers other than Dr. Wilson and Dr. Kyger, nor

15   would it be fruitful to make any further referrals.

16             So that end, I would request that

17   Mr. Waddey, to whatever degree he may not have been

18   receiving treatment from those doctors up until the

19   time of his arrest, I would ask that he be ordered to

20   resume treatment with those providers.  And that he

21   provide me with a list of his treatment schedule and

22   that after each appointment he obtain some form of

23   proof that he did attend treatment.

24             That way we would not be in a position

25   where in order to meet your -- fulfill your order we

```
1    were forced to -- we would have to refer him somewhere
2    other than where we know that he will already go.
3                    THE COURT:  All right.  It's Dr. Kriger,
4    that's K-r-i-g-e-r; correct?
5                    MR. FOSTER:  I believe Kyger, K-y-g-e-r.
6                    THE COURT:  K-y-e-r?
7                    MR. FOSTER:  K-y-g-e-r.
8                    THE COURT:  All right.  And then
9    Dr. Wilson is the other provider?
10                   MR. FOSTER:  Yes, that's my
11   understanding; although, if there is another treatment
12   provider who's already in the mix, I think now would
13   be the time to disclose that so that can be part of
14   the record.
15                   THE COURT:  Mr. Farmer, are there any
16   other mental health providers with whom Mr. Waddey
17   would be willing to participate in treatment?
18                   MR. FARMER:  I don't -- I don't know of
19   one, Your Honor.  Those are the two I know of.
20                   THE COURT:  All right.  So I'm going to
21   order that Mr. Waddey will resume treatment
22   immediately with Dr. Kyger and Dr. Wilson.  And he
23   will provide a schedule of weekly appointments to
24   Mr. Foster and then confirmation that he kept that
25   appointment.
```

1           And, Gary Waddey, if that means that your

2    son needs to miss work to go to appointments with his

3    mental health providers, then he's going to need to

4    miss work.  And I'm even going to put that, that he'll

5    maintain or seek employment except as necessary to

6    receive mental health treatment.

7           That's going to be the most important

8    thing at this point, Robert Waddey, is that you get

9    back into treatment with Dr. Kyger and Dr. Wilson and

10   that you keep -- you make appointments with them and

11   you keep those appointments with them.  And follow

12   their recommendations.

13          All right.  Then report as soon as

14   possible and no later than 48 hours to the supervising

15   officer any contact with law enforcement personnel,

16   including but not limited to any arrests, questioning

17   or traffic stop.  So any kind of contact with law

18   enforcement of any kind.  If you're in a car and you

19   go through a roadblock and they stop the driver,

20   that's contact because you're in the car, though, so

21   you have to report that.

22          Something happens in your neighborhood

23   and the police are questioning you, even if it has

24   nothing to do with you, that's contact.  And certainly

25   any contact as a result of your own conduct has to be

1    reported.

2              And you'll permit probation officers to

3    visit at any time at your home or elsewhere without

4    advance notification and permit confiscation of any

5    contraband observed in plain view.  You will be placed

6    in the third party custody of Gary Waddey, to reside

7    at the defendant's current residence with Gary Waddey.

8              Mr. Foster -- oh, and I'm going to say

9    other than work, scheduled court appointment, court

10   hearings, medical or mental health appointments,

11   religious services or appointments with his lawyer,

12   that he'll be subject to home confinement with the

13   monitoring to be at the discretion of probation

14   office, Mr. Foster.  So you can figure out however

15   best you need to monitor that.  And that will be

16   completely within your discretion.

17             Go ahead, Mr. Foster.

18             MR. FOSTER:  I would suggest that given

19   the nature of the third-party custodian with which

20   Mr. Waddey is being released, I think that ordering

21   him to remain at home, other than for those times

22   (indiscernible) would be sufficient.

23             Even with the limited types of monitoring

24   the probation office could offer right now, I don't

25   think it would be (indiscernible) the level of

1 monitoring that his father is currently offering. I
2 would only advise or request that his father agree to
3 remain in touch with me and while we're in this
4 hearing provide me with his cell phone number so I can
5 conduct a follow-up call as soon as the hearing is
6 complete.

7 THE COURT: We're going to get his cell
8 phone number. I'm going to leave in the monitoring at
9 the discretion of the probation office, Mr. Foster,
10 because then that gives you the ability to say contact
11 by Gary Waddey is sufficient monitoring, that's all
12 you need. But if at some point you think you need to
13 step up the level of monitoring, then you can do that
14 as well. I'm just going to leave that and leave it up
15 to your discretion.

16 All right. And the procedure,
17 Mr. Farmer, is going to be that I'm going to enter a
18 separate release order and conditions of release with
19 all of these conditions. I'm going to send you the
20 one for Robert Waddey to sign, and then you will
21 return that to the Court once he's signed it. And
22 then I'll do a supplemental order that files that with
23 the Court to show that he has reviewed all the
24 conditions of release.

25 But let me ask a couple of things first.

1  Robert Waddey, you heard the conditions of release and
2  the penalties for noncompliance.  And do you
3  understand all of the conditions of release and the
4  penalties if you fail to comply?
5              THE DEFENDANT:  Yes, ma'am, Your Honor.
6              THE COURT:  And do I have your agreement
7  that you will obey all the conditions of release to
8  appear as directed and to surrender to serve any
9  sentence imposed?
10             THE DEFENDANT:  Yes, ma'am, Your Honor.
11             THE COURT:  All right.  So then
12  Mr. Farmer is going to give you -- and that will be
13  another condition that you will have to sign and
14  return to your attorney these conditions of release.
15             All right.  And Gary Waddey, having heard
16  all of these conditions of release now, are you still
17  willing to be a third-party custodian for your son?
18             MR. GARY WADDEY:  Yes, Your Honor.
19             THE COURT:  All right.
20             MR. GARY WADDEY:  And thank you for your
21  decision.  I did want you to add, if you would,
22  please, my wife, Paula.
23             THE COURT:  I can do that.
24             MR. GARY WADDEY:  And she is willing.  If
25  we need to sign any documents, she will be willing to

1   do so.

2            THE COURT:  All right.  And one of the

3   two of you needs to -- I really feel, Mr. Waddey --

4   and I say this as a mother.  I really feel like adult

5   sons pay more attention to their father than they do

6   to their mothers.  I can say that as the mother of a

7   33-year-old adult son.  So my preference would be that

8   I will place him in the third-party custodian of both

9   of you but that you be the one that is at his house in

10  the evenings with him and spending the night with him.

11  So I'm going to include that in the conditions of

12  release.  All right.

13           MR. GARY WADDEY:  Well, yes.  But I do

14  have to travel on Fridays.  I have to be at a

15  different location, so that's why it needs to have

16  both of us.

17           THE COURT:  All right.

18           MR. GARY WADDEY:  And, again,

19  occasionally I do have to travel.

20           THE COURT:  So what I'm going to say is

21  unless you're out of town, and then it will be Paula

22  Waddey who can spend the night.  Hopefully this won't

23  go on very long and Judge Crenshaw will set an early

24  revocation hearing.

25           All right.  And what is your address, you

1  and Paula Waddey's address, Mr. Waddey?

2              MR. GARY WADDEY:  Yes.  Judge, our

3  address is 4716 Lealand Lane, L-e-a-l-a-n-d, Lane.

4  And that is Nashville 37220.

5              THE COURT:  All right.  And your -- do

6  you have a home telephone number?

7              MR. GARY WADDEY:  Yes.  The home number

8  is (615) 292-4626.

9              THE COURT:  And your cell number?

10             MR. GARY WADDEY:  Is -- my cell number is

11 (615) 945-5946.

12             THE COURT:  And your wife's cell phone

13 number?

14             MR. GARY WADDEY:  Is (615) 945-5947.

15             THE COURT:  All right.  Mr. Farmer is

16 going to send you this form that says upon finding

17 that release to a third-party custodian will assure

18 the appearance of the defendant and the safety of

19 other persons in the community, I'm ordering that he

20 will be released subject to the following conditions

21 placed in your third-party custody; that you agree to

22 supervise your son in accordance with all the

23 conditions of release, to use every effort to assure

24 his appearance at all scheduled court proceedings and

25 to notify the Court immediately in the event that he

1    violates any conditions of release or disappears.

2              And that you understand that your failure

3    to abide by this agreement may subject you to contempt

4    of court proceedings.  So Mr. Farmer is going to

5    provide you with this form.  You'll need to sign it

6    immediately and send it back.  And if you don't do

7    that, then Mr. Suedekum is going to take further

8    action to ask the Court to reconsider -- I'm quite

9    certain that Mr. Suedekum will do that if he doesn't

10   get this form back, particularly given the Court's

11   findings about the importance of this third-party

12   custodian arrangement.

13             All right.

14             MR. GARY WADDEY:  Do you need my email

15   address?

16             THE COURT:  It probably would be helpful

17   for Mr. Foster to have that and for Mr. Farmer to have

18   it.  So let me -- actually, I probably have it

19   because -- was it gwaddey@comcast.net?

20             MR. GARY WADDEY:  That's correct, ma'am.

21   Thank you.

22             THE WITNESS:  All right.  So that's the

23   address to which Mr. Foster can send the supervised

24   release conditions and Mr. Farmer can send the other

25   paperwork that you need to sign and be aware of.

1                 Anything else, Mr. Foster?

2                 MR. FOSTER:  One, could you repeat that

3       email address one more time?

4                 THE COURT:  Yes, it's gwaddey,

5       g-w-a-d-d-e-y, at comcast.net.

6                 MR. FOSTER:  And the last matter would

7       be -- and it would be nice if we could get someone in

8       the marshals lockup on this, is when exactly

9       Mr. Waddey will be released.  I understand that he was

10      brought from a local jail today.  I'm not -- I want to

11      make sure whether or not he's going to released now or

12      tomorrow.

13                THE COURT:  I think the requirement is

14      that Davidson County does not let him -- they don't

15      release him from here, that he'll have to go back and

16      be released from there.  And I'm not sure, given the

17      time of day, if that will happen this afternoon or if

18      it will happen in the morning.

19                Mr. Farmer, do you know the answer to

20      that?

21                MR. FARMER:  I do not know, Your Honor.

22                THE COURT:  All right.  I don't --

23                MR. FARMER:  Frankly, I would expect them

24      to release him tonight.  Just knowing Davidson County,

25      they tend to shuffle people out as quick as we can,

1    but I don't know for sure.

2              THE COURT:  Well, we're providing the

3    release order to the marshal, but I don't know the

4    answer to that.  Mr. Farmer, you'll need to contact

5    the marshal and Davidson County and make arrangements

6    because Mr. Waddey will need to be there to pick up --

7    oh, wait a minute, I see a hand.  Is there -- go

8    ahead.

9              MARSHAL:  Yes, Your Honor.  This is Robin

10   Romaniuk with the US Marshals.

11             THE COURT:  Yes.

12             MARSHAL:  And he was housed at Davidson

13   County, and so we will send him back there, but he

14   will be released subject to being booked out of their

15   system as soon as he gets back.

16             THE COURT:  Okay.  And so Mr. Waddey or

17   Mr. Farmer -- Gary Waddey or Mr. Farmer, you need to

18   be there to pick him up.  And then he'll need to --

19   he'll be -- so that he can be released into one -- not

20   just to be released back out onto the street.  There

21   needs to be someone there to pick him up and take him

22   back home.  All right?  Which it's really -- I'll

23   leave that up to you.  That's really outside the

24   Court's purview, but I'll leave that up to you.

25             MR. GARY WADDEY:  That will not be a

1   problem.

2              THE COURT:  All right.  Anything else,

3   Mr. Suedekum or Mr. Foster?

4              MR. SUEDEKUM:  No, Your Honor.  I'll

5   just -- for the record, I started having video issues

6   at some point while you were going through the

7   conditions, and so I logged out and logged back in.

8   It looked like I was probably the only one having the

9   issue, so as long as everybody else was able to hear

10  everything, I don't have any issues.

11             THE COURT:  I think everybody was.  And

12  I'll -- you will see an order from me probably not

13  today because I've got a whole slough of search

14  warrants that are waiting for my review, but probably

15  sometime in the morning we'll get the order -- release

16  order entered and all of the conditions of release

17  will be recited in that.

18             And then all the -- Mr. Farmer, it's

19  going to be up to you to make sure all of this

20  paperwork gets to the people it needs to get to and

21  gets signed by the people it needs to be signed by and

22  then gets returned to the Court because, again, if you

23  don't do that, then there's a very good possibility

24  that Mr. Suedekum is going to be asking for the Court

25  to reconsider or set a status conference or take some

1    action to make sure that everyone's compliant with
2    what's expected.
3                    MR. FARMER:  Yes, Your Honor.
4                    THE COURT:  All right.  Anything else
5    from you, Mr. Farmer, that we need to address this
6    afternoon?
7                    MR. FARMER:  No, Your Honor.  Thank you.
8                    THE COURT:  All right, then.  Anything
9    else, Mr. Foster, from you?
10                   MR. FOSTER:  No, Your Honor.  Thank you.
11                   THE COURT:  All right.  Thank you.  We'll
12   be in recess.
13              **\*\*\*END OF ELECTRONIC RECORDING\*\*\***
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Roxann Harkins, Official Court Reporter

 4     for the United States District Court for the Middle

 5     District of Tennessee, in Nashville, do hereby

 6     certify:

 7                 That I transcribed from **electronic**

 8     **recording** the proceedings held via video conference on

 9     May 19, 2020, in the matter of UNITED STATES OF

10     AMERICA v. ROBERT ELLIS WADDEY, Case No. 3:17-cr-025;

11               that said proceedings in connection with the

12     hearing were reduced to typewritten form by me; and

13     that the foregoing transcript is a true and accurate

14     transcript of said proceedings.

15

16             This is the 2nd day of July, 2020.

17

18                       s/ Roxann Harkins_____
                         ROXANN HARKINS, RPR, CRR
19                       Official Court Reporter

20

21

22

23

24

25
```